EXHIBIT B

**LEGENDS SUITE LICENSE AGREEMENT**
**(20 Games – Plan 2)**

Dear Licensee:

This will confirm that you ("you" or "Licensee") have agreed to license from the New York Yankees Partnership ("us" or "Licensor") the right to use and access the Legends Suite, in accordance with and subject to the terms and conditions set forth below and in the attached Exhibit A (Terms and Conditions) and Exhibit B (Health Notice), which are, by reference, incorporated herein and form a part of this Legends Suite License Agreement (collectively, this or the "Agreement"). Unless otherwise defined or the context requires a different definition, all capitalized terms shall have the meanings assigned to such terms in Section 15 of Exhibit A (Terms and Conditions).

1.     LEGENDS SUITE. In accordance with and subject to: (a) Exhibit A (Terms and Conditions); and (b) Licensee entering into the Ticket Agreement and licensing the requisite number of Tickets covered by the Ticket Plan, as set forth in the Ticket Agreement, Licensor grants to Licensee the License during the Term (defined below). Licensee has agreed to and shall enter into the Food and Beverage Agreement concomitantly with the Ticket Agreement and this Agreement.

2.     TERM. The term of the License will be for the following Two (2) separate License Periods (the "Term"):

        (a)     January 1, 2023, through December 31, 2023; and

        (b)     January 1, 2024, through December 31, 2024.

3.     LICENSE FEE.

        (a)     (i)     In consideration for the License and for the first License Period, Licensee shall pay to Licensor a License Fee of Thirty Two Thousand Seven Hundred Ninety Nine Dollars and Eighty Four Cents ($32,799.84).

        (ii)     Thereafter, during the remainder of the Term, the License Fee shall increase each subsequent License Period by a maximum of four and one-half percent (4.5%) (the "License Fee Escalator") compounded on a License Period-by-License Period basis following the first License Period. For example, the License Fee for the second License Period shall be Thirty Four Thousand Two Hundred Seventy Five Dollars and Eighty Three Cents ($34,275.83) (*i.e.*, $32,799.84 x 1.045% = $34,275.83).

        (b)     Each License Period's License Fee shall be due and payable as follows:

        (i)     For the 2023 License Period, payment shall be due in full upon execution of the Agreement by Licensee, unless otherwise agreed to between the parties; and

        (ii)     For all remaining License Periods during the Term, payment shall be due on December 31 of the year prior to the applicable License Period (*i.e.*, December 31, 2023, for the 2024 License Period; December 31, 2024, for the 2025 License Period; etc.).

        (c)     Notwithstanding anything to the contrary in the Agreement, Licensee acknowledges that each License Period's License Fee Escalator shall be determined by Licensor in its sole and absolute discretion. Accordingly, and for each successive License Period during the Term after the first License Period, nothing contained herein prohibits Licensor from applying a Reduced License Fee Escalator. Licensee further acknowledges that any application of a Reduced License Fee Escalator

1

by Licensor: (i) does not create an expectation that a Reduced License Fee Escalator(s) must be applied to the License Fee in any future License Period; and (ii) does not create an entitlement to any future Reduced License Fee Escalator(s). Furthermore, and notwithstanding anything to the contrary contained in this Agreement, if Licensor applies a Reduced License Fee Escalator for any given License Period, Licensor shall be permitted to equalize any subsequent License Period's License Fee so that the amount payable by Licensee to Licensor for such License Period is equal to the amount Licensee would have paid had the License Fees for each License Period (after the first License Period) been increased for each License Period by the License Fee Escalator on a compounded basis commencing with the second License Period.

(d)     Furthermore, and notwithstanding anything to the contrary in this Agreement, the Ticket Agreement and/or the Food and Beverage Agreement, Licensor may adjust each License Fee by a percentage greater than or less than the License Fee Escalator (as determined by Licensor in its sole and absolute discretion) on a License Period-by-License Period basis; provided, in no event shall Licensee be required and/or obligated to pay Licensor more than the Total Fee for the applicable License Period.

(e)     **NOTE:**

(i)     THE LICENSE DOES NOT PERMIT ENTRY INTO THE STADIUM AND/OR USE AND OCCUPANCY OF THE LEGENDS SUITE WITHOUT APPLICABLE TICKETS FOR THE SEATING LOCATIONS. THE LICENSE FEE DOES NOT CONTAIN OR INCLUDE: (A) TAXES; AND/OR (B) THE COST OR THE PRICE OF FOOD AND BEVERAGES AND/OR TICKETS TO EACH OR ANY GAME AND, IF APPLICABLE, EACH OR ANY JEWEL EVENT OR OTHER EVENT.

(ii)     LICENSEE HAS AGREED TO AND SHALL ENTER INTO: (A) THE FOOD AND BEVERAGE AGREEMENT AND PAY THE FOOD AND BEVERAGE FEES; AND (B) THE TICKET AGREEMENT AND LICENSE THE REQUISITE NUMBER OF TICKETS TO EACH GAME COVERED BY THE TICKET PLAN AS SET FORTH IN THE TICKET AGREEMENT.

(iii)     TICKETS ARE REQUIRED FOR ADMISSION TO EACH JEWEL EVENT AND OTHER EVENT, WHICH TICKETS MUST BE LICENSED SEPARATELY, WITH EACH LICENSE SUBJECT AND PURSUANT TO A SEPARATE AGREEMENT. ALL TICKETS TO JEWEL EVENTS AND OTHER EVENTS SHALL BE SUBJECT TO SECTION 4 OF EXHIBIT A (TERMS AND CONDITIONS) AND THE PAYMENT OF TAXES. FURTHERMORE, LICENSEE IS REQUIRED TO PAY SEPARATE FOOD AND BEVERAGE FEES ASSOCIATED WITH EACH TICKET LICENSED BY LICENSEE FOR EACH JEWEL EVENT AND OTHER EVENT.

(iv)     LICENSEE ACKNOWLEDGES THAT THE TOTAL NUMBER OF GAMES THAT COMPRISES A REGULAR SEASON SHALL BE DETERMINED BY MLB. LICENSEE SHALL NOT BE ENTITLED TO ANY REFUND OF THE LICENSE FEE IF THE TOTAL NUMBER OF GAMES INCLUDED IN THE TICKET PLAN IS REDUCED AS A RESULT OF MLB'S DETERMINATION THAT A FULL REGULAR SEASON IS COMPRISED OF LESS THAN 81 GAMES. INSTEAD, THE LICENSE FEE WILL BE APPORTIONED OVER THE ACTUAL TOTAL NUMBER OF GAMES IN THE TICKET PLAN AS DETERMINED BY LICENSOR.

4.     SERVICES AND OTHER BENEFITS. Subject to change and/or modification by Licensor from time to time, and Section 7 of Exhibit A (Terms and Conditions), Licensor shall provide

2

20-Game Legends Suite License Agreement for Two (2) License Periods (Plan 2)

Licensee with the following number of complimentary Parking Pass(es) to each Game covered by eligible Ticket Plans (minimum 41-Games in Ticket Plan):

| NUMBER OF TICKETS IN TICKET PLAN | NUMBER OF PARKING PASS(ES) |
| --- | --- |
| Up to 5 Tickets | 1 Parking Pass |
| 6 to 8 Tickets | 2 Parking Passes |

AGREED & ACCEPTED:

LICENSEE:
JENNIFER KUTLER

By: _____
Name: JENNIFER KUTLER
Title: Payroll Specialist
Date: August 15, 2022
Address:  400 Thomas Ave.
          Floor 2
          Lyndhurst, NJ 07071-3100
Telephone: 2016152574
Fax: 2016047868
E-mail: jenkutler@aol.com

LICENSOR:
NEW YORK YANKEES PARTNERSHIP

By: Lonn A Trost as Chief Operating Officer
Name: Lonn A. Trost
Title:  Chief Operating Officer

WIRE INSTRUCTIONS:
Bank: Bank of America
ABA: 026009593
Acct: 483011477171
Name: New York Yankees Partnership
Federal I.D.: 34-1122131

3

# EXHIBIT A

## <u>Terms and Conditions</u>

These Terms and Conditions shall be fully incorporated into and form a part of the Agreement (*i.e.*, the Legends Suite License Agreement) to which this Exhibit A is attached. For further clarity, all capitalized terms that are defined in Section 15 shall have the same meaning for purposes of all other Paragraphs and Sections of this Agreement unless otherwise defined or the context requires a different definition. To the extent that any provision of these Terms and Conditions conflicts with any provision of the Agreement, the Terms and Conditions shall control.

1. <u>LICENSE</u>.

1.1    For and in consideration of: (a) the timely payment of each License Period's License Fee; (b) Licensee's execution and performance of the requisite Ticket Agreement and timely payment of each Ticket Fee and Taxes; (c) Licensee's execution and performance of the requisite Food and Beverage Agreement and timely payment of each Food and Beverage Fee; and (d) Licensee not being in breach of the Agreement and the Ticket Agreement, Licensor grants to Licensee the License and the other rights set forth in this Agreement on and subject to the terms and conditions set forth herein.

1.2    The License is subject to the following policies of Licensor:

(a)  Subject to such exceptions as may be determined by Licensor, the Licensee must be age 18 or older.

(b)  A Licensee is only permitted to purchase, control, coordinate, manage or direct (collectively, "<u>control</u>") the following maximum number of Tickets-per-Game (the "<u>Ticket Limit</u>"): (i) eight (8) Tickets-per-Game for a Licensee existing as of August 1, 2018; or (ii) four (4) Tickets-per-Game for a Licensee existing after August 1, 2018. Examples of how the Ticket Limit can be exceeded include: (i) Ticket(s) controlled by any person related to Licensee; or (ii) Ticket Account(s) that is/are in any way tied, linked or related to a specific person or group that is in any way affiliated with each other or under common ownership, control or direction. Use of aliases, separate forms of payment or separate persons or third parties to circumvent the Ticket Limit constitutes a material breach of the License and the Agreement. The Ticket Limit will be strictly enforced. Licensor may refuse any sale and revoke any License that violate the Ticket Limit. Licensor reserves the right to make exceptions to the Ticket Limit.

(c)  Licensee must be a legal resident, domiciled and/or have a principal place of business located in the Territory (the "<u>Territory Limit</u>"). Licensor can determine whether a Licensee, which includes: (i) any person related to Licensee; or (ii) any Ticket Account(s) that is/are in any way tied, linked, or related to a specific person or group that is in any way a legal resident, domiciled and/or has a principal place of business located in the Territory. Falsely claiming a legal residence/domicile at a post office box/commercial mail receiving agency located in the Territory, redirecting mail from inside/outside the Territory or using addresses of persons or third parties located in the Territory constitutes a material breach of the License and the Agreement. Licensor will strictly enforce the Territory Limit policy, refuse to sell to any person that would cause this policy to be violated and revoke any License relating to any Ticket Account that violates this policy. Licensor reserves the right to make exceptions to the Territory Limit policy.

2. <u>TERM OF THE LICENSE</u>.

2.1    <u>Term</u>. The Term of the Agreement shall be for the number of License Periods identified in Paragraph 2 of the Agreement.

2.2    <u>Opportunity to Renew</u>. At any time, Licensor may (in Licensor's sole and absolute discretion) offer Licensee the opportunity to obtain a New License by providing Licensee with a written notice (the "<u>Renewal Notice</u>") which will set forth: (a) the New Term; (b) the New License Fee(s); (c) the New Ticket Fee(s); (d) the New Food and Beverage Fee(s); and (e) such other terms and conditions of the New License, as more particularly set forth in the New Agreements – all as determined by Licensor and the Concessionaire, each in its sole and absolute discretion. In order to exercise the opportunity to obtain a New License, Licensee is required to accept all the terms and conditions set forth in the New Agreements by executing and returning the New Agreements to Licensor and the Concessionaire (together with any prepayment amounts required by the New Agreements). Licensee may reject the terms for the New License by sending Licensor a notice of rejection within fourteen (14) days after the Renewal Notice is provided to Licensee. A failure to respond within such fourteen (14) day period shall be deemed a rejection by Licensee of the New Agreements. If Licensee rejects (or is deemed to have rejected) the offers contained in the New Agreements, Licensor shall have the unencumbered right to license the Legends Suite for periods commencing from and after the expiration of the Term to any person or entity on such terms and

conditions and for such consideration as Licensor may determine in its sole and absolute discretion without any liability or obligation whatsoever to Licensee.

3.    PAYMENTS.

     3.1     Payment of License Fees; Payment Dates. In consideration for the License and other benefits granted to Licensee under this Agreement (other than those for which a charge or an additional charge is expressly contemplated under this Agreement, the Ticket Agreement and the Food and Beverage Agreement), Licensee shall pay to Licensor the License Fee for each License Period in accordance with the terms set forth in Paragraph 3, *et seq.*, of the Agreement. Except as otherwise agreed to by Licensor, all payments by Licensee under this Agreement shall be made without offset, deduction or counterclaim and by credit card, company, cashier's or certified check or wire transfer of immediately available funds to Licensor at its address or account set forth in the Agreement, or pursuant to such other written instructions as may be given by Licensor or any Assignee designated pursuant to Section 14.1. Each License Fee shall be due and payable each License Period regardless of the threatened cancellation or postponement of any Games during the preceding License Period or threatened cancellation or postponement of any Games during the forthcoming License Period, whether due to any Force Majeure Event or otherwise.

     3.2     Acceptance of License. Payment of each License Fee pursuant to Paragraph 3, *et seq.*, of the Agreement constitutes Licensee's acceptance of the License during the relevant License Period pursuant to the Terms and Conditions. This License is revocable, at the sole and absolute discretion of Licensor, with cause including failure to pay any Taxes, License Fee, Food and Beverage Fee or Ticket Fee or failure to enter into the Food and Beverage Agreement and the Ticket Agreement. Any revocation of the License by Licensor with cause shall be subject to Section 10.

     3.3     Taxes. Licensee shall pay and/or be responsible for paying all Taxes regardless of: (a) when levied, assessed or imposed; (b) upon whom levied, assessed or imposed; (c) the License Period (past, present and/or future) or portion of the Term (past, present and/or future) that is subject to said levy, assessment or imposition; and (d) which event constitutes a taxable event. If such Taxes are not collected directly from Licensee by the charging or collecting authority and/or entity, all such Taxes shall be immediately due and payable by Licensee to and upon demand by Licensor. Licensee shall reimburse Licensor for any fees, penalties, interest or other charge paid by Licensor with respect to any Taxes.

     3.4     Interest. Any and all sums due hereunder from Licensee, if not paid when due, shall bear interest at the lesser of: (a) one percent (1%) per month; or (b) the maximum rate then permitted by Law, from the date due until paid. Licensee agrees that the interest charges reflected in both clauses (a) and (b) are reasonable and represent a fair estimate of the additional expense that may be incurred by Licensor in handling, collecting and accounting for delinquent payments. Such interest charge shall be in addition to, and not in lieu of, all other rights and remedies of Licensor under this Agreement.

4.    TICKETS.

     4.1     Games. EACH LICENSE FEE DOES NOT INCLUDE TAXES AND/OR THE COST OR PRICE OF ANY TICKETS FOR THE GAMES COVERED BY THE TICKET PLAN. Licensee shall have the right and obligation to license all Tickets for the Seating Locations for each Game covered by the Ticket Plan as and when the Tickets become available at such prices and on such terms and conditions as are set forth in the Ticket Agreement.

     4.2     Jewel Events. EACH LICENSE FEE DOES NOT INCLUDE TAXES AND/OR THE COST OR PRICE OF ANY TICKETS AND/OR FOOD AND BEVERAGES FOR ANY JEWEL EVENTS.

     (a)     There is no guarantee or assurance that any Jewel Events will be held at the Stadium. If any Jewel Events are held at the Stadium during the Term, Licensee will have the right, but not the obligation, to license Tickets for all Seating Locations for each such Jewel Event that Licensee may be eligible for (as determined by Licensor). More particularly, in the event Licensee elects to license Tickets to such Jewel Event, Licensee must license the full strip of Tickets (*i.e.*, all Tickets to all potential games of all potential series and/or all potential events included in such Jewel Event) for each Seating Location and pay any Food and Beverage Fee(s) associated with such Jewel Event(s). Furthermore, Licensee is limited to licensing that number of Tickets for all applicable Jewel Events that is equal to the number of Seating Locations, as and when such Tickets become available at such prices, Taxes and on such other terms, conditions and procedures as may be determined by Licensor and/or MLB (each in its sole and absolute discretion).

     (b)     If Licensee does not elect to exercise its right to license such Ticket(s) to any Jewel Event or pay any Food and Beverage Fee(s) associated with such Jewel Event(s) for all or any portion of the Seating Locations in accordance with the terms, conditions and procedures set forth in sub-Section 4.2(a), Licensor shall have the unencumbered right to license all or any portion, respectively, of the Seating Locations (based on Ticket(s) not licensed by Licensee) to any third party or parties on such terms, conditions and procedures as Licensor and/or MLB may determine (each in its sole and absolute

ii

discretion) without any further liability or obligation to Licensee. Licensee shall not be entitled to any proceeds from any such licensing of any Seating Location and/or any compensation, credit, rebate, refund, offset, make-good or other remedy as a result of the licensing of the Legends Suite to any third party. To the extent Licensee does not license all or any portion of such Ticket(s) and/or pay the Food and Beverage Fee(s) associated with such Jewel Event(s), Licensee shall not have the right to use or access the Seating Locations and the Legends Suite (based on Ticket(s) not licensed by Licensee) during such Jewel Event(s).

4.3 Other Events. EACH LICENSE FEE DOES NOT INCLUDE THE COST OR PRICE OF ANY TICKETS, TAXES AND/OR FOOD AND BEVERAGES FOR ANY OTHER EVENTS.

(a) There is no guarantee or assurance that any Other Event will be held at the Stadium, or that if an Other Event is held at the Stadium, the Legends Suite and/or the Seating Locations will be made available to Licensee by the Other Event promoter. Subject to any terms, conditions, procedures, rules or regulations as may be established and/or imposed by Licensor or any Other Event promoter (each in its sole and absolute discretion) and any other applicable terms and conditions of this Agreement (including Section 4.4), if the Legends Suite and the Seating Locations (or portion thereof) are made available to Licensee for any such Other Event, Licensee shall have the right, but not the obligation, to license Tickets for all available Seating Locations for such Other Event and pay any Food and Beverage Fee(s) associated with such Other Event. More particularly, in the event Licensee has the right and elects to license Tickets for such Other Event, Licensee is limited to licensing that number of available Tickets as and when such Tickets become available at such prices and on such other terms, conditions and procedures as may be determined by Licensor and/or the Other Event promoter (each in its sole and absolute discretion).

(b) If Licensee does not exercise its right to license all or any portion of such Tickets and/or pay any Food and Beverage Fee(s) to the applicable Other Event in accordance with the terms, conditions and procedures set forth in sub-Section 4.3(a), Licensor or the Other Event promoter shall have the unencumbered right to license all or any portion, respectively, of the Seating Locations (based on Ticket(s) not licensed by Licensee) to any third party or parties on such terms, conditions and procedures as Licensor and/or the Other Event promoter may determine (each in its sole and absolute discretion), without any further liability or obligation to Licensee. Licensee shall not be entitled to any proceeds from any such licensing of any Seating Location and/or any compensation, credit, rebate, refund, offset, make-good or other remedy as a result of the licensing of the Legends Suite to any third party. To the extent Licensee does not exercise its right to license all or any portion of such Ticket(s) for the available Seating Locations and pay any Food and Beverage Fee(s) associated with such Other Event, Licensee shall not have the right to use or access the Seating Locations and the Legends Suite (based on Ticket(s) not licensed by Licensee) during such Other Event.

4.4 Limitations.

(a) Licensee acknowledges that, subject to rules and regulations of either MLB or the Other Event promoter (as the case may be), a row or rows of seats/chairs may be placed on the field in front of the first row of seating locations located between the outfield end of either dugout and the respective foul poles during Jewel Events and/or Other Events. The placement and/or occupancy of such seats/chairs in such locations shall not constitute a breach by Licensor or entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

(b) The Seating Locations, Tickets and licenses thereof for any Jewel Events and Other Events shall be subject to such terms, conditions, procedures, rules and regulations as to Ticket prices, Taxes, deadlines, postponements, cancellations, schedules, dates, times and other matters as may be established, respectively, by Licensor, the Club, MLB and/or any Other Event promoter, each in its sole and absolute discretion. Furthermore, and except with respect to Postseason Games, the availability of the Seating Locations and/or Tickets for any Jewel Event and any Other Event will be determined by Licensor, MLB and/or any Other Event promoter, each in its sole and absolute discretion. In the event the Seating Locations, Seating Area or Legends Suite are not available to Licensee for any Jewel Event (except Postseason Games) and/or Other Event, Licensor shall use commercially reasonable efforts to provide Licensee with the use of the Legends Club (if available) and Suite Lounges (if available) and the opportunity to license tickets elsewhere in the Stadium, subject to Sections 4.2 and 4.3 (as the case may be), at the then-prevailing rates, costs and prices for all such tickets.

(c) Licensor's obligation to provide use of and access to the Legends Suite under this Agreement shall be subject to applicable Laws relating to fire and occupancy.

4.5 Obstructed Views.

(a) Licensee acknowledges that during Games, Jewel Events and Other Events viewing ability and lines of sight may be impacted as a result of game and/or event conditions, protective netting/devices, the manner of play, the field configuration, the location of fixed and electronic (computerized) signage (provided any signage that does not materially

iii

obstruct lines of sight shall not be deemed to impact lines of sight), cameramen (*e.g.*, television and film), photographers, production personnel and their equipment, sound equipment, cables, stages, on-deck circles, coaches boxes, security personnel, placement of Sports Participants and their family members (whether or not participating), other fans, as well as other similar and dissimilar conditions, including the reconfiguration of the Stadium's seating bowl, playing field, aisle seating and seating required by Laws pertaining to fans with disabilities and otherwise. Obstructed views shall not entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

(b)     Licensee acknowledges that certain Other Events may not be viewable, in whole or in part, from the Seating Locations and/or the Legends Suite due to the location of the playing field, stage or event floor for the Other Event, the type of set-up for the Other Event or other matters related to the manner or presentation of the Other Event. If Licensor determines, in its sole and absolute discretion, that the viewing of any such Other Event from the Seating Locations is so obstructed, Licensor reserves the right to decline to make Licensee's Seating Locations available for such Other Event; Licensor shall, however, use commercially reasonable efforts to provide Licensee with the use of the Suite Lounges (if available) and Legends Club (if available) and the opportunity to license tickets elsewhere in the Stadium for such Other Event, subject to Sections 4.3 and 4.4, at the then-prevailing rates, costs and prices for all such tickets and Taxes, in each case, and subject to any arrangement made with the Other Event promoter.

5.    USE AND OCCUPANCY.

5.1     Use.    The times during which the Licensee and Invitees will have the right to use and access the Legends Suite (including portions thereof) shall be determined by the Licensor (in its sole and absolute discretion) and subject to the rules and regulations of the Stadium as established and amended from time to time by Licensor (in its sole and absolute discretion). Licensor reserves the right to change the times during which the Licensee and Invitees will have the right to use and access the Legends Suite (including portions thereof) referenced in the preceding two (2) sentences as conditions warrant, as determined by Licensor in its sole and absolute discretion; provided, in no event shall the times be earlier than the conclusion of the applicable Game, Jewel Event or Other Event (if available).

5.2     Access by Licensor.    Licensor and its officers, agents, employees and representatives and the Club's personnel shall have the right to access the Legends Suite on such occasions and to such extent as Licensor, in its sole and absolute discretion, shall deem necessary or appropriate for the exercise of the rights and the proper performance of their duties and obligations.

5.3     Licensee's Rights.    This Agreement provides Licensee and Invitees only with the right and privilege to occupy and use the available areas of the Legends Suite in the manner set forth herein and does not confer upon Licensee or Invitees any rights or privileges with respect to admission to the Stadium. Admission to the Stadium and the available areas of the Legends Suite requires the licensing and presentation of Tickets to the applicable Game, Jewel Event or Other Event. The rights under this Agreement are rights of personal privilege and do not under any circumstances confer upon Licensee any title, interest or estate in real property or any leasehold interest in the Legends Suite or the Stadium or any other interest or rights of any kind in any specific real or personal property. The relationship between Licensee and Licensor is that of licensee and licensor only.

5.4     Reservation of Rights.

(a)     Licensor reserves the right, in its sole and absolute discretion, with or without refunding any portion of any License Fee, to revoke the License, refuse admission or eject any person who: (i) is or appears to be impaired; (ii) conceals alcohol, illegal substances or other prohibited items while attempting to enter the Stadium; (iii) acts in a manner that is unruly, disruptive or illegal; (iv) uses derogatory, foul and/or abusive language and/or gestures; (v) displays and/or wears and fails to cover obscene, indecent and/or inappropriate clothing; (vi) exposes him/herself; (vii) otherwise violates the Stadium's Code of Conduct; (viii) fails to comply with the terms and conditions of this Agreement; (ix) interferes with any ball in the field of play or any Sports Participant attempting to make a play on any batted, pitched or thrown baseball; (x) attempts to gain admission/access/entry to the Legends Suite with a Ticket which is already being used by another person and/or a fraudulent wristband; (xi) refuses to provide proof of vaccination status and/or provides false and/or fraudulent proof of vaccination; or (xii) violates any Law. Violation of any of the foregoing, as determined by Licensor, by Licensee or any person using a Ticket shall constitute a material breach of this Agreement.

(b)     During any sporting event, it shall be illegal for any person other than a Sports Participant to: (i) knowingly enter or remain unlawfully upon the playing area; (ii) subject a Sports Participant to contact by means of any substance, object or dangerous instrument; (iii) place, drop, toss or hurl any substance, object or dangerous instrument onto the playing area; (iv) strike, slap, kick or otherwise subject to physical contact a Sports Participant; and (v) attempt to do (ii), (iii) or (iv) with the intent to cause physical injury to a Sports Participant or with the intent to disrupt a sporting event. Any person who

iv

violates the foregoing may be guilty of a misdemeanor punishable by imprisonment and/or fine as well as civil penalties of up to $25,000. Violators will be prosecuted to the fullest extent of the law. Violation of any of the foregoing, as determined by Licensor, by Licensee, any Invitee or any person using a Ticket shall constitute a material breach of this Agreement.

(c) Licensee acknowledges that Licensor is retaining all rights of access to and use of the Legends Suite with respect to all uses and functions for which Licensee has not duly exercised expressed rights granted hereby and made all applicable payments. Any use reserved by Licensor or any grant of rights by Licensor to any third party in connection with the exercise of such reserved rights shall not entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

(d) Licensor further reserves the right to install protective devices, such as netting, aisle termination glass or other transparent or non-transparent panels, with or without non-transparent trim, within the Stadium, including in the concourses, seating areas, aisles, etc., to the extent Licensor, in its sole and absolute discretion, deems necessary to protect fans and/or as may be required by Law. The installation and/or use of such protective devices in the Stadium shall not entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

(e) Licensor reserves the right to restrict, modify, alter, change and/or amend use and access to the Legends Suite as a result of: (i) MLB requirements; (ii) Laws; (iii) alteration of the Stadium; and/or (iv) other reasons beyond the control of Licensor. If the use and access to the Legends Suite are not available due to any of the aforementioned reasons for a Game, then Licensor will use commercially reasonable efforts to provide Licensee with the opportunity to use and access other designated premium areas in the Stadium, subject to availability and as determined by the Licensor. If Licensor is unable to provide use and access to other designated premium areas in the Stadium, then Licensee shall be entitled, as its sole remedy, to a credit in an amount equal to the product obtained by multiplying: (i) the number of Games covered by the Ticket Plan that Licensee is not permitted use and access to the Legends Suite as determined by Licensor; by (ii) the relevant License Fee paid divided by the number of Games covered by the Ticket Plan in a Regular Season, excluding the potential for any "tie-breaker" games. Such credit may be applied towards the purchase of tickets to another Game within 12 months of the originally scheduled Game, subject to availability.

6. <u>FOOD AND BEVERAGE</u>.

EACH LICENSE PERIOD'S LICENSE FEE DOES NOT CONTAIN OR INCLUDE THE COST OR PRICE OF FOOD AND BEVERAGES FOR ANY GAME, JEWEL EVENT AND/OR OTHER EVENT. Licensee has agreed to and shall execute, comply with and perform the Food and Beverage Agreement and is required to timely pay each Food and Beverage Fee. The term of the Food and Beverage Agreement shall be equal to the same number of License Periods as the Term.

7. <u>SERVICES AND OTHER BENEFITS</u>.

7.1 Licensor shall provide (or use commercially reasonable efforts to cause to be provided) the goods and services specified herein in connection with Licensee's use of the Legends Suite during Games and, if applicable, Jewel Events. Licensee acknowledges that such goods, services and other benefits (including access to and use of the Legends Club and Suite Lounges) may not be available for Other Events.

(a) In accordance with the Food and Beverage Agreement, food and non-alcoholic beverages and waiter/waitress services shall be provided within the Seating Area, the Legends Club (on an à la carte and/or buffet-style basis to the extent deemed appropriate, from time to time, by the Concessionaire, in its sole and absolute discretion) and the Suite Lounges. Gratuities are not included in any Food and Beverage Fee and alcoholic beverages are subject to a separate charge. Only persons holding appropriate Tickets and, if Licensor deems appropriate, identification bracelets or marks, shall have access to the Legends Club.

(b) Licensee shall receive that number of Parking Pass(es) as determined by Licensor for each applicable Game or Jewel Event. If provided, such Parking Pass(es) shall permit the holder to park a standard-sized passenger car in certain parking lot(s) associated with the Stadium (as determined by Licensor in its sole and absolute discretion) at one or more locations, at times to be designated by Licensor from time to time in its sole and absolute discretion and subject to any applicable rules and regulations then in effect. Any provided Parking Pass(es) do(es) not guarantee any specific parking space in any parking lot or that any parking space will be available if Licensee and/or any Invitee arrive(s) at the relevant parking lot later than the time designated by Licensor. The unavailability of any parking lot, the assignment of Licensee to different parking lot(s) and the determination by Licensor as to whether Licensee will receive any Parking Pass and/or the availability of any parking lot shall not constitute a breach by Licensor or entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or any other remedy.

7.2     The unavailability of any of the services and other benefits set forth in Section 7.1, except as set forth in this Agreement, shall not constitute a breach by Licensor or entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

8.     <u>COVENANTS, ACKNOWLEDGMENTS AND REPRESENTATIONS OF LICENSEE</u>.

8.1     Licensee covenants and agrees with Licensor as follows:

(a)     Licensee and Invitees shall keep and maintain the Legends Suite in good repair, order and condition, and, in addition to the other payments provided for in this Agreement, shall reimburse Licensor, upon Licensor's demand, for any costs incurred by Licensor to repair any damage directly or indirectly caused by Licensee or Invitees to the Legends Suite or any other area of the Stadium or to any property of Licensor therein, in each case except for normal wear and tear. Furthermore, Licensee and Invitees shall not borrow, dislodge, relocate or otherwise remove any personal property of Licensor or any third party located in the Legends Suite or any other part of the Stadium.

(b)     Licensee and Invitees shall at all times maintain proper decorum while using the Legends Suite and any other area of the Stadium and shall abide by all applicable Laws including those pertaining to fan behavior and the use and consumption of alcoholic beverages and prohibition of smoking (including electronic cigarettes). Without limiting the generality of the foregoing sentence, Licensee shall not serve or permit to be served (and shall cause its Invitees not to serve or permit to be served), in the Legends Suite or elsewhere in the Stadium, alcoholic beverages to persons under 21 years of age or persons intoxicated, visibly or not, and shall comply with such rules and regulations as may be adopted and revised from time to time by Licensor, MLB or any Other Event promoter for the Legends Suite or any other area of the Stadium. If Licensee or any Invitee violates the preceding sentence, Licensor: (i) may eject Licensee and/or any Invitee and revoke the License and/or any Ticket privilege at any time, both for the event at which the violation occurs and/or one or more future events; and/or (ii) exercise any of Licensor's rights (including the right to declare an Event of Default and/or to terminate this Agreement) due to such violation of this sub-Section 8.1(b).

(c)     Neither Licensee nor any Invitees shall place any of their respective property or any other materials including any waste products generated by Licensee or any Invitees, outside of the Legends Suite.

(d)     Banners and signs are permitted during the Games provided they are baseball-related, in good taste and non-commercial, non-political and/or non-advocacy in nature. Any banner or sign may be removed at the sole discretion of Licensor. However, neither Licensee nor any Invitees shall, without first obtaining Licensor's written approval (which may be withheld in Licensor's sole and absolute discretion), place or display any merchandise, advertisements, corporate identifications or symbols, flags, pennants or emblems of any kind in the Stadium.

(e)     Neither Licensee nor any Invitees shall use any tripods, monopods, selfie sticks, extended length zoom lenses, other camera equipment, movie cameras, flash photography or any other video or audio recording equipment anywhere in the Stadium.

(f)     Neither Licensee nor any Invitees shall use any mobile device in the Seating Area during live Game action and, if applicable, live Jewel Event or Other Event action or in any manner that Licensor, MLB and/or the Other Event promoter may deem disruptive; <u>provided</u>, <u>however</u>, mobile devices may be used prior to, after the conclusion of, and as applicable, "in between" innings of any Game, Jewel Event or Other Event. LAPTOP AND/OR TABLET COMPUTERS SHALL NOT BE PERMITTED IN THE STADIUM.

(g)     Neither Licensee nor any Invitees shall use any air horns, megaphones, loud speakers, portable stereo systems or other voice or sound amplification equipment, flashlights, lasers or any device that may: (i) interfere with and/or distract any Sports Participant and/or other patrons in, on or about the Legends Suite or any other part of the Stadium; (ii) interfere with and/or disrupt any audio and/or audio/visual telecast and/or recording of the Game, Jewel Event or Other Event; or (iii) interfere with and/or disrupt any technology-related service provided in the Stadium.

(h)     Licensee and Invitees shall permit any and all bags, clothing and other articles to be screened and/or inspected prior to entry into the Stadium and shall not enter the Stadium with and/or shall remove any items that Licensor deems inappropriate, offensive or potentially injurious to the Stadium, any Sports Participant, Licensor's employees, agents and contractors and/or other patrons of the Stadium. By accepting the License, Licensee and Invitees consent to being screened by metal detectors, hand-wand inspection and, if necessary (as determined in Licensor's sole and absolute discretion), a pat-down inspection. Furthermore, Licensee and Invitees consent to X-ray inspection of any and all personal items.

(i)     Neither Licensee nor any Invitees shall bring into or consume in the Legends Suite any food or beverages other than that which was purchased or obtained from the Concessionaire.

vi

(j)        Licensee hereby agrees to keep the terms and conditions of the Agreement (including those relating to pricing) strictly confidential and not make any disclosure thereof unless required by Law (in which case Licensee shall give prompt written notice to Licensor).

(k)        Neither Licensee nor any Invitees shall bring any animal to the Legends Suite or any other part of the Stadium, other than licensed service animals that Licensor is required to permit entry into the Stadium under applicable Law. Licensee must provide Licensor with no less than twenty-four (24) hours prior notice if it intends to bring a licensed service animal to the Stadium so that appropriate accommodations may be arranged by Licensor.

(l)        Without the prior approval of Licensor, neither Licensee nor any Invitees shall directly or indirectly solicit or otherwise seek social, political, religious or charitable contributions or otherwise promote any social, political, religious or charitable cause in the Legends Suite or any other part of the Stadium.

(m)        Neither Licensee nor any Invitees shall directly or indirectly conduct or otherwise engage in any commercial or business-related enterprise in the Legends Suite or any other part of the Stadium; provided, however, it is understood that discussing and/or negotiating commercial or business matters shall not be subject to the prohibition contained herein.

(n)        Without the prior approval of Licensor, neither Licensee nor any Invitees shall directly or indirectly use the Legends Suite as part of any promotional, giveaway, sweepstakes or lottery activity.

(o)        Neither Licensee nor any Invitees shall obstruct, limit or impede Licensor and its employees, agents or contractors from entering into the Legends Suite to perform any duties of Licensor, to inspect the condition of the Legends Suite or to investigate any suspected violations of the Agreement or any applicable rules and regulations.

(p)        Neither Licensee nor any Invitees shall interfere with the business of Licensor or the enjoyment of Games, Jewel Events and Other Events by patrons of the Stadium.

(q)        Licensee and its Invitees recognize that the names, trademarks, logos, copyrights and intellectual property (collectively, "Intellectual Property") owned by Licensor, other MLB Clubs, MLB or the Other Event promoter represent valuable assets of the owner of such Intellectual Property and that substantial recognition and goodwill are associated with such Intellectual Property.  Nothing contained herein grants Licensee the right to use any Intellectual Property without the prior written consent of the owner of such Intellectual Property, which consent may be withheld in the Intellectual Property owner's sole and absolute discretion.

(r)        BY USING A TICKET, LICENSEE AND ANY INVITEES AGREE THAT: (i) HE/SHE WILL NOT TRANSMIT OR AID IN TRANSMITTING ANY PHOTOGRAPHS, IMAGES, VIDEOS, AUDIO, LIVESTREAMS OR OTHER ACCOUNTS OR DESCRIPTIONS (INCLUDING PLAY-BY-PLAY DATA) WHETHER TEXT, DATA OR VISUAL, IN ANY MEDIA, OF ALL OR ANY PART OF THE GAME, JEWEL EVENT OR OTHER EVENT (AS APPLICABLE) TO WHICH THE TICKET GRANTS ADMISSION OR ANY ENTERTAINMENT, ATTRACTIONS, WARM-UPS, PRACTICES, PRE-GAME, POST-GAME OR BETWEEN-INNING ACTIVITIES, PROMOTIONS OR COMPETITIONS OFFERED IN CONNECTION WITH THE GAME, JEWEL EVENT OR OTHER EVENT INCLUDING ANY ACCOUNT, DESCRIPTION, PICTURE, VIDEO, AUDIO, REPRODUCTION OR OTHER INFORMATION CONCERNING THE GAME, JEWEL EVENT OR OTHER EVENT (COLLECTIVELY, "GAME INFORMATION"); (ii) MLB, MLB ADVANCED MEDIA, L.P. ("MLBAM"), THE APPLICABLE MLB CLUB, LICENSOR OR THE OTHER EVENT PROMOTER, AS APPLICABLE, IS THE EXCLUSIVE OWNER OF ALL COPYRIGHTS AND OTHER PROPRIETARY RIGHTS IN THE GAME, JEWEL EVENT OR OTHER EVENT AND GAME INFORMATION RELATED THERETO, RESPECTIVELY; AND (iii) THE COMMISSIONER, MLB, MAJOR LEAGUE BASEBALL PROPERTIES, INC. ("MLBPI"), MLBAM, EACH OF THE MAJOR LEAGUE BASEBALL CLUBS, INCLUDING LICENSOR (THE "MLB CLUBS"), THE MLB NETWORK, LLC, AND EACH OF THEIR PARENT, SUBSIDIARY, AFFILIATED AND RELATED ENTITIES, ANY ENTITY WHICH, NOW OR IN THE FUTURE, CONTROLS, IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH THE MLB CLUBS OR MLB AND THE OWNERS, GENERAL AND LIMITED PARTNERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS OF THE FOREGOING ENTITIES (EACH AN "MLB PARTY" AND COLLECTIVELY, THE "MLB PARTIES"), THE OTHER EVENT PROMOTER AND CERTAIN CURRENT AND FUTURE SPONSORS, ASSIGNEES AND LICENSEES OF SUCH MLB PARTIES AND THE OTHER EVENT PROMOTER WILL HAVE THE UNRESTRICTED, IRREVOCABLE, ASSIGNABLE, ROYALTY-FREE (AND WITHOUT FURTHER PAYMENT) RIGHT AND LICENSE TO USE LICENSEE'S AND ANY INVITEE'S IMAGE, LIKENESS, NAME, VOICE, COMMENTS AND/OR PROPRIETARY OR PUBLIC RIGHTS IN ANY LIVE OR RECORDED BROADCAST, TELECAST, PHOTOGRAPH, VIDEO, AUDIO, AUDIOVISUAL AND/OR OTHER RECORDING TAKEN IN CONNECTION WITH THE GAME,

vii

JEWEL EVENT OR OTHER EVENT OR OTHER TRANSMISSION, DISTRIBUTION, PUBLIC PERFORMANCE, OR REPRODUCTION, IN WHOLE OR IN PART, OF THE GAME, JEWEL EVENT OR OTHER EVENT, FOR ALL PURPOSES, WORLDWIDE, IN PERPETUITY, AND IN ANY AND ALL MEDIA NOW OR HEREAFTER KNOWN, WITHOUT COMPENSATION OR CONSIDERATION, NOTIFICATION OR PERMISSION, UNLESS OTHERWISE PROHIBITED BY APPLICABLE LAW.

8.2  Licensee hereby represents, warrants and agrees as follows:

(a)    Licensee has read and understands the terms of this Agreement (and the attached Exhibits).

(b)    Licensee is acquiring the License for its own personal use and the use by Invitees and not with a view to the distribution, transfer or license of the License to any other person or entity or for any investment or other purpose.

(c)    Licensee has full authority to enter into this Agreement and carry out its terms and conditions and, upon execution, this Agreement shall be a legal and binding obligation of Licensee, enforceable against Licensee in accordance with its terms.

8.3  Licensee acknowledges and confirms that:

(a)    Licensor, its affiliates and their respective officers, agents, managers and employees have not made any representations, warranties or guarantees with respect to the Stadium or the Legends Suite, including whether any events other than Games will be held in the Stadium.

(b)    The Agreement confers no rights to directly or indirectly create, depict, imply or infer that Licensee and/or any Invitees are associated or affiliated with or are an official or unofficial business partner, advertiser, marketer, promoter or sponsor of the Club.

(c)    The Club's and the opponent club's rosters, lineups, coaches and manager are subject to change and Licensee is entering into this Agreement irrespective of any change to any of the foregoing.

(d)    The number of innings in a regulation game shall be determined by MLB and may be shortened in accordance with MLB rules.  Licensor makes no representation, warranty and/or guarantee that nine (9) innings will be played in any regulation game.

(e)    The number of Games in a Regular Season shall be determined by MLB.  Licensor makes no representation, warranty and/or guarantee that a Regular Season will be comprised of eighty-one (81) Games.

(f)    The dates and times for each Game, Jewel Event and Other Event are all subject to change and Licensee is entering into this Agreement irrespective of any change to any of the foregoing.

9.  COVENANTS OF LICENSOR.

9.1    Licensor covenants and agrees as follows:

(a)    Licensor shall perform ordinary repair and maintenance of the interior and exterior of the Legends Suite, to the extent made necessary by normal wear and tear, at no additional expense to Licensee.

(b)    Licensor shall perform ordinary housekeeping services for the Legends Suite and other areas of the Stadium, including dusting, sweeping, cleaning and trash removal after each Game, Jewel Event and Other Event, at no additional charge to Licensee.

10.  DEFAULT AND TERMINATION.

10.1    Default.  Licensee shall be in default under this Agreement upon the occurrence of any one of the following events (any such event, an "Event of Default"):

(a)    Licensee fails to pay in full, as and when due, the License Fees or any other fee, charge or amount to be paid by Licensee or any Invitee hereunder, including any Taxes.

(b)    Licensee fails to enter into the Ticket Agreement and license the requisite number of Tickets to the Games pursuant to the terms and conditions of the Ticket Agreement.

(c)    Licensee fails to perform or observe any terms, conditions, covenants or obligations under the Ticket Agreement within ten (10) days after Licensor gives Licensee notice of such failure including any failure to pay the Ticket Fees, Taxes and the costs associated with any Tickets to Jewel Events and/or Other Events licensed by Licensee, including any Taxes.

viii

(d)    The Ticket Agreement is terminated for any reason.

(e)    Licensee fails to enter into the Food and Beverage Agreement.

(f)    Licensee fails to perform or observe any terms, conditions, covenants or obligations under the Food and Beverage Agreement within ten (10) days after the Concessionaire gives Licensee notice of such failure including any failure to pay the Food and Beverage Fees.

(g)    The Food and Beverage Agreement is terminated for any reason.

(h)    Licensee and/or any Invitees engage(s) in any illegal activity or commit(s) any material or repeat violation of any provision of this Agreement or any of Licensor's rules and regulations pertaining to the admission/access/entry to or use of the Legends Suite or the Stadium including any violation of Section 8.

(i)    Licensee fails to perform or observe any of the terms, conditions, covenants or obligations under this Agreement (other than those set forth in sub-Sections 10.1(a) through (h), above) or makes any misrepresentation or breaches any warranty under this Agreement and Licensee fails to cure such failure, misrepresentation or breach of warranty within ten (10) days after Licensor gives Licensee notice thereof.

(j)    Licensee either voluntarily files for bankruptcy, receivership, insolvency, reorganization, dissolution, liquidation or any similar proceedings, as applicable, or involuntarily has a proceeding instituted against it and such proceeding is not dismissed within thirty (30) days.

(k)    Licensee makes a general assignment for the benefit of creditors.

10.2    Remedies.

(a)    Upon the occurrence of any Event of Default, Licensor may, in addition to all other rights and remedies that it may have, at its option and with or without notice to Licensee, do any one or more of the following:

(i)    withhold distribution of Tickets or services and other benefits for any Game, Jewel Event or Other Event from Licensee until such Event of Default is cured or, if Tickets for any such Game, Jewel Event and/or Other Event already have been distributed to Licensee, void all barcodes for the Tickets or otherwise deny holders of Tickets admission/access/entry to or the use of the Stadium, the Legends Suite and/or any other area in the Stadium until such Event of Default is cured;

(ii)    deny Licensee the right to license any Tickets to any and all Jewel Events and/or Other Events;

(iii)    (A) continue to hold Licensee responsible for: (1) Licensee's obligations under the Agreement and the Ticket Agreement; and (2) all amounts that would have been due during the remainder of the Term, including any remaining portions of the License Fee(s), Ticket Fee(s) and Taxes; (B) as liquidated damages and not as a penalty, accelerate and declare the entire unpaid balance of the License Fee(s), Ticket Fee(s) and Taxes which for the purposes hereof shall include the total unpaid balance of the License Fees, Ticket Fees and Taxes for the remainder of the Term, immediately due and payable; and (C) cause the Concessionaire to continue to hold Licensee responsible for Licensee's obligations under the Food and Beverage Agreement and as liquidated damages and not as a penalty, accelerate all amounts that would have been due during the remainder of the Term, including all remaining portions of the Food and Beverage Fee(s) and declare such amounts immediately due and payable; and/or

(iv)    terminate this Agreement, whereupon: (A) all licenses, rights and privileges of Licensee hereunder shall immediately terminate; (B) the Ticket Agreement shall automatically terminate; (C) the Food and Beverage Agreement shall automatically terminate; (D) Licensee shall return to Licensor, and Licensor may revoke, any unused Tickets and Parking Passes; (E) Licensor shall have no further obligation of any kind to Licensee; (F) as liquidated damages and not as a penalty, accelerate and declare the entire unpaid balance of the License Fee(s), Ticket Fee(s), Food and Beverage Fee(s) and Taxes which for the purposes hereof shall include the total unpaid balance of the License Fees, Ticket Fees and Taxes for the remainder of the Term, immediately due and payable, whereupon Licensor shall have no further obligation of any kind to Licensee hereunder; and (G) Licensor may recover from Licensee, and Licensee shall pay to Licensor, all damages Licensor may incur by reason of Licensee's default, including the costs of recovering the Legends Suite and all unpaid amounts due with respect to periods prior to termination.

(b)    Licensor shall have no duty to mitigate its damages as a result of any failure, misrepresentation or default by Licensee hereunder.  The decision whether to re-license the Seating Locations and the terms and conditions (including any fees) pursuant to which the Seating Locations shall be re-licensed shall be made by Licensor in its sole and absolute discretion.  Any amounts received by Licensor, whether during or after the originally scheduled Term of this Agreement,

ix

from any re-licensing of the Seating Locations after termination of this Agreement shall not reduce any of Licensee's obligations under this Agreement.

10.3     Attorneys' and Professionals' Fees and Costs.  Upon any Event of Default, Licensor shall be entitled to recover all reasonable attorneys' and professionals' fees, expenses and costs (including arbitration fees and costs) incurred in connection with such Event of Default.

10.4     Remedies Are Cumulative; No Waiver.  The remedies contained in this Section 10 are cumulative and shall not limit or exclude any other right or remedy set forth herein or otherwise available to Licensor in law or in equity, including Licensor's right to receive indemnification under Section 12.  No waiver by Licensor of any Event of Default or breach by Licensee of its obligations hereunder shall be construed to be a waiver or release of any other or subsequent Event of Default or breach by Licensee hereunder, and no failure or delay by Licensor in the exercise of any remedy provided for herein shall be construed to constitute a waiver thereof or of any other right or remedy available to Licensor at law or in equity.

11.  FORCE MAJEURE.

11.1(a)     Except as expressly provided in sub-Section 11.1(b), Licensor shall not be liable to Licensee as a result of any failure by Licensor to perform this Agreement as a result of, directly or indirectly: (i) any Force Majeure Event; or (ii) any other damage or destruction to the Legends Suite, the Stadium and/or any portion thereof.  Any delay in the performance of this Agreement as a result, directly or indirectly, of any of the foregoing will not constitute a breach of this Agreement or a ground for cancellation, suspension or termination hereof.

(b)     If, as a result of any of the events, damages and/or destructions referred to in sub-Section 11.1(a), above, a regulation game (as defined by MLB) is not played, the Ticket will constitute a rain check that can be either: (i) used for admission to the rescheduled Game, if any, subject to certain doubleheader limitations; or (ii) exchanged for a ticket comparable in price and location to another, similar regular season Game within 12 months of the originally scheduled Game, subject to availability.  For complete details of the Rain Check Policy, please visit www.yankees.com/raincheck.

(c)     Notwithstanding any of the foregoing, if the Seating Location(s) is/are damaged and Licensor provides Licensee with, in Licensor's opinion, a reasonably comparable seat location(s) at the Stadium, the relevant License Fee shall not be reduced and Licensee shall not be entitled to any compensation, credit, rebate, refund, offset, make-good or any other remedy.

11.2     If, for any reason, either the Stadium Lease and/or the Stadium Sublease, both as defined in sub-Section 14.14(b), that permit the Club to play the Games in the Stadium is/are terminated, this Agreement shall automatically terminate as of the effective date of such termination and Licensee shall have no other rights or remedies at law or in equity; provided, however, Licensee shall be entitled, as its sole remedy, to a refund of a portion of the License Fee paid for the relevant License Period equal to the product obtained by multiplying: (a) the number of Games covered by the Ticket Plan remaining, excluding the potential for any "tie-breaker" games, in the Regular Season during the relevant License Period after either the Stadium Lease and/or the Stadium Sublease is/are terminated; by (b) the relevant License Fee paid divided by the number of Games covered by the Ticket Plan in a Regular Season, excluding the potential for any "tie-breaker" games; provided, however, that, if the number of Games in sub-Section 11.2(a) is zero, then Licensee shall not receive any refund.

11.3     Any inconvenience resulting from repairs being made or required in the Legends Suite or Stadium areas in or around the Legends Suite does not entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

12.  WARNING, ASSUMPTION OF RISK AND INDEMNITY.

12.1     WARNING. BASEBALLS AND BATS AND FRAGMENTS THEREOF MAY BE THROWN OR HIT ANYWHERE IN THE STADIUM.  FOR THE SAFETY OF EVERY GUEST, ALL GUESTS MUST STAY ALERT AND BE AWARE OF THEIR SURROUNDINGS AT ALL TIMES WHILE VISITING THE STADIUM. GUESTS WHO ARE CONCERNED WITH THEIR SEATS AT ANY TIME DURING THE GAME SHOULD CONTACT ANY GUEST RELATIONS REPRESENTATIVE FOR AN ALTERNATE SEAT.

12.2     Licensee, on behalf of itself and any Invitees, assumes all risk of personal injury or damage to, or loss of property of, Licensee and any Invitees arising out of, during or related to Licensee's and any Invitees' attendance at Games, Jewel Events and Other Events or otherwise incidental to any sports competition (including the sport of baseball) and/or attendance at the Stadium.  Licensor shall not be liable or responsible for any loss, damage or injury to any person or to any property of Licensee and any Invitees in, about or around the Legends Suite, the Stadium and/or any portion thereof and/or parking lots, resulting from any cause whatsoever including injury to person or property of Licensee and any Invitees from

x

thrown bats and fragments thereof, batted and thrown balls, theft, vandalism, criminal activities, misconduct by other patrons and/or negligence, unless such loss, damage or injury is caused by the gross negligence or willful misconduct of Licensor.

12.3     Licensee/Invitees agrees that (a) the MLB Parties; (b) the Other Event promoter; (c) the owner and/or operator of the Stadium and event sponsors, contractors, vendors, operators, agencies and advertisers of the MLB Parties, the Other Event promoter and/or the Stadium including any City Parties; (d) any local or state governmental body associated with the Stadium including the City Parties; (e) the Ticket manufacturer, provider and/or agent; (f) licensees, and retail, concession, broadcast and media partners of the MLB Parties and/or the Other Event promoter; (g) press and other media; (h) vendors that may provide testing or medical services; (i) entities and individuals providing accommodation and transportation to or from the Stadium; (j) other entities and individuals who enter the Stadium and (k) all past, present and future parent, subsidiary, affiliated and related companies and affiliates, successors, assigns, players, managers, coaches, employees, trustees, partners, members, directors, officers, owners, agents, licensees, representatives, insurers, servants, independent contractors and subcontractors of each of the foregoing entities listed in subsections (a) through (k) (collectively, the "Released Parties") will not be responsible for any personal injury (including illness and death), property damage, or other loss suffered as a result of Licensee's/Invitee's: (x) participation in, attendance at, and/or observation of the Game; and/or (y) the negligence of any of the Released Parties (collectively, the "Released Claims").

12.4     Licensee/Invitees hereby releases, forever discharges, and covenants not to sue the Released Parties from and against any and all Released Claims and/or any other claims which Licensee/Invitee has or may have for invasion of privacy, defamation, violation of any right of publicity, right of privacy or any other cause of action arising out of the production, reproduction, distribution, transmission, publication, public performance, broadcast or exhibition of advertisements, promotions, content, programs and/or materials in which recordings or photographs of Licensee/Invitee from the Game, Jewel Event and/or Other Event appear, whether such recordings and photographs are captured prior to, during or subsequent thereto.

BY ATTENDING AND/OR PARTICIPATING IN THE GAME, LICENSEE/INVITEE IS DEEMED TO HAVE GIVEN A FULL RELEASE OF LIABILITY TO THE RELEASED PARTIES TO THE FULLEST EXTENT PERMITTED BY LAW.

LICENSEE/INVITEE IS DEEMED TO HAVE GIVEN ALL OF THE FOREGOING GRANTS OF RIGHTS, RELEASES AND WAIVERS ON BEHALF OF ANY MINOR(S) AS THEIR PARENT OR GUARDIAN OR AS THE AUTHORIZED AGENT OF THEIR PARENT OR GUARDIAN.  IF LICENSEE/INVITEE DOES NOT WISH TO OR IS NOT AUTHORIZED TO GRANT SUCH RIGHTS, RELEASES AND WAIVERS ON BEHALF OF ANY MINOR(S), LICENSEE/INVITEE SHOULD IMMEDIATELY LEAVE THE STADIUM WITH SUCH MINOR(S).

12.5     Licensee/Invitee will indemnify, defend and hold harmless the Released Parties from and against any and all demands, suits, claims, costs (including reasonable attorneys' fees and expenses), expenses and liability arising out of, incidental to or related in any way to Licensee's/Invitee's: (i) use of the Tickets; (ii) attendance at, observation of, and/or participation in the Game, Jewel Event and/or Other Event; (iii) acts or omissions; or (iv) breach of any of the terms, conditions or representations made in the Agreement and these Terms and Conditions.

13.  MANDATORY ARBITRATION AGREEMENT & CLASS ACTION WAIVER ("ARBITRATION AGREEMENT").

13.1     (a)  Licensor cares deeply about maintaining good relationships with fans.  If Licensee/Invitee has a problem, a telephone call to customer service may resolve the matter quickly and amicably.  Any dispute not resolved informally must be resolved in accordance with this Arbitration Agreement.

(b)  Unless prohibited by federal Laws, Licensee and Licensor agree to arbitrate through BINDING INDIVIDUAL ARBITRATION any and all claims and disputes relating in any way to the Agreement, the purchase or use of any Ticket Plan and/or Ticket, the participation in, attendance at, and/or observation of the Game, Jewel Event and/or Other Event by Licensee, any Invitee (including any Accompanying Party) (collectively, for purposes of this Arbitration Agreement, the "Covered Licensees"), these Terms and Conditions and any related dealings between them, including claims of personal injury (including illness and death) or property damage arising out of attendance at and/or participation in the Game, Jewel Event and/or Other Event by any Covered Licensees ("Arbitration Claims"), except for Arbitration Claims concerning the validity, scope or enforceability of the Arbitration Agreement.  This Arbitration Agreement shall be governed by Article 75 of the CPLR.

(c)  In any Arbitration Claim to be resolved by arbitration, neither Covered Licensees nor Licensor will be able to have a court or jury trial or participate in a class action or class arbitration.  Other rights that Covered Licensees and Licensor would have in court will not be available or will be more limited in arbitration, including the right to appeal. Covered Licensees and Licensor each understand and agree that by requiring each other to resolve all disputes through

individual arbitration, THE COVERED LICENSEES AND LICENSOR ARE EACH WAIVING THE RIGHT TO A COURT OR JURY TRIAL.  ALL DISPUTES SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS, AND NOT AS A CLASS ACTION, REPRESENTATIVE ACTION, CLASS ARBITRATION OR ANY SIMILAR PROCEEDING.  The arbitrator(s) may not consolidate the claims of multiple parties.

(d)  Arbitrations shall be administered by JAMS in accordance with its then-existing commercial arbitration rules.  Covered Licensees may obtain information about arbitration, arbitration procedures and fees from JAMS by calling 212-751-2700 or visiting www.jamsadr.com.  If JAMS is unable or unwilling to arbitrate a dispute, then the dispute may be referred to any other arbitration organization or arbitrator the parties both agree upon in writing or that is appointed pursuant to Section 7504 of the CPLR.  The arbitration shall take place in New York, New York. The arbitration shall be presided over by a single arbitrator, who shall be selected in accordance with the rules that, as specified above, shall govern the arbitration. The arbitrator shall be authorized to award any relief that would have been available in court, provided that the arbitrator's authority is limited to Covered Licensees and Licensor alone, except as otherwise specifically stated herein.  No arbitration decision will have any preclusive effect as to non-parties.  The arbitrator's decision shall be final and binding.  The Covered Licensees and Licensor agree that the Arbitration Agreement extends to any other parties involved in any Arbitration Claims, including all Covered Licensees and the Released Parties.  This Arbitration Agreement shall take precedence over the rules of the arbitration organization or arbitrator in the event of any conflict.

(e)  Payment of all filing, administration, hearing and other fees ("Arbitration Fees") will be governed by the JAMS's rules. Covered Licensees will be responsible for paying Covered Licensee's share of any Arbitration Fees, but only up to the amount of the filing fees Covered Licensees would have incurred in the state or federal court in New York, whichever is less. Licensor will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. Notwithstanding any other provision herein, Covered Licensees and Licensor may seek relief in a small claims court for Arbitration Claims within its jurisdiction.  In addition, Covered Licensees and Licensor each may exercise any lawful rights to seek provisional remedies or self-help, without waiving the right to arbitrate by doing so.  Notwithstanding any other provision of the Agreement and these Terms and Conditions, if the foregoing class action waiver and prohibition against class arbitration is determined to be invalid or unenforceable, then the entire Arbitration Agreement shall be void.  If any portion of the Arbitration Agreement other than the class action waiver and prohibition against class arbitration is deemed invalid or unenforceable, it shall not invalidate the remaining portions of the Arbitration Agreement.  This Arbitration Agreement will survive the termination of the Agreement and these Terms and Conditions and/or the bankruptcy or insolvency of a party (to the extent permitted by applicable Law).

(f)  LICENSEE HAS THE RIGHT TO REJECT THIS ARBITRATION AGREEMENT, BUT LICENSEE MUST EXERCISE THIS RIGHT PROMPTLY.  If Licensee does not wish to be bound by the Arbitration Agreement, Licensee must notify Licensor by mailing a written opt-out notice, postmarked within seven (7) days after Licensee acknowledges acceptance of and agrees to be bound by these Terms and Conditions.  Licensee must send the request to: New York Yankees, Attn: Legal Department, Re: Arbitration, One East 161st Street, Bronx, New York 10451.  The request must include your full name, address, account number, and the statement "I reject the Arbitration Agreement contained in the Legends Suite License Agreement."  If Licensee exercises the right to reject arbitration, the other terms of the Agreement and these Terms and Conditions shall remain in full force and effect as if Licensee had not rejected arbitration.

(g)  Prior to bringing a claim under the Arbitration Agreement, the Claimant shall give the other party or parties written notice of the Arbitration Claim (a "Claim Notice") and a reasonable opportunity, not less than 30 days, to resolve the Arbitration Claim.  Any Claim Notice to one or more of Licensor shall be sent by mail to: New York Yankees, Attn: Legal Department, Re: Legends Suite License Agreement Claim Notice, One East 161st Street, Bronx New York 10451.  Any Claim Notice must (i) identify the Claimant by name, address, email address, and telephone number; (ii) explain the nature of the Arbitration Claim and the relief demanded; and (iii) be submitted only on behalf of the Claimant, and not on behalf of any other party. The Claimant must reasonably cooperate in providing any information about the Arbitration Claim that the other party reasonably requests and must give the other party a reasonable opportunity to respond to the demand for relief.

LICENSEE IS DEEMED TO HAVE AGREED TO THIS ARBITRATION AGREEMENT ON BEHALF OF ANY INVITEE (INCLUDING ACCOMPANYING MINOR(S) AS THEIR PARENT OR GUARDIAN OR AS THE AUTHORIZED AGENT OF THEIR PARENT OR GUARDIAN).  IF LICENSEE DOES NOT WISH TO OR IS NOT AUTHORIZED TO MAKE SUCH AGREEMENT ON BEHALF OF ANY ACCOMPANYING MINOR(S), LICENSEE SHOULD IMMEDIATELY LEAVE THE STADIUM WITH SUCH ACCOMPANYING MINOR(S).

13.2  Confidentiality.  Except as necessary in connection with a judicial challenge to or enforcement of an arbitration award, or unless otherwise required by Law or judicial decision, the parties agree that the arbitration procedure will be confidential.  All conduct, statements, promises, offers, views and opinions, oral or written expressed during the arbitration by any party or a party's agent, employee or attorney will remain confidential and, where appropriate, will be considered

xii

work product and privileged, and the existence and the results of the arbitration will be maintained by the parties and their respective agents, employees, professionals and attorneys as confidential at all times.

13.3    Arbitration Exception.  Notwithstanding Sections 13.1(b) – (e), above, in the event the dispute involves: (a) Licensee's failure to pay: (i) the full amounts due under any of the Agreement, the Ticket Agreement and/or the Food and Beverage Agreement; and/or (ii) any amounts due for any License Period under any of the Agreement, the Ticket Agreement and/or the Food and Beverage Agreement; and/or (b) Licensee's failure to participate in the arbitration in good faith, or attempts to frustrate the arbitration process and/or the arbitration process reaches an impasse, then as a result of any of the foregoing, Licensor, at its sole option, shall be relieved from mandatory arbitration and may immediately proceed with any legal action, suit or proceeding in the United States District Court for the Southern District of New York, or if such court does not have subject matter jurisdiction, the State Courts of New York located in Bronx County.  Licensee expressly and irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam and waives any claim that such forum is inconvenient, inappropriate or any similar claim.  Licensee further acknowledges and agrees that if Licensor is forced to proceed under this Section 13.3 with respect to any dispute, such dispute is likely to involve complicated and difficult issues.  Accordingly, Licensee hereby irrevocably and unconditionally waives any right it may have to a trial by jury in respect to any litigation contemplated hereunder.  Licensee further certifies and acknowledges that: (w) no representative, agent or attorney of Licensor has represented, expressly or otherwise, that Licensor would not, in the event of litigation, seek to enforce Licensee's waiver of a trial by jury; (x) it understands and has considered the implications of Licensee's waiver of a trial by jury; (y) it makes such waiver voluntarily; and (z) it has induced Licensor to enter into this Agreement by, among other things, its waiver of a trial by jury and the certifications contained in Sections 13.3(w) – (z).

14.  MISCELLANEOUS.

14.1    Assignment by Licensor.  Licensor may assign, pledge or otherwise transfer or encumber (each, a "transfer") this Agreement, and any or all of its rights and obligations hereunder and any rights and benefits emanating hereunder to any other entity (each, an "Assignee") and this Agreement shall be subject to any such transfer.  Upon reasonable prior notice from Licensor, Licensee shall make any payments due hereunder to such Assignee and shall execute and deliver any documents that Licensor or any Assignee may reasonably request to acknowledge and confirm that upon any such transfer, this Agreement will remain in full force and effect, will continue to be a legal, valid and binding obligation of Licensee enforceable in accordance with its terms (subject to applicable Laws relating to bankruptcy or insolvency and general principles of equity) and that neither Licensee nor, to Licensee's knowledge, Licensor is in material breach or violation of this Agreement.

14.2    Assignment by Licensee.

(a)  Licensee may not sell, assign, sublicense, re-license, delegate, pledge, grant a lien or security interest in or otherwise transfer or encumber this Agreement or any of Licensee's rights and/or obligations hereunder without the prior written consent of Licensor, which consent may be withheld in Licensor's sole and absolute discretion.  Notwithstanding the foregoing, Licensor will not withhold its consent to assignment of this Agreement to any of the following (it being understood that clauses (i), (ii) and (iii) shall apply only to a Licensee that is an individual and clause (iv) shall apply only to a Licensee that is an entity); provided, however, no consent by Licensor hereunder to any assignment of this Agreement shall relieve Licensee of any of its obligations under this Agreement and Licensee shall remain liable therefor:

(i)   a member of Licensee's immediate family;

(ii)  a trust established for the benefit of Licensee or one or more members of Licensee's immediate family;

(iii) upon Licensee's death, Licensee's estate; or

(iv) an affiliate of Licensee that controls, is controlled by or is under common control with Licensee.

(b)  Any attempted sale, assignment, sublicense, delegation, re-license, pledge, lien, security interest or other transfer or encumbrance of this Agreement without Licensor's express prior written consent (including any assignment described in clauses (a)(i)-(iv), above) shall be void and, upon demand by Licensor, shall be formally rescinded or, at its sole option, Licensor may declare an immediate Event of Default hereunder and be entitled to all remedies provided for in Section 10.2, above.  If Licensee is an entity, a sale, assignment or other transfer, directly or indirectly, of effective control of Licensee or of a fifty percent (50%) or greater ownership interest in Licensee, in one or a series of related transactions, shall be deemed an assignment for purposes of this Agreement; provided, however, that this sentence shall not apply to any Licensee that has a class of equity securities registered under Section 12 of the Securities Exchange Act of 1934, as amended, and the transfer of control or ownership interest arises as a result of a sale or other transfer of such equity securities.

20-Game Legends Suite License Agreement for Two (2) License Periods (Plan 2)

14.3    <u>Governing Law</u>.  This Agreement shall be governed and construed by New York law without giving effect to conflict of law principles thereof.

14.4    <u>Notices</u>.  All notices, requests, claims, demands and other communications must be in writing and shall be deemed duly given on the date of delivery, if transmitted by a nationally recognized courier service or by facsimile to the applicable facsimile number set forth below, so as to be received during the hours of 8:00 AM to 5:00 PM, Monday through Friday, or upon receipt, if mailed to the person to whom notice is to be given by certified or registered mail, postage prepaid, and properly addressed to the respective address set forth below or such other address as may be set forth in a written notice of change of address transmitted in the manner set forth in this Section 14.4.

(a)    If to Licensor:
New York Yankees Partnership
Yankee Stadium
Bronx, New York 10451
Attention:        Lonn A. Trost, Esq.
                  Chief Operating Officer
Phone:            (718) 579-4420
Facsimile:        (718) 681-1051

(b)    If to Licensee: To the person, address and contact information set forth below Licensee's signature.

14.5    <u>Entire Agreement; Modification; No Waiver</u>.  This Agreement, the Ticket Agreement, the Food and Beverage Agreement and the terms and conditions set forth on any Ticket (in digital or printed form) contain the entire agreement of the parties with respect to the matters provided for herein and shall supersede any representations or agreements previously made or entered into by the parties hereto (whether oral or written).  No amendment, modification or waiver to this Agreement shall be valid or enforceable unless in writing and signed by both parties.  The failure of Licensor to insist in any one or more instances upon the strict performance of the representations, warranties, covenants, agreements, terms, provisions or conditions of this Agreement or to exercise any election herein contained shall not be construed as a waiver or relinquishment for the future of such covenant, agreement, term, provision, condition or election, but the same shall continue and remain in full force and effect.  The rights and remedies herein provided are cumulative and may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law or equity.

14.6    <u>Binding Effect</u>.  Without limiting the prohibitions on assignment by Licensee set forth herein, this Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns.  This Agreement shall not be binding and enforceable until signed by a duly authorized representative of Licensor.  An original counterpart of this Agreement, signed by Licensor, will be on file at Licensor's offices.  Any incomplete or altered Agreement may be rejected by Licensor.

14.7    <u>Severability</u>.  If any provision of this Agreement shall be held invalid or unenforceable, the remainder of this Agreement shall not be affected, but shall continue to be valid and enforceable to the fullest extent permitted by Law.

14.8    <u>Time of Essence</u>.  Time is of the essence with respect to the payment by Licensee of the License Fee and any other monetary obligation and the performance by Licensee of any other obligation contained in this Agreement.

14.9    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, and by the different parties in separate counterparts, each of which when executed will be an original but all of which taken together will constitute one and the same agreement.  Licensor may execute this Agreement with a rubber stamp signature or facsimile/digital signature.  This Agreement may be executed and delivered via facsimile machine or other form of electronic delivery by the parties hereto, which shall be deemed for all purposes as an original.

14.10    <u>Exhibits</u>.  All exhibits attached to the Agreement are incorporated herein and made a part hereof.

14.11    <u>Force Majeure</u>.  Except as expressly provided in Section 11, Licensor shall not be liable for any failure to comply or delay in complying with its obligations hereunder if such failure or delay is due, directly or indirectly, to a Force Majeure Event.  It is expressly agreed that Licensor will not be obligated to settle any strike, lockout or other labor dispute to avoid a Force Majeure Event from continuing.

14.12    <u>Damages</u>.  IN NO EVENT WILL LICENSOR AND/OR ANY OTHER RELEASED PARTY BE LIABLE TO LICENSEE/INVITEE OR ANY TICKET PURCHASER FOR ANY DIRECT, INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES OR FOR LOST PROFITS, REVENUES OR

20-Game Legends Suite License Agreement for Two (2) License Periods (Plan 2)

BUSINESS OPPORTUNITIES EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

14.13    (a)    No Recourse Against Licensor's Partners.  No general partner of Licensor shall have any personal liability with respect to any of Licensor's obligations under this Agreement by reason of his/her/its/their status as general partner.  In addition, no limited partner, member, officer, director, stockholder or other holder of any ownership interest of or in Licensor shall have any personal liability with respect to Licensor's obligations under the Agreement by any reason of his/her/its/their status as limited partner, officer, director, stockholder, interest holder or otherwise.

(b)    Recourse Against Licensee's Partners or Members.  Each general or limited partner, member, manager, beneficiary, trustee, or other controlling person (any natural person or legal entity (*i.e.*, corporation, limited liability company, general or limited partnership and/or trust) each, a "person") of Licensee (as the case may be) shall be jointly and severally liable for any obligation or liability of Licensee under this Agreement, and all obligations and liabilities of Licensee hereunder shall be enforceable against each such person and each such person's assets on a joint and several basis.

14.14    Subservience.

(a)    Notwithstanding any other provision of this Agreement, this Agreement and the rights, exclusivities and protections granted by Licensor to Licensee hereunder shall, at the request of MLB, be subject to its review and written approval, and shall in all respects be subordinate to, and shall not prevent the issuance, entering into, or amendment of, any of the following, each as may be issued, entered into or amended from time to time (collectively, the "MLB Documents"): (i) any present or future agreements or arrangements entered into by, or on behalf of, any of the Major League Baseball entities and/or any of their respective present or future affiliates, assigns or successors (collectively, the "MLB Entities"), or the MLB Clubs acting collectively, including the Major League Constitution, the Basic Agreement between the MLB Clubs and the MLB Players Association, the Professional Baseball Agreement, the Major League Rules, the Interactive Media Rights Agreement, and each agency agreement and operating guidelines among the MLB Clubs and any MLB Entity; and (ii) the present and future mandates, rules, regulations, policies, practices, bulletins, by-laws, directives or guidelines issued or adopted by, or on behalf of, the Commissioner or any other MLB Entity. The issuance, entering into, amendment, or implementation of any of the MLB Documents shall be at no cost or liability to Licensor or any MLB Entity or to any individual or entity related thereto.  In the event such MLB Documents materially affect Licensor's performance of this Agreement, then Licensor shall have the right to terminate this Agreement and Licensee shall be entitled, as its sole remedy, to a refund of the portion of the License Fee paid for the relevant License Period equal to the product obtained by multiplying: (x) the number of Games covered by the Ticket Plan remaining in the Regular Season in the relevant License Period, excluding the potential for any "tie-breaker" games, immediately following the effective date of termination by Licensor; by (y) the License Fee for the relevant License Period divided by the number of Games covered by the Ticket Plan in a Regular Season, excluding the potential for any "tie-breaker" games.

(b)    This Agreement and the rights and interests of Licensee hereunder shall be further subordinate and subject to: (i) the Lease Agreement dated as of August 1, 2006, by and between the New York City Industrial Development Agency and Yankee Stadium LLC, as it may be amended, restated, modified, supplemented, extended or assigned from time to time (the "Stadium Lease"); (ii) the Stadium Sublease, dated as of August 1, 2006, by and between Yankee Stadium LLC and Licensor, as it may be amended, restated, modified, supplemented, extended or assigned from time to time (the "Stadium Sublease"); and (iii) any applicable rules, procedures, policies, regulations, directives, agreements, governing documents, actions and subservience requirements, as in effect from time to time, of the Other Event participants and/or promoter.

14.15    No Presumption.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party which drafted or caused this Agreement to be drafted.

14.16    Certain Rules of Interpretation. For purposes of this Agreement, whenever the words "commercially reasonable efforts" are used, they shall be deemed to mean the good faith exploration and fair consideration by the party undertaking such efforts of all financially reasonable options that are available to satisfy the obligation(s) which is/are owed to the other party taking into consideration the totality of the circumstances including the financial interests of the party undertaking such efforts; provided, in no event shall the party undertaking such efforts be required to suffer serious financial difficulty and/or loss. Furthermore, whenever the words "include", "includes", or "including" are used, they shall be deemed to be followed by the words "without limitation" and/or "but not limited to", and, whenever the circumstance or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa. As used in this Agreement, the words "herein", "hereof", "hereby" and "hereunder" shall refer to the Agreement as a whole, and not to any particular section, provision or subdivision thereof.  All references to a "Paragraph", "sub-paragraph", Section" or "sub-Section" shall mean paragraph, sub-paragraph, section or sub-section, as the case may be, of the Agreement, unless the context otherwise requires.  The captions used in this Agreement are intended for convenience of

xv

reference only, shall not constitute any part of this Agreement and shall not modify or affect in any manner the meaning or interpretation of any of the provisions of this Agreement.

14.17    Survival.  The parties agree that all representations and warranties contained in this Agreement shall survive the termination and/or expiration of this Agreement.  In addition, the parties agree that the following Sections of Exhibit A (Terms and Conditions) shall survive the termination and/or expiration of this Agreement: Sections 3, 5.4, 8, 9, 10, 12, 13, 14.1, 14.3, 14.4, 14.5, 14.6, 14.7, 14.11, 14.13, 14.14, 14.15, 14.16, 14.17 and 15 and Exhibit B (Health Notice).

15. CERTAIN DEFINITIONS.  For purposes of this Agreement, unless otherwise defined herein or the context requires a different definition, the following terms shall have the following meanings:

"Accompanying Party" means any person accompanying Licensee/Invitee including any minor or person admitted into the Stadium by the Ticket (each of whom Licensee/Invitee represents have authorized Licensee/Invitee to act on their behalf in accepting the Terms and Conditions).

"Adverse Weather Condition(s)" mean(s) rain, freezing rain, snow, sleet, hail, fog, tornado, flood, hurricane, tsunami (caused by hurricane), lightning or any other adverse atmospheric condition with respect to temperature, pressure, humidity, wind and/or any combination thereof.

"City Parties" mean the City of New York, the New York City Industrial Development Agency, the New York City Economic Development Corporation and the City of New York Police Department and their respective trustees, officials, members, officers, directors, employees, agents and servants.

"Club" means that MLB Club (and all successors thereto and assigns thereof) that is currently a member of the American League and at the time of execution hereof is playing baseball under the name "New York Yankees," all as may be subsequently changed from time to time by or pursuant to any MLB Documents or action by any MLB Entity.

"Commissioner" means the Office of the Commissioner of Baseball.

"Communicable Disease" means airborne, aerosolized or surface transmissible communicable and/or infectious diseases, viruses, bacteria or illnesses or the causes thereof.

"Concessionaire" means the entity(ies) designated by Licensor from time to time with whom Licensor or any of its affiliates enters into an agreement(s) to provide food and beverages at the Stadium.

"COVID-19" means COVID-19 and any strains, variants, or mutations thereof, the coronavirus that causes COVID-19.

"CPLR" means the Civil Practice Law and Rules of New York.

"Food and Beverage Agreement" means the agreement(s) between Licensee and the Concessionaire that sets forth the terms and conditions pursuant to which Licensee and Invitees shall be provided with food and non-alcoholic beverages and dining privileges in the Legends Suite.

"Food and Beverage Fee" means the amounts set forth in the Food and Beverage Agreement and payable by Licensee to the Concessionaire for food and non-alcoholic beverages during each License Period during the Term for: (i) the Games; (ii) Jewel Events (as applicable); and (iii) Other Events (as applicable).

"Force Majeure Event" means any of the following: (i) act of God; (ii) Health Emergency; (iii) hostility (whether war is declared or not), civil war, rebellion, revolution, insurrection, act of terrorism or enemy action; (iv) military or usurped power or confiscation, nationalization or national, state and/or local government sanction, regulation, restriction or emergency (declared or undeclared); (v) riot, crime or civil commotion; (vi) unavoidable casualty, fire or earthquake; (vii) interruption or failure of electricity or utilities, electrical, utilities or mechanical difficulty, inability to obtain labor, lack of materials, strike (regardless of the cause), lockout, work stoppage or other labor disturbance; (viii) order, directive, rule or regulation by MLB; (ix) MLB Labor Dispute; (x) Adverse Weather Condition; or (xi) any other cause or condition, whether similar or dissimilar to any of the foregoing, beyond the reasonable control of Licensor.

"Game(s)" mean(s) the MLB games in the Stadium (including, if applicable, one or more "tie-breaker" games played for the purpose of determining whether the Club will participate in any Postseason Games) participated in by the Club (designated as the home team) during the Regular Season for determining the participants in the Postseason Games, but excluding all exhibition games, Jewel Events and Other Events.

"Health Emergency" means disease (including COVID-19 and any Communicable Disease), plague, famine, epidemic, pandemic, public health emergency, contagions and/or communicable diseases irrespective of cause that results in a national, state and/or local crisis, quarantine, public health emergency and/or extraordinary public security or health measures (such as

xvi

shelter-in-place, stay-at-home or social/physical distancing directives) declared by any national, state and/or local government or regulatory body and/or MLB.

"Invitee(s)" mean(s) all persons, including any Accompanying Party gaining entry into the Stadium and/or Legends Suite with any Ticket(s).

"JAMS" means the alternative dispute resolution service formerly known as Judicial Arbitration and Mediation Services.

"Jewel Event(s)" mean(s) any Postseason Game(s) or other event(s) designated by MLB as a "Jewel Event" (*e.g.*, MLB All-Star Game, MLB All-Star Game-related activities, Fan Festival, Celebrity Softball Game, Workout Day, Home Run Derby, Futures Game, etc.).

"Law(s)" mean all applicable federal, state and local laws, codes, statutes, orders, directives, rules and regulations.

"Legends Club" means the bi-level restaurant/club located contiguous to the Seating Area.

"Legends Suite" means, collectively, the Seating Area, the Legends Club and the Suite Lounges in the Stadium.

"License" means the non-exclusive, revocable license granted by Licensor to Licensee to use and access the Legends Suite pursuant and subject to the terms and conditions set forth in this Agreement.

"License Fee" means the amount payable by Licensee to Licensor for each License Period during the Term.  The License Fee for each subsequent License Period during the Term, after the first License Period shall be equal to the sum of: (a) the License Fee for the immediately preceding License Period; plus (b) the product obtained by multiplying: (i) the License Fee for the immediately preceding License Period by (ii) the License Fee Escalator.

"License Fee Escalator" means the percentage increase in the License Fee set forth in sub-Paragraph 3(a) of the Agreement and compounded on a License Period-by-License Period basis following the first License Period.

"License Period" means the time period during which the License is effective and could include (if specified) a twelve calendar month period beginning January 1 and ending December 31 of the same year.

"MLB" means Major League Baseball.

"MLB Labor Dispute" means a MLB players' strike, a lockout by the MLB Clubs or any other labor dispute or work stoppage involving MLB players or other MLB personnel and/or MLB and the MLB Clubs.

"New Agreements" mean the New License Agreement, the New Ticket Agreement and the New Food and Beverage Agreement.

"New Food and Beverage Agreement" means the agreement(s) between Licensee and the Concessionaire that set(s) forth the terms and conditions pursuant to which Licensee and Invitees shall be provided with food and non-alcoholic beverages and dining privileges in the Legends Suite during the New Term and that is coterminous with the New License Agreement and the New Ticket Agreement.

"New Food and Beverage Fee" means the amount payable by Licensee to the Concessionaire for food and non-alcoholic beverages during the New Term as provided in the New Food and Beverage Agreement.

"New License" means the non-exclusive, revocable license granted by Licensor to Licensee to use and access the Legends Suite pursuant and subject to the then-existing terms and conditions set forth in the New License Agreement and the New Ticket Agreement.

"New License Agreement" means the agreement that sets forth the terms and conditions pursuant to which Licensor grants Licensee the New License at the expiration of the Term, for the New Term, and which is coterminous with the New Ticket Agreement and the New Food and Beverage Agreement.

"New License Fee" means the amount payable by Licensee to Licensor for each License Period during the New Term as provided in the New License Agreement.

"New Term" means the term of the New License Agreement specified therein.

"New Ticket Agreement" means the agreement that sets forth the terms and conditions pursuant to which Licensee agrees to license from Licensor the requisite number of Tickets to the Games during the New Term and that is coterminous with the New License Agreement and the New Food and Beverage Agreement.

"New Ticket Fee" means the amount payable by Licensee to Licensor for the Tickets to the Games covered by the Ticket Plan as provided in the New Ticket Agreement.

xvii

"Other Event(s)" mean(s) any and all charitable, religious, civic, political, sport, musical, theatrical and other events (other than Games and Jewel Events) that are held in the Stadium from time to time including any event where, as a result of any contractual arrangement with an event promoter, Licensor does not control the right to license Tickets or other tickets in the Stadium.

"Parking Pass(es)" mean(s) such sticker(s), pass(es), code(s) or equivalent(s), as and if provided by Licensor in its sole and absolute discretion, that will permit Licensee and Invitees to park in certain parking lot(s) associated with the Stadium or the Club but are not owned or controlled by Licensor.

"Postseason Game(s)" mean(s) MLB games in the Stadium participated in by the Club (designated as the home team) during any MLB postseason series (*e.g.*, American League Wild Card, American League Division Series, American League Championship Series, World Series or their equivalent in the event the designation of the various series or form of postseason play is changed or altered by MLB) as originally scheduled and published by MLB.

"Reduced License Fee Escalator" means any lower percentage increase in the License Fee which may be less than the License Fee Escalator on a License Period-by-License Period basis as determined by Licensor in its sole and absolute discretion.  Such Reduced License Fee Escalator may also be zero if the Licensor determines not to increase the License Fee for any subsequent License Period.

"Regular Season" means the MLB regular season during which the Club participates in such number of Games as determined by MLB and that commences and ends on such dates as determined by MLB as originally scheduled and published by MLB.

"Seating Area" means the Legends Suite seating area in the Stadium and includes the Seating Locations.

"Seating Location(s)" shall have the meaning(s) assigned thereto in the Ticket Agreement.

"Sports Participant" means any umpire, referee, player, coach, manager, security personnel, groundskeeper, Stadium operations employee or any other sanctioned participant, such as musicians, band members, color guards, etc.

"Stadium" means Yankee Stadium located at One East 161st Street in the Bronx, New York and the areas surrounding the Stadium, including parking lots.

"Suite Lounges" means the two (2) lounge areas located in proximity with the Seating Area down the foul lines toward right and left field past each dugout.

"Taxes" mean any and all use, sales, privilege, rental, admission, amusement, entertainment, occupancy and other taxes, charges, impositions, levies, fees and assessments that are or may be assessed, levied or imposed with respect to the Legends Suite, the Agreement, the License Fee, the Ticket Agreement, the Ticket Fee, the Food and Beverage Agreement, the Food and Beverage Fee and any other services, benefits and/or transactions contemplated by this Agreement, such as Parking Passes, food, beverages, use of the Legends Suite, etc. (but specifically excludes Licensor's income taxes), regardless of whom the tax, charge, imposition or levy is assessed, levied or imposed upon (*i.e.*, Licensor or Licensee).

"Territory" means: (i) the State of New York; (ii) the State of Connecticut; (iii) the State of New Jersey; and (iv) the State of Pennsylvania.

"Ticket(s)" mean(s) ticket(s), pass(es), code(s) or equivalent(s) permitting admission to the Legends Suite corresponding to the Seating Location(s) designated thereon, which Licensee: (a) is required to license for the Games pursuant to the terms and conditions set forth in the Ticket Agreement; and (b) subject to Sections 4.2 through 4.5 of Exhibit A (Terms and Conditions), may license for Jewel Events and Other Events.

"Ticket Account" means the record maintained by Licensor that contains information concerning Licensee and the Tickets licensed by Licensee pursuant to the Ticket Agreement.

"Ticket Agreement" means the agreement that sets forth the terms and conditions pursuant to which Licensee agrees to license from Licensor the requisite number of Tickets to the Games during the Term and that is coterminous with the Agreement.

"Ticket Fee" means the amount set forth in the Ticket Agreement and payable by Licensee to Licensor for the Tickets to the Games covered by the Ticket Plan during each License Period during the Term.

"Ticket Plan" means the plan pursuant to which Licensee licenses Tickets for the Seating Locations, with the specific number of Games and specific Games included in such plan determined by the Licensor.  For example, a Full Season Ticket

Plan shall be for all Games.  As a further example, a Partial Season Ticket Plan shall be for a certain number of Games, with the specific Games included in such Partial Season Ticket Plan determined by Licensor.

"Total Fee" means the sum total of the Ticket Fee, License Fee and Food and Beverage Fee in each applicable License Period during the Term.

20-Game Legends Suite License Agreement for Two (2) License Periods (Plan 2)

**EXHIBIT B**

**Health Notice**

Unless otherwise defined or the context requires a different definition, all capitalized terms shall have the meanings assigned to such terms in Section 15 of Exhibit A (Terms and Conditions).

1.      COVID-19 AND OTHER INFECTIOUS AND/OR COMMUNICABLE DISEASES, VIRUSES, BACTERIA OR ILLNESSES.

       (a)      COVID-19 IS AN EXTREMELY CONTAGIOUS DISEASE THAT CAN LEAD TO SEVERE ILLNESS AND DEATH. AN INHERENT RISK OF EXPOSURE TO COVID-19 EXISTS IN ANY PUBLIC PLACE INCLUDING THE STADIUM REGARDLESS OF PRECAUTIONS THAT MAY BE TAKEN. LICENSEE/INVITEE AGREES TO: (i) ASSUME ALL RISKS ASSOCIATED WITH COVID-19 AND OTHER COMMUNICABLE DISEASES; AND (ii) COMPLY WITH ALL RELATED HEALTH & SAFETY POLICIES OF THE LICENSOR AND THE STADIUM.

       (b)      Licensee/Invitee acknowledges and agrees to comply with: (i) all relevant policies and protocols issued by the Licensor and/or the Stadium, including any policies and protocols regarding security, bags, fan conduct and health and safety, currently available at https://www.mlb.com/yankees/ballpark/information, all of which, due to the evolving nature of the COVID-19 pandemic, may continue to be updated from time to time between purchase of the Ticket and the ticketed Game, Jewel Event or Other Event date; and (ii) all current guidance of the Centers for Disease Control and Prevention ("CDC") and all applicable Laws and policies of federal, state, city and local authorities.

2.      FAN HEALTH PROMISE.

       (a)      Licensee/Invitee acknowledges and understands that, if infected with COVID-19 or other Communicable Disease, Licensee/Invitee may infect others that they may subsequently come in contact with, even if they are not experiencing or displaying any symptoms of illness, and that the risk of exposure to others remains at all times. Accordingly, Licensee/Invitee agrees that Licensee/Invitee will not attend the Game, Jewel Event or Other Event, if within ten (10) days preceding the Game, Jewel Event or Other Event, they have:

              (i)      tested positive or presumptively positive for COVID-19 or other Communicable Disease or been identified as a potential carrier of COVID-19 or other Communicable Disease; OR

              (ii)      experienced any symptoms commonly associated with COVID-19 or other Communicable Disease; OR

              (iii)      been in direct contact with or the immediate vicinity of any person who is confirmed or suspected of being infected with COVID-19 or other Communicable Disease.

3.      RESALE TERMS AND POD INTEGRITY (AS APPLICABLE).

       (a)      Licensee/Invitee agrees to comply with all terms and conditions presented at the time of purchase not specifically enumerated herein, including (i) terms that mandate or prescribe the quantity of Tickets available to be purchased, (ii) additional requirements regarding Accompanying Party(ies) and (iii) terms regarding the resale or transfer of Tickets.

4.      ASSUMPTION OF RISK RELATED TO COVID-19 AND OTHER COMMUNICABLE DISEASES.

       (a)      Licensee/Invitee acknowledges and expressly assumes all risks that are in any way related to or arising from being exposed to or contracting COVID-19 or other Communicable Disease in the Stadium. By using the Ticket, Licensee/Invitee is acknowledging and confirming, both now and in the future, that Licensee/Invitee understands and expressly assumes the risk that Licensee/Invitee may be exposed to COVID-19 or other Communicable Disease. Licensee/Invitee expressly understands that these risks include contracting COVID-19 or other Communicable Disease and the associated dangers, medical complications and physical and mental injuries, both foreseen and unforeseen, that may result from contracting COVID-19 or other Communicable Disease. Licensee/Invitee further acknowledges and understands that any interaction with the general public poses an elevated, inherent risk of being exposed to and contracting Communicable Disease, including COVID-19, that it cannot be guaranteed that Licensee/Invitee will not be exposed, and that as such, potential exposure to or contraction of COVID-19 or other Communicable Disease are risks inherent in Licensee's/Invitee's decision to use the Ticket that cannot be eliminated.

i

5.    RELEASE OF LIABILITY AND COVENANT NOT TO SUE.

(a)    LICENSEE/INVITEE, ON BEHALF OF LICENSEE/INVITEE AND THEIR PERSONAL REPRESENTATIVES, HEIRS, SPOUSE, GUARDIANS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, NEXT OF KIN AND ANY OTHER PERSON OR ENTITY THAT MAY BE ENTITLED TO MAKE A CLAIM ON THEIR BEHALF, WAIVES, RELEASES, DISCHARGES, HOLDS HARMLESS AND COVENANTS NOT TO SUE THE RELEASED PARTIES WITH RESPECT TO ANY CLAIM, LIABILITY OR DEMAND OF WHATEVER KIND OR NATURE, EITHER IN LAW OR IN EQUITY (INCLUDING FOR PERSONAL INJURIES OR WRONGFUL DEATH) THAT MAY ARISE IN CONNECTION WITH, OR RELATE IN ANY WAY TO, (i) USE OF THE TICKET, (ii) PRESENCE AT THE STADIUM OR (iii) PARTICIPATION IN THE GAME, JEWEL EVENT OR OTHER EVENT OR ANY RELATED ACTIVITIES ARRANGED, PROMOTED AND/OR SPONSORED BY THE LICENSOR OR OTHER RELEASED PARTIES, INCLUDING THOSE CLAIMS THAT ARISE AS A RESULT OF: (A) IN WHOLE OR IN PART, THE SOLE, JOINT, OR COMPARATIVE NEGLIGENCE, OR STRICT LIABILITY, OF THE RELEASED PARTIES AND/OR (B) THE INHERENT RISKS ASSOCIATED WITH VISITING THE STADIUM, INCLUDING (I) ALL CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH OR EXPOSURE TO OR CONTRACTION OF COVID-19 OR OTHER COMMUNICABLE DISEASE BY LICENSEE/INVITEE, OR OTHER INDIVIDUALS EXPOSED TO COVID-19 OR OTHER COMMUNICABLE DISEASE BY LICENSEE/INVITEE; AND (II) ALL CLAIMS IN CONNECTION WITH THE APPLICATION OF ANY HEALTH AND SAFETY PROTOCOLS TO LICENSEE/INVITEE.

(b)    The acknowledgements and express assumptions of risk, waivers of claims, and releases of liability contained herein are binding and full waivers of claims and releases of liability, and interpreted to be as broad and inclusive as is permitted by Law, including with respect to any controversy, claim or dispute that may arise related to exposure or contraction of COVID-19 or other Communicable Disease. If any part hereof is held to be invalid or legally unenforceable for any reason, the remainder of these terms shall not be affected thereby and shall remain valid and fully enforceable.

6.    FULLY VACCINATED SEATING SECTIONS (AS APPLICABLE).

(a)    Licensor may offer seating sections at full capacity without physical distancing for persons who have been fully vaccinated against COVID-19 ("Fully Vaccinated Seating Sections").

(b)    In order to be permitted entry into the Stadium and to sit in a Fully Vaccinated Seating Section, a ticket holder (5 years or older) must show proof of full COVID-19 vaccination.

(c)    According to the CDC, a person is considered fully vaccinated against COVID-19: (A) two (2) weeks or more after receiving the second dose in a 2-dose series (*e.g.*, Pfizer-BioNTech or Moderna); or (B) two (2) weeks or more after they have received a single-dose vaccine (*e.g.*, Johnson and Johnson [J&J]/Janssen).

(d)    Acceptable forms of proof of full COVID-19 vaccination include: (i) a CDC-approved COVID-19 Vaccination Record Card; (ii) Excelsior Pass; (iii) a government-issued photograph identification and proof of vaccination form; or (iv) electronically stored versions of any of the foregoing.

(e)    Guests 4 years old and younger who accompany a fully vaccinated person in a Fully Vaccinated Seating Section are exempt from providing proof of being fully vaccinated against COVID-19.

20-Game Legends Suite License Agreement for Two (2) License Periods (Plan 2)

**LEGENDS SUITE TICKET AGREEMENT**
**(20 Games – Plan 2)**

Dear Licensee:

This will confirm that you ("you" or "Licensee") have agreed to license from the New York Yankees Partnership ("us" or "Licensor") certain Tickets in the Legends Suite as required under the License Agreement entered into contemporaneously herewith – all in accordance with and subject to the terms and conditions set forth below and in the attached Exhibit A (Terms and Conditions) and Exhibit B (Health Notice) which are, by reference, incorporated herein and form a part of this Legends Suite Ticket Agreement (collectively, this or the "Agreement"). Unless otherwise defined or the context requires a different definition, all capitalized terms shall have the meanings assigned to such terms in Section 14 of Exhibit A (Terms and Conditions).

1.    TICKETS.  In accordance with and subject to: (a) Exhibit A (Terms and Conditions); and (b) Licensee entering into the License Agreement and paying the License Fees specified therein, Licensee agrees to license from Licensor during the Term (defined below) Four (4) Tickets located in the following seating locations in the Legends Suite (each a "Seating Location" and, collectively, the "Seating Locations") for Games covered by the Ticket Plan:

(a)    Section 024B, Row 5, Seats 8, 9, 10, and 11.

2.    TERM.  The term of the Ticket License will be for the following Two (2) separate License Periods (the "Term"):

(a)    January 1, 2023, through December 31, 2023; and

(b)    January 1, 2024, through December 31, 2024.

3.    TICKET FEE AND TAXES.

(a)    (i)    In consideration for the Ticket License and for the first License Period, Licensee shall pay to Licensor the following Ticket Fee plus Taxes:

| 2023 TICKET FEE | + | 2023 TAXES | = | 2023 TOTAL |
|---|---|---|---|---|
| $20,941.60 | + | $1,858.56 | = | $22,800.16 |

(ii)    Thereafter, during the remainder of the Term, the Ticket Fee shall increase each subsequent License Period by a maximum of four and one-half percent (4.5%) (the "Ticket Fee Escalator") compounded on a License Period-by-License Period basis following the first License Period. For example, the Ticket Fee for the second License Period shall be as follows:

| 2024 TICKET FEE | + | 2024 TAXES | = | 2024 TOTAL |
|---|---|---|---|---|
| $21,883.97 | + | $1,942.20 | = | $23,826.17 |

(b)    Each License Period's Ticket Fee and Taxes shall be due and payable as follows:

(i)    For the 2023 License Period, payment shall be due in full upon execution of the Agreement by Licensee, unless otherwise agreed to between the parties; and

1

(ii)     For all remaining License Periods during the Term, payment shall be due on December 31 of the year prior to the applicable License Period (*i.e.*, December 31, 2023, for the 2024 License Period; December 31, 2024, for the 2025 License Period; etc.).

(c)     Notwithstanding anything to the contrary in the Agreement, Licensee acknowledges that each License Period's Ticket Fee Escalator shall be determined by Licensor in its sole and absolute discretion. Accordingly, and for each successive License Period during the Term after the first License Period, nothing contained herein prohibits Licensor from applying a Reduced Ticket Fee Escalator. Licensee further acknowledges that any application of a Reduced Ticket Fee Escalator by Licensor: (i) does not create an expectation that a Reduced Ticket Fee Escalator(s) must be applied to the Ticket Fee in any future License Period; and (ii) does not create an entitlement to any future Reduced Ticket Fee Escalator(s). Furthermore, and notwithstanding anything to the contrary contained in this Agreement, if Licensor applies a Reduced Ticket Fee Escalator for any given License Period, Licensor shall be permitted to equalize any subsequent License Period's Ticket Fee so that the amount payable by Licensee to Licensor for such License Period is equal to the amount Licensee would have paid had the Ticket Fees for each License Period (after the first License Period) been increased for each License Period by the Ticket Fee Escalator on a compounded basis commencing with the second License Period.

(d)     Furthermore, and notwithstanding anything to the contrary in this Agreement, the License Agreement and/or the Food and Beverage Agreement, Licensor may adjust each Ticket Fee by a percentage greater than or less than the Ticket Fee Escalator (as determined by Licensor in its sole and absolute discretion) on a License Period-by-License Period basis; provided, in no event shall Licensee be required and/or obligated to pay Licensor more than the Total Fee for the applicable License Period.

(e)     **NOTE:**

(i)     THE TICKET FEE ONLY INCLUDES THE COST AND PRICE OF THE TICKETS FOR THE GAMES COVERED BY THE TICKET PLAN DURING THE RELEVANT LICENSE PERIOD. THE TICKET FEE DOES NOT CONTAIN OR INCLUDE THE COST OR THE PRICE OF: (A) THE LICENSE FEE; (B) FOOD AND BEVERAGES; (C) TICKETS TO EACH OR ANY JEWEL EVENT OR OTHER EVENT; AND/OR (D) TAXES.

(ii)     LICENSEE HAS AGREED TO AND SHALL ENTER INTO: (A) THE FOOD AND BEVERAGE AGREEMENT AND PAY THE FOOD AND BEVERAGE FEES; AND (B) THE LICENSE AGREEMENT FOR THE RIGHT TO USE AND ACCESS THE LEGENDS SUITE.

(iii)     TICKETS ARE REQUIRED FOR ADMISSION TO EACH JEWEL EVENT AND OTHER EVENT AND MUST BE LICENSED SEPARATELY, WITH EACH LICENSE SUBJECT AND PURSUANT TO A SEPARATE AGREEMENT. ALL TICKETS TO JEWEL EVENTS AND OTHER EVENTS SHALL BE SUBJECT TO SECTION 5 OF EXHIBIT A (TERMS AND CONDITIONS) AND THE PAYMENT OF TAXES. FURTHERMORE, LICENSEE IS REQUIRED TO PAY SEPARATE FOOD AND BEVERAGE FEES ASSOCIATED WITH EACH TICKET LICENSED BY LICENSEE FOR EACH JEWEL EVENT AND OTHER EVENT.

(iv)     LICENSEE ACKNOWLEDGES THAT THE TOTAL NUMBER OF GAMES THAT COMPRISES A REGULAR SEASON SHALL BE DETERMINED BY MLB. LICENSEE SHALL NOT BE ENTITLED TO ANY REFUND OF THE TICKET FEE AND/OR TAXES IF THE TOTAL NUMBER OF GAMES INCLUDED IN THE TICKET PLAN IS

2

**REDUCED AS A RESULT OF MLB'S DETERMINATION THAT A FULL REGULAR SEASON IS COMPRISED OF LESS THAN 81 GAMES. INSTEAD, THE TICKET FEE AND TAXES WILL BE APPORTIONED OVER THE ACTUAL TOTAL NUMBER OF GAMES IN THE TICKET PLAN AS DETERMINED BY LICENSOR.**

AGREED & ACCEPTED:

LICENSEE:
JENNIFER KUTLER

By: _____
Name: JENNIFER KUTLER
Title: Payroll Specialist
Date: August 15, 2022
Address:  400 Thomas Ave.
          Floor 2
          Lyndhurst, NJ 07071-3100
Telephone: 2016152574
Fax: 2016047868
E-mail: jenkutler@aol.com

LICENSOR:
NEW YORK YANKEES PARTNERSHIP

By: Lonn A Trost as Chief Operating Officer
Name: Lonn A. Trost
Title:  Chief Operating Officer

WIRE INSTRUCTIONS:
Bank: Bank of America
ABA: 026009593
Acct: 483011477171
Name: New York Yankees Partnership
Federal I.D.: 34-1122131

3

20-Game Legends Suite Ticket Agreement for Two (2) License Periods (Plan 2)

# EXHIBIT A

# Terms and Conditions

These Terms and Conditions shall be fully incorporated into and form a part of the Agreement (*i.e.*, the Legends Suite Ticket Agreement) to which this Exhibit A is attached.  For further clarity, the Agreement subsumes these Terms and Conditions and Exhibit B (Health Notice) – all of which are integral to the agreement of the parties hereto.  All capitalized terms that are defined in Section 14 shall have the same meaning for purposes of all other Paragraphs and Sections of this Agreement unless otherwise defined or the context requires a different definition.  To the extent that any provision of these Terms and Conditions conflicts with: (a) any provision of the Agreement; (b) the terms and conditions on any invoice for the Tickets; (c) the terms and conditions set forth on the Tickets (in digital or printed form); and/or (d) the terms and conditions set forth on http://www.yankees.com, these Terms and Conditions shall control.  To the extent that any provision of these Terms and Conditions conflict with the terms and conditions of the License Agreement, the License Agreement shall control.

1.    TICKET LICENSE.

1.1      For and in consideration of: (a) the timely payment of each License Period's Ticket Fee and Taxes; (b) Licensee's execution and performance of the requisite License Agreement and timely payment of each License Fee; (c) Licensee's execution and performance of the requisite Food and Beverage Agreement and timely payment of each Food and Beverage Fee; and (d) Licensee not being in breach of the Agreement and/or the License Agreement, Licensor grants to Licensee the Ticket License on and subject to the terms and conditions set forth herein.  THE TICKET LICENSE COVERS: (x) THE GAMES; AND (y) THE POSTSEASON GAMES TO THE EXTENT LICENSEE LICENSES APPLICABLE TICKETS FOR SUCH POSTSEASON GAMES.  ANY TICKET LICENSE FOR ANY JEWEL EVENTS OR ANY OTHER EVENTS SHALL BE SUBJECT TO SECTIONS 5.2 THROUGH 5.5, AS APPLICABLE.

1.2      Any opportunity granted by Licensor to renew the Ticket License or to license Tickets to Jewel Events or Other Events is a privilege revocable, at any time, in Licensor's sole and absolute discretion.

2.    TICKET ACCOUNT.

2.1      All Ticket Account information provided by Licensee (*e.g.*, name, billing/mailing/email addresses, phone, etc.), including as reflected on Licensee's My Yankees Account and in Licensor's database), must be the Licensee's own and true personal or business information.  All payments must be made directly by the Licensee unless approved by Licensor.  Any payment by any person or entity other than Licensee must be expressly authorized by such person or entity.  False or misleading information constitutes a material breach of the License.  Licensor reserves the right to require valid identification and/or other proof of information related to the Ticket Account.  Licensee can only be one (1) person to whom/which a Ticket Account is registered.  If the Ticket Account is registered in the name of a business entity, a contact person (who will not be considered the Licensee) must be identified.  Payment of any Invoice by anyone other than Licensee, and receipt and/or acceptance of payment thereof by Licensor, does not constitute or effectuate an assignment or transfer of the Agreement.

3.    TERM OF THE TICKET LICENSE.

3.1      Term.  The Term of the Ticket License shall be for the number of License Periods identified in Paragraph 2 of the Agreement.

3.2      Opportunity to Renew.  At any time, Licensor may (in Licensor's sole and absolute discretion) offer Licensee the opportunity to obtain a New Ticket License by providing Licensee with a written notice (the "Renewal Notice") which will set forth: (a) the New Term; (b) the New Ticket Fee(s); (c) the New License Fee(s); (d) the New Food and Beverage Fee(s); and (e) such other terms and conditions of the New Ticket License, as more particularly set forth in the New Agreements – all as determined by Licensor and the Concessionaire, each in its sole and absolute discretion.  In order to exercise the opportunity to obtain a New Ticket License, Licensee is required to accept all the terms and conditions set forth in the New Agreements by executing and returning the New Agreements to Licensor and the Concessionaire (together with any prepayment amounts required by the New Agreements).  Licensee may reject the terms for the New Agreements by sending Licensor a notice of rejection within fourteen (14) days after the Renewal Notice is provided to Licensee.  A failure to respond within such fourteen (14) day period shall be deemed a rejection by Licensee of the New Agreements.  If Licensee rejects (or is deemed to have rejected) the offers contained in the New Agreements, Licensor shall have the unencumbered right to license the Tickets for periods commencing from and after the expiration of the Term to any person or entity on such terms and conditions and for such consideration as Licensor may determine in its sole and absolute discretion without any liability or obligation whatsoever to Licensee.

i

4. PAYMENTS.

4.1 <u>Payment of Ticket Fees; Payment Dates</u>. In consideration for the Ticket License, Licensee shall pay to Licensor the Ticket Fee for each License Period in accordance with the terms set forth in Paragraph 3, *et seq.*, of the Agreement. Except as otherwise agreed to by Licensor, all payments by Licensee under this Agreement shall be made without offset, deduction or counterclaim and by credit card, company, cashier's or certified check or wire transfer of immediately available funds to Licensor at its address or account set forth in the Agreement or pursuant to such other written instructions as may be given by Licensor or any Assignee designated pursuant to Section 13.1. Each Ticket Fee shall be due and payable each License Period regardless of the threatened cancellation or postponement of any Games, during the preceding License Period or threatened cancellation or postponement of any Games during the forthcoming License Period, whether due to any Force Majeure Event or otherwise.

4.2 <u>Acceptance of License</u>. Payment of each Ticket Fee pursuant to Paragraph 3, *et seq.*, of the Agreement constitutes Licensee's acceptance of the Ticket License during the relevant License Period pursuant to the Terms and Conditions. This Ticket License is revocable at the sole and absolute discretion of Licensor with cause including failure to pay any Taxes, License Fee, Food and Beverage Fee or Ticket Fee or failure to enter into the Food and Beverage Agreement and the License Agreement. Any revocation of the Ticket License by Licensor with cause shall be subject to Section 8.

4.3 <u>Taxes</u>. Licensee shall pay and/or be responsible for paying all Taxes regardless of: (a) when levied, assessed or imposed; (b) upon whom levied, assessed or imposed; (c) the License Period (past, present and/or future) or portion of the Term (past, present and/or future) that is subject to said levy, assessment or imposition; and (d) which event constitutes a taxable event. If such Taxes are not collected directly from Licensee by the charging or collecting authority and/or entity, all such Taxes shall be immediately due and payable by Licensee to and upon demand by Licensor. Licensee shall reimburse Licensor for any fees, penalties, interest or other charges paid by Licensor with respect to any Taxes.

4.4 <u>Interest</u>. Any and all sums due hereunder from Licensee, if not paid when due, shall bear interest at the lesser of: (a) one percent (1%) per month; or (b) the maximum rate then permitted by Law, from the date due until paid. Licensee agrees that the interest charges reflected in both clauses (a) and (b) are reasonable and represent a fair estimate of the additional expense that may be incurred by Licensor in handling, collecting and accounting for delinquent payments. Such interest charge shall be in addition to, and not in lieu of, all other rights and remedies of Licensor under this Agreement.

5. <u>TICKETS</u>.

5.1 <u>Games</u>. SUBJECT IN ALL RESPECTS TO THE TERMS AND CONDITIONS HEREIN, EACH TICKET FEE ONLY INCLUDES THE COST AND PRICE OF THE TICKETS FOR THE GAMES AND EXCLUDES TAXES.

5.2 <u>Jewel Events</u>. EACH TICKET FEE DOES NOT INCLUDE TAXES AND/OR THE COST OR PRICE OF ANY TICKETS AND/OR FOOD AND BEVERAGES FOR ANY JEWEL EVENTS.

(a) There is no guarantee or assurance that any Jewel Events will be held at the Stadium. If any Jewel Events are held at the Stadium during the Term, Licensee will have the right, but not the obligation, to license all Tickets for all Seating Locations for each such Jewel Event that Licensee may be eligible for (as determined by Licensor). More particularly, in the event Licensee elects to license Tickets to such Jewel Event, Licensee must license the full strip of Tickets (*i.e.*, all Tickets to all potential games of all potential series and/or all potential events included in such Jewel Event) for each Seating Location and pay Taxes associated with Tickets and any Food and Beverage Fee(s) associated with such Jewel Event(s). Furthermore, Licensee is limited to licensing that number of Tickets for all applicable Jewel Events that is equal to the number of Tickets set forth in Paragraph 1 of the Agreement, as and when such Tickets become available at such prices and on such other terms, conditions and procedures as may be determined by Licensor and/or MLB (each in its sole and absolute discretion). If the maximum number of games and/or events included in a Jewel Event to which Licensee has licensed Tickets does not occur, the amount paid for Tickets and Taxes for such non-occurring game and/or event will be refunded to Licensee, unless Licensee agrees to apply such refund to Licensee's Ticket Account.

(b) If Licensee does not elect to exercise its right to license all or any portion of such Jewel Event Tickets and pay Taxes associated with such Jewel Event Tickets and any Food and Beverage Fees associated therewith in accordance with the terms, conditions and procedures set forth in sub-Section 5.2(a), Licensor shall have the unencumbered right to license all or any portion, respectively, of such Tickets not licensed by Licensee to any third party or parties on such terms, conditions and procedures as Licensor and/or MLB may determine (each in its sole and absolute discretion) without any further liability or obligation to Licensee. Licensee shall not be entitled to any proceeds from any such sale(s) of Ticket(s) not licensed by Licensee and/or any compensation, credit, rebate, refund, offset, make-good or other remedy as a result of the sale(s) of Ticket(s) to any third party.

ii

5.3    Other Events.  EACH TICKET FEE DOES NOT INCLUDE THE COST OR PRICE OF TAXES, ANY TICKETS AND/OR FOOD AND BEVERAGES FOR ANY OTHER EVENTS.

(a)    There is no guarantee or assurance that any Other Event will be held at the Stadium, or that if any Other Event is held at the Stadium, Tickets will be made available to Licensee by the Other Event promoter.  Subject to any terms, conditions, procedures, rules or regulations as may be established and/or imposed by Licensor or any Other Event promoter (each in its sole and absolute discretion) and any other applicable terms and conditions of this Agreement (including Section 5.4), if the Seating Locations (or portion thereof) are made available to Licensee for any such Other Event, Licensee shall have the right, but not the obligation, to license Tickets for all available Seating Locations for such Other Event and pay any Food and Beverage Fee(s) associated with such Other Event.  More particularly, in the event Licensee has the right and elects to license Tickets for the available Seating Locations for such Other Event, Licensee is limited to licensing that number of available Tickets for the Other Event, as and when such Tickets become available at such prices, Taxes and on such other terms, conditions and procedures as may be determined by Licensor and/or the Other Event promoter (each in its sole and absolute discretion).

(b)    If Licensee does not exercise its right to license all or any portion of such Other Event Tickets and pay Taxes associated with such Other Event Tickets and the Food and Beverage Fee(s) associated therewith in accordance with the terms, conditions and procedures set forth in sub-Section 5.3(a), Licensor or the Other Event promoter shall have the unencumbered right to license all or any portion, respectively, of the Tickets not licensed by Licensee to any third party or parties on such terms, conditions and procedures as Licensor and/or the Other Event promoter may determine (each in its sole and absolute discretion) without any further liability or obligation to Licensee.  Licensee shall not be entitled to any proceeds from any such sale(s) of Ticket(s) not licensed by Licensee and/or any compensation, credit, rebate, refund, offset, make-good or other remedy as a result of the licensing of Ticket(s) to any third party.

5.4    Limitations.

(a)    Licensee acknowledges that, subject to rules and regulations of either MLB or the Other Event promoter (as the case may be), a row or rows of seats/chairs may be placed on the field in front of the first row of seating locations located between the outfield end of either dugout and the respective foul poles during Jewel Events and/or Other Events.  The placement and/or occupancy of such seats/chairs in such locations shall not constitute a breach by Licensor or entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

(b)    Tickets and licenses thereof for any Jewel Events and Other Events shall be subject to such terms, conditions, procedures, rules and regulations as to Ticket prices, Taxes, deadlines, postponements, cancellations, schedules, dates, times and other matters as may be established, respectively, by Licensor, the Club, MLB and/or any Other Event promoter, each in its sole and absolute discretion.  Furthermore, and except with respect to Postseason Games, the availability of Tickets for any Jewel Event and any Other Event will be determined by Licensor, MLB and/or any Other Event promoter, each in its sole and absolute discretion.  In the event Licensor is unable to provide Licensee with Tickets in the Legends Suite and/or the Seating Locations for any Jewel Event (except Postseason Games) and/or Other Event, Licensor will use commercially reasonable efforts to provide Licensee with the opportunity to license tickets elsewhere in the Stadium, subject to Sections 5.2 and 5.3 (as the case may be) and availability at the then-prevailing rates, costs, and prices for all such tickets and Taxes.

(c)    Licensor's obligation to provide Tickets under this Agreement shall be subject to applicable Laws relating to fire and occupancy.

(d)    Licensor reserves the right to restrict, modify, alter, change and/or amend the Seating Locations as a result of: (i) MLB requirements; (ii) Laws; (iii) alteration of the Stadium; and/or (iv) other reasons beyond the control of Licensor .  If the Seating Locations are not available due to any of the aforementioned reasons for a Game, then Licensor will use commercially reasonable efforts to provide Licensee with the opportunity to license tickets elsewhere in the Stadium, subject to availability and as determined by Licensor.  If Licensor is unable to provide Licensee with the opportunity to license tickets elsewhere in the Stadium to a Game, then Licensee shall be entitled, as its sole remedy, to a credit in an amount equal to the established price of the Ticket(s) for the Games to which the Seating Location(s) were determined by Licensor to be unavailable. Such credit may be applied towards the purchase of tickets to another Game within 12 months of the originally scheduled Game, subject to availability.

5.5    Obstructed Views.

(a)    Licensee acknowledges that during Games, Jewel Events and Other Events, viewing ability and lines of sight may be impacted as a result of game and/or event conditions, protective netting/devices, the manner of play, the field configuration, the location of fixed and electronic (computerized) signage (provided any signage that does not materially

iii

obstruct lines of sight shall not be deemed to impact lines of sight), cameramen (*e.g.*, television and film), photographers, production personnel and their equipment, sound equipment, cables, stages, on-deck circles, coaches boxes, security personnel, placement of Sports Participants and their family members (whether or not participating), other fans as well as other similar and dissimilar conditions including the reconfiguration of the Stadium's seating bowl, playing field, aisle seating and seating required by Laws pertaining to fans with disabilities and otherwise.  Obstructed views shall not entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

(b)  Licensee acknowledges that certain Other Events may not be viewable, in whole or in part, from the Seating Locations due to the location of the playing field, stage or event floor for the Other Event, the type of set-up for the Other Event or other matters related to the manner or presentation of the Other Event.  If Licensor determines, in its sole and absolute discretion, that the viewing of any such Other Event from the Seating Locations may be so obstructed, Licensor reserves the right to decline to make Tickets available for such Other Event; Licensor shall, however, use commercially reasonable efforts to provide Licensee with the opportunity to license tickets elsewhere in the Stadium for such Other Event, subject to Sections 5.3 and 5.4 and availability, at the then-prevailing rates, costs, prices and Taxes for all such tickets, in each case, and subject to any arrangement made with the Other Event promoter.

6.  RESALE OF TICKET(S)/PROMOTIONAL OR OTHER USE OF TICKET(S).

6.1  Any sale, resale, auction, assignment or transfer (collectively, "Resale") of Tickets must be done in accordance with applicable Laws including NY Arts & Cultural Affairs § 25, *et seq*.  Any Resale in violation of Laws will constitute a material breach of the Agreement.  Any attempt by two (2) or more persons to gain admission with both a cancelled Ticket and any reissued Ticket whether as part of a Resale transaction and/or otherwise transferred by Licensee constitutes a material breach of the Agreement.  NEW YORK LAW PROVIDES THAT (a) THE UNLAWFUL RESALE OF FIVE (5) OR MORE TICKETS WITHOUT HAVING FIRST PROCURED A LICENSE FROM THE NEW YORK SECRETARY OF STATE IS PUNISHABLE BY IMPRISONMENT OF UP TO ONE (1) YEAR AND FINES OF UP TO $2,000.00; (b) THE USE OF ANY MACHINE, DEVICE, COMPUTER PROGRAM OR COMPUTER SOFTWARE THAT NAVIGATES OR RUNS AUTOMATED TASKS ON RETAIL TICKET PURCHASING WEBSITES IN ORDER TO BYPASS SECURITY MEASURES TO PURCHASE TICKETS IS ILLEGAL; AND (c) THE RESALE OF ANY TICKET WITHIN ONE THOUSAND FIVE HUNDRED (1,500) FEET FROM THE PHYSICAL STRUCTURE OF THE STADIUM (INCLUDING ANY BUILDING OR OTHER STRUCTURE AT WHICH TICKETS ARE OFFERED FOR FIRST SALE TO THE PUBLIC) IS PROHIBITED UNDER PENALTY OF LAW. LICENSOR RESERVES THE RIGHT TO REQUIRE PROOF OF A VALID NEW YORK TICKET RESELLER LICENSE.

6.2  No Ticket(s) may be used for advertising, promotion (including contests, giveaways or sweepstakes), charitable, trade or commercial purposes without the express prior written consent of Licensor.  Any violation of the foregoing is the sole responsibility of Licensee.  Licensor will investigate any violations of the Ticket License.  The failure of Licensee or any person in possession of the Ticket(s) to cooperate with any investigation constitutes a material breach of this Agreement.

7.  COVENANTS, ACKNOWLEDGMENTS AND REPRESENTATIONS OF LICENSEE.

7.1  Licensee covenants and agrees with Licensor as follows:

(a)  Licensee and Invitees shall keep and maintain the Legends Suite in good repair, order and condition and, in addition to the other payments provided for in this Agreement, shall reimburse Licensor, upon Licensor's demand, for any costs incurred by Licensor to repair any damage directly or indirectly caused by Licensee or Invitees to the Legends Suite or any other area of the Stadium or to any property of Licensor therein, in each case except for normal wear and tear. Furthermore, Licensee and Invitees shall not borrow, dislodge, relocate or otherwise remove any personal property of Licensor or any third party located in the Legends Suite or any other part of the Stadium.

(b)  Licensee and Invitees shall at all times maintain proper decorum while using the Legends Suite and any other area of the Stadium and shall abide by all applicable Laws including those pertaining to fan behavior and the use and consumption of alcoholic beverages and prohibition of smoking (including electronic cigarettes).  Without limiting the generality of the foregoing, Licensee shall not serve or permit to be served (and shall cause its Invitees not to serve or permit to be served), in the Legends Suite or elsewhere in the Stadium, alcoholic beverages to persons under 21 years of age or persons intoxicated, visibly or not, and shall comply with such rules and regulations as may be adopted and revised from time to time by Licensor, MLB or any Other Event promoter for the Legends Suite or any other area of the Stadium.  If Licensee or any Invitee violates the preceding sentence, Licensor: (i) may eject Licensee and/or any Invitee and revoke the Ticket License and/or any Ticket privilege at any time, both for the event at which the violation occurs and/or one or more future

iv

events; and/or (ii) exercise any of Licensor's rights (including the right to declare an Event of Default and/or to terminate this Agreement) due to such violation of this sub-Section 7.1(b).

(c)     Neither Licensee nor any Invitees shall place any of their respective property or any other materials including any waste products generated by Licensee or any Invitees, outside of the Legends Suite.

(d)     Banners and signs are permitted during the Games provided they are baseball-related, in good taste and non-commercial, non-political and/or non-advocacy in nature.  Any banner or sign may be removed at the sole discretion of Licensor.  However, neither Licensee nor any Invitees shall, without first obtaining Licensor's written approval (which may be withheld in Licensor's sole and absolute discretion), place or display any merchandise, advertisements, corporate identifications or symbols, flags, pennants or emblems of any kind in the Stadium.

(e)     Neither Licensee nor any Invitees shall use any tripods, monopods, selfie sticks, extended length zoom lenses, other camera equipment, movie cameras, flash photography or any other video or audio recording equipment anywhere in the Stadium.

(f)     Neither Licensee nor any Invitees shall use any mobile device in the Legends Suite during live Game action and, if applicable, live Jewel Event or Other Event action or in any manner which Licensor, MLB and/or the Other Event promoter may deem disruptive; provided, however, mobile devices may be used prior to, after the conclusion of and, as applicable, "in between" innings of any Game, Jewel Event or Other Event.  LAPTOP AND/OR TABLET COMPUTERS SHALL NOT BE PERMITTED IN THE STADIUM.

(g)     Neither Licensee nor any Invitees shall use any air horns, megaphones, loud speakers, portable stereo systems or other voice or sound amplification equipment, flashlights, lasers or any device that may: (i) interfere with and/or distract any Sports Participant and/or other patrons in, on or about the Legends Suite or any other part of the Stadium; (ii) interfere with and/or disrupt any audio and/or audio/visual telecast and/or recording of the Game, Jewel Event or Other Event; or (iii) interfere with and/or disrupt any technology-related service provided in the Stadium.

(h)     Licensee and Invitees shall permit any and all bags, clothing and other articles to be screened and/or inspected prior to entry into the Stadium and shall not enter the Stadium with and/or shall remove any items that Licensor deems inappropriate, offensive or potentially injurious to the Stadium, any Sports Participant, Licensor's employees, agents and contractors and/or other patrons of the Stadium.  By using the Tickets, Licensee and Invitees consent to being screened by metal detectors, hand-wand inspection and, if necessary (as determined in Licensor's sole and absolute discretion), a pat-down inspection.  Furthermore, Licensee and Invitees consent to X-ray inspection of any and all personal items.

(i)     Neither Licensee nor any Invitees shall bring into or consume in the Legends Suite any food or beverages other than that which was purchased or obtained from the Concessionaire.

(j)     Licensee hereby agrees to keep the terms and conditions of the Agreement (including those relating to pricing) strictly confidential and not make any disclosure thereof unless required by Law (in which case Licensee shall give prompt written notice to Licensor).

(k)     Neither Licensee nor any Invitees shall bring any animal to the Legends Suite or any other part of the Stadium, other than licensed service animals that Licensor is required to permit entry into the Stadium under applicable Law.  Licensee must provide Licensor with no less than twenty-four (24) hours prior notice if it intends to bring a licensed service animal to the Stadium so that appropriate accommodations may be arranged by Licensor.

(l)     Without the prior approval of Licensor, neither Licensee nor any Invitees shall directly or indirectly solicit or otherwise seek social, political, religious or charitable contributions or otherwise promote any social, political, religious or charitable cause in the Legends Suite or any other part of the Stadium.

(m)     Neither Licensee nor any Invitees shall directly or indirectly conduct or otherwise engage in any commercial or business-related enterprise in the Legends Suite or any other part of the Stadium; provided, however, it is understood that discussing and/or negotiating commercial or business matters shall not be subject to the prohibition contained herein.

(n)     Without the prior approval of Licensor, neither Licensee nor any Invitees shall directly or indirectly use the Legends Suite as part of any promotional, giveaway, sweepstakes or lottery activity.

(o)     Neither Licensee nor any Invitees shall obstruct, limit or impede Licensor and its employees, agents and contractors from entering into the Legends Suite to perform any duties of Licensor, to inspect the condition of the Legends Suite or to investigate any suspected violations of the Agreement or any applicable rules and regulations.

(p)        Neither Licensee nor any Invitees shall interfere with the business of Licensor or the enjoyment of Games, Jewel Events and Other Events by patrons of the Stadium.

(q)        Licensee and its Invitees recognize that the names, trademarks, logos, copyrights and intellectual property (collectively, "Intellectual Property") owned by Licensor, other MLB Clubs, MLB or the Other Event promoter represent valuable assets of the owner of such Intellectual Property and that substantial recognition and goodwill are associated with such Intellectual Property. Nothing contained herein grants Licensee the right to use any Intellectual Property without the prior written consent of the owner of such Intellectual Property, which consent may be withheld in the Intellectual Property owner's sole and absolute discretion.

(r)        BY USING A TICKET, LICENSEE AND ANY INVITEES AGREE THAT: (i) HE/SHE WILL NOT TRANSMIT OR AID IN TRANSMITTING ANY PHOTOGRAPHS, IMAGES, VIDEOS, AUDIO, LIVESTREAMS OR OTHER ACCOUNTS OR DESCRIPTIONS (INCLUDING PLAY-BY-PLAY DATA) WHETHER TEXT, DATA OR VISUAL, IN ANY MEDIA, OF ALL OR ANY PART OF THE GAME, JEWEL EVENT OR OTHER EVENT (AS APPLICABLE) TO WHICH THE TICKET GRANTS ADMISSION OR ANY ENTERTAINMENT, ATTRACTIONS, WARM-UPS, PRACTICES, PRE-GAME, POST-GAME OR BETWEEN-INNING ACTIVITIES, PROMOTIONS OR COMPETITIONS OFFERED IN CONNECTION WITH THE GAME, JEWEL EVENT OR OTHER EVENT INCLUDING ANY ACCOUNT, DESCRIPTION, PICTURE, VIDEO, AUDIO, REPRODUCTION OR OTHER INFORMATION CONCERNING THE GAME, JEWEL EVENT OR OTHER EVENT (COLLECTIVELY, "GAME INFORMATION"); (ii) MLB, MLB ADVANCED MEDIA, L.P. ("MLBAM"), THE APPLICABLE MLB CLUB, LICENSOR OR THE OTHER EVENT PROMOTER, AS APPLICABLE, IS THE EXCLUSIVE OWNER OF ALL COPYRIGHTS AND OTHER PROPRIETARY RIGHTS IN THE GAME, JEWEL EVENT OR OTHER EVENT AND GAME INFORMATION RELATED THERETO, RESPECTIVELY; AND (iii) THE COMMISSIONER, MLB, MAJOR LEAGUE BASEBALL PROPERTIES, INC. ("MLBPI"), MLBAM, EACH OF THE MAJOR LEAGUE BASEBALL CLUBS, INCLUDING LICENSOR (THE "MLB CLUBS"), THE MLB NETWORK, LLC, AND EACH OF THEIR PARENT, SUBSIDIARY, AFFILIATED AND RELATED ENTITIES, ANY ENTITY WHICH, NOW OR IN THE FUTURE, CONTROLS, IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH THE MLB CLUBS OR MLB AND THE OWNERS, GENERAL AND LIMITED PARTNERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS OF THE FOREGOING ENTITIES (EACH AN "MLB PARTY" AND COLLECTIVELY, THE "MLB PARTIES"), THE OTHER EVENT PROMOTER AND CERTAIN CURRENT AND FUTURE SPONSORS, ASSIGNEES AND LICENSEES OF SUCH MLB PARTIES AND THE OTHER EVENT PROMOTER WILL HAVE THE UNRESTRICTED, IRREVOCABLE, ASSIGNABLE, ROYALTY-FREE (AND WITHOUT FURTHER PAYMENT) RIGHT AND LICENSE TO USE LICENSEE'S AND ANY INVITEE'S IMAGE, LIKENESS, NAME, VOICE, COMMENTS AND/OR PROPRIETARY OR PUBLIC RIGHTS IN ANY LIVE OR RECORDED BROADCAST, TELECAST, PHOTOGRAPH, VIDEO, AUDIO, AUDIOVISUAL AND/OR OTHER RECORDING TAKEN IN CONNECTION WITH THE GAME, JEWEL EVENT OR OTHER EVENT OR OTHER TRANSMISSION, DISTRIBUTION, PUBLIC PERFORMANCE, OR REPRODUCTION, IN WHOLE OR IN PART, OF THE GAME, JEWEL EVENT OR OTHER EVENT, FOR ALL PURPOSES, WORLDWIDE, IN PERPETUITY, AND IN ANY AND ALL MEDIA NOW OR HEREAFTER KNOWN, WITHOUT COMPENSATION OR CONSIDERATION, NOTIFICATION OR PERMISSION, UNLESS OTHERWISE PROHIBITED BY APPLICABLE LAW.

7.2        Licensee hereby represents, warrants and agrees as follows:

(a)        Licensee has read and understands the terms of this Agreement.

(b)        Licensee has full authority to enter into this Agreement and carry out its terms and conditions and, upon execution, this Agreement shall be a legal and binding obligation of Licensee, enforceable against Licensee in accordance with its terms.

7.3        Licensee acknowledges and confirms that:

(a)        The rights granted under this Agreement are for the personal use of Licensee and Invitees and do not convey any other rights in or to Licensor, the Stadium or any other party.

(b)        Licensor, its affiliates and their respective officers, agents, managers and employees have not made any representations, warranties or guarantees with respect to the Stadium or the Legends Suite, including whether any events other than Games will be held in the Stadium.

(c)        The Agreement confers no rights to directly or indirectly create, depict, imply or infer that Licensee and/or any Invitees are associated or affiliated with or are an official or unofficial business partner, advertiser, marketer, promoter or sponsor of the Club.

vi

20-Game Legends Suite Ticket Agreement for Two (2) License Periods (Plan 2)

(d)    The Club's and the opponent club's rosters, lineups, coaches and manager are subject to change and Licensee is entering into this Agreement irrespective of any change to any of the foregoing.

(e)    The number of innings in a regulation game shall be determined by MLB and may be shortened in accordance with MLB rules.  Licensor makes no representation, warranty and/or guarantee that nine (9) innings will be played in any regulation game.

(f)    The number of Games in a Regular Season shall be determined by MLB.  Licensor makes no representation, warranty and/or guarantee that a Regular Season will be comprised of eighty-one (81) Games.

(g)    The dates and times for each Game, Jewel Event and Other Event are all subject to change and Licensee is entering into this Agreement irrespective of any change to any of the foregoing.

8.    DEFAULT AND TERMINATION.

8.1    Default.  Licensee shall be in default under this Agreement upon the occurrence of any one of the following events (any such event, an "Event of Default"):

(a)    Licensee fails to pay in full, as and when due, the Ticket Fees or any other fee, charge or amount to be paid by Licensee or any Invitee hereunder, including any Taxes.

(b)    Licensee fails to enter into the License Agreement.

(c)    Licensee fails to perform or observe any terms, conditions, covenants or obligations under the License Agreement within ten (10) days after Licensor gives Licensee notice of such failure including the failure to pay the License Fees.

(d)    The License Agreement is terminated for any reason.

(e)    Licensee fails to enter into the Food and Beverage Agreement.

(f)    Licensee fails to perform or observe any terms, conditions, covenants or obligations under the Food and Beverage Agreement within ten (10) days after the Concessionaire gives Licensee notice of such failure including any failure to pay the Food and Beverage Fees.

(g)    The Food and Beverage Agreement is terminated for any reason.

(h)    Licensee or any Invitees engage(s) in any illegal activity or commit(s) any material or repeat violation of any provision of this Agreement or any of Licensor's rules and regulations pertaining to the admission/access/entry to or use of the Legends Suite or the Stadium including any violation of Section 7.

(i)    Licensee fails to perform or observe any of the terms, conditions, covenants or obligations under this Agreement (other than those set forth in sub-Sections 8.1(a) through (h), above) or makes any misrepresentation or breaches any warranty under this Agreement and Licensee fails to cure such failure, misrepresentation or breach of warranty within ten (10) days after Licensor gives Licensee notice thereof.

(j)    Licensee either voluntarily files for bankruptcy, receivership, insolvency, reorganization, dissolution, liquidation or any similar proceedings, as applicable, or involuntarily has a proceeding instituted against it and such proceeding is not dismissed within thirty (30) days.

(k)    Licensee makes a general assignment for the benefit of creditors.

8.2    Remedies.

(a)    Upon the occurrence of any Event of Default, Licensor may, in addition to all other rights and remedies that it may have, at its option and with or without notice to Licensee, do any one or more of the following:

(i)    withhold distribution of Tickets to any Game, Jewel Event or Other Event from Licensee until such Event of Default is cured or, if Tickets for any such Game, Jewel Event or Other Event already have been distributed to Licensee, void all barcodes for the Tickets or otherwise deny holders of Tickets admission/access/entry to or the use of the Stadium, the Legends Suite and/or any other area in the Stadium until such Event of Default is cured;

(ii)    deny Licensee the right to license any Tickets to any and all Jewel Events and/or Other Events;

(iii)    (A) continue to hold Licensee responsible for: (1) Licensee's obligations under the Agreement and the License Agreement; and (2) all amounts that would have been due during the remainder of the Term, including any remaining portions of the Ticket Fee(s), Food and Beverage Fee(s), License Fee(s) and Taxes; (B) as liquidated damages and

vii

not as a penalty, accelerate and declare the entire unpaid balance of the Ticket Fee(s), Taxes and License Fee(s) which for the purposes hereof shall include the total unpaid balance of the Ticket Fees, Taxes and License Fees for the remainder of the Term, immediately due and payable; and (C) cause the Concessionaire to continue to hold Licensee responsible for Licensee's obligations under the Food and Beverage Agreement and as liquidated damages and not as a penalty, accelerate all amounts that would have been due during the remainder of the Term, including all remaining portions of the Food and Beverage Fee(s) and declare such amounts immediately due and payable; and/or

(iv)    terminate this Agreement, whereupon: (A) all licenses, rights and privileges of Licensee hereunder shall immediately terminate; (B) the License Agreement shall automatically terminate; (C) the Food and Beverage Agreement shall automatically terminate; (D) Licensee shall return to Licensor, and Licensor may revoke, any unused Tickets and Parking Passes; (E) Licensor shall have no further obligation of any kind to Licensee; (F) as liquidated damages and not as a penalty, accelerate and declare the entire unpaid balance of the Ticket Fee(s), Taxes and License Fee(s) which for the purposes hereof shall include the total unpaid balance of the Ticket Fees, Taxes and License Fees for the remainder of the Term, immediately due and payable, whereupon Licensor shall have no further obligation of any kind to Licensee hereunder; and (G) Licensor may recover from Licensee, and Licensee shall pay to Licensor, all damages Licensor may incur by reason of Licensee's default including the costs of recovering the Legends Suite and all unpaid amounts due with respect to periods prior to termination.

(b)    Licensor shall have no duty to mitigate its damages as a result of any failure, misrepresentation or default by Licensee hereunder.  The decision whether to re-license any Tickets and the terms and conditions (including any fees) pursuant to which any Tickets shall be re-licensed may be made by Licensor in its sole and absolute discretion.  Any amounts received by Licensor, whether during or after the originally scheduled Term of this Agreement, from any re-license of any Tickets after termination of this Agreement shall not reduce any of Licensee's obligations under this Agreement.

8.3    Attorneys' and Professionals' Fees and Costs.  Upon any Event of Default, Licensor shall be entitled to recover all reasonable attorneys' and professionals' fees, expenses and costs (including arbitration fees and costs) incurred in connection with such Event of Default.

8.4    Remedies Are Cumulative; No Waiver.  The remedies contained in this Section 8 are cumulative and shall not limit or exclude any other right or remedy set forth herein or otherwise available to Licensor in law or in equity, including Licensor's right to receive indemnification under Section 10.  No waiver by Licensor of any Event of Default or breach by Licensee of its obligations hereunder shall be construed to be a waiver or release of any other or subsequent Event of Default or breach by Licensee hereunder and no failure or delay by Licensor in the exercise of any remedy provided for herein shall be construed to constitute a waiver thereof or of any other right or remedy available to Licensor at law or in equity.

9.    FORCE MAJEURE.

9.1    Except as otherwise provided in this Agreement, Tickets are not subject to any refund and shall bear no cash value. In the event a regulation game (as defined by MLB) is not played, the Ticket will constitute a rain check that can be either: (a) used for admission to the rescheduled Game, if any, subject to certain doubleheader limitations; or (b) exchanged for a ticket comparable in price and location to another, similar regular season Game within 12 months of the originally scheduled Game, subject to availability.  For complete details of the Rain Check Policy, please visit www.yankees.com/raincheck.

9.2 (a)    Licensor shall not be liable to Licensee as a result of any failure by Licensor to perform this Agreement as a result of, directly or indirectly: (i) any Force Majeure Event; or (ii) any other damage or destruction to the Legends Suite, the Stadium and/or any portion thereof.  Any delay in the performance of this Agreement as a result, directly or indirectly, of any of the foregoing will not constitute a breach of this Agreement or a ground for cancellation, suspension or termination hereof.

(b)    Notwithstanding any of the foregoing, if the Seating Location(s) is/are damaged and Licensor provides Licensee with, in Licensor's opinion, tickets for a reasonably comparable seat location(s) at the Stadium, the relevant Ticket Fee shall not be reduced and Licensee shall not be entitled to any compensation, credit, rebate, refund, offset, make-good or any other remedy.

9.3    If, for any reason, either the Stadium Lease and/or the Stadium Sublease, both as defined in sub-Section 13.14(b), that permit the Club to play the Games in the Stadium is/are terminated, this Agreement shall automatically terminate as of the effective date of such termination and Licensee shall have no other rights or remedies at law or in equity; provided, however, Licensee shall be entitled, as its sole remedy, to a refund of a portion of the Ticket Fee and Taxes paid for the relevant License Period equal to the product obtained by multiplying: (a) the number of Games covered by the Ticket Plan remaining, excluding the potential for any "tie-breaker" games, in the Regular Season during the relevant License Period

viii

after either the Stadium Lease and/or the Stadium Sublease is/are terminated; by (b) the relevant Ticket Fee and Taxes paid divided by the number of Games covered by the Ticket Plan in a Regular Season, excluding the potential for any "tie-breaker" games; provided, however, that if the number of Games in sub-Section 9.3(a) is zero, then Licensee shall not receive any refund.

9.4    Any inconvenience resulting from repairs being made or required in the Legends Suite or Stadium areas in or around the Legends Suite does not entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

10.  WARNING, ASSUMPTION OF RISK AND INDEMNITY.

10.1    WARNING. BASEBALLS AND BATS AND FRAGMENTS THEREOF MAY BE THROWN OR HIT ANYWHERE IN THE STADIUM.  FOR THE SAFETY OF EVERY GUEST, ALL GUESTS MUST STAY ALERT AND BE AWARE OF THEIR SURROUNDINGS AT ALL TIMES WHILE VISITING THE STADIUM. GUESTS WHO ARE CONCERNED WITH THEIR SEATS AT ANY TIME DURING THE GAME SHOULD CONTACT ANY GUEST RELATIONS REPRESENTATIVE FOR AN ALTERNATE SEAT.

10.2    Licensee, on behalf of itself and any Invitees, assumes all risk of personal injury or damages to, or loss of property of, Licensee and any Invitees, arising out of, during or related to Licensee's and any Invitees' attendance at Games, Jewel Events and Other Events or otherwise incidental to any sports competition (including the sport of baseball) and/or attendance at the Stadium.  Licensor shall not be liable or responsible for any loss, damage or injury to any person or to any property of Licensee and any Invitees in, about or around the Legends Suite, the Stadium and/or any portion thereof and/or parking lots, resulting from any cause whatsoever, including injury to person or property of Licensee and any Invitees from thrown bats and fragments thereof, batted and thrown balls, theft, vandalism, criminal activities, misconduct by other patrons and/or negligence, unless such loss, damage or injury is caused by the gross negligence or willful misconduct of Licensor.

10.3    Licensee/Invitees agrees that (a) the MLB Parties; (b) the Other Event promoter; (c) the owner and/or operator of the Stadium and event sponsors, contractors, vendors, operators, agencies and advertisers of the MLB Parties, Other Event promoter and/or the Stadium including any City Parties; (d) any local or state governmental body associated with the Stadium including the City Parties; (e) the Ticket manufacturer, provider and/or agent; (f) licensees, and retail, concession, broadcast and media partners of the MLB Parties and/or Other Event promoter; (g) press and other media; (h) vendors that may provide testing or medical services; (i) entities and individuals providing accommodation and transportation to or from the Stadium; (j) other entities and individuals who enter the Stadium and (k) all past, present and future parent, subsidiary, affiliated and related companies and affiliates, successors, assigns, players, managers, coaches, employees, trustees, partners, members, directors, officers, owners, agents, licensees, representatives, insurers, servants, independent contractors and subcontractors of each of the foregoing entities listed in subsections (a) through (k) (collectively, the "Released Parties") will not be responsible for any personal injury (including illness and death), property damage, or other loss suffered as a result of Licensee's/Invitee's: (x) participation in, attendance at, and/or observation of the Game; and/or (y) the negligence of any of the Released Parties (collectively, the "Released Claims").

10.4    Licensee/Invitee hereby releases, forever discharges, and covenants not to sue the Released Parties from and against any and all Released Claims and/or any other claims which Licensee/Invitee has or may have for invasion of privacy, defamation, violation of any right of publicity, right of privacy or any other cause of action arising out of the production, reproduction, distribution, transmission, publication, public performance, broadcast or exhibition of advertisements, promotions, content, programs and/or materials in which recordings or photographs of Licensee/Invitee from the Game, Jewel Event and/or Other Event appear, whether such recordings and photographs are captured prior to, during or subsequent thereto.

BY ATTENDING AND/OR PARTICIPATING IN THE GAME, LICENSEE/INVITEE IS DEEMED TO HAVE GIVEN A FULL RELEASE OF LIABILITY TO THE RELEASED PARTIES TO THE FULLEST EXTENT PERMITTED BY LAW.

LICENSEE/INVITEE IS DEEMED TO HAVE GIVEN ALL OF THE FOREGOING GRANTS OF RIGHTS, RELEASES AND WAIVERS ON BEHALF OF ANY MINOR(S) AS THEIR PARENT OR GUARDIAN OR AS THE AUTHORIZED AGENT OF THEIR PARENT OR GUARDIAN.  IF LICENSEE/INVITEE DOES NOT WISH TO OR IS NOT AUTHORIZED TO GRANT SUCH RIGHTS, RELEASES AND WAIVERS ON BEHALF OF ANY MINOR(S), LICENSEE/INVITEE SHOULD IMMEDIATELY LEAVE THE STADIUM WITH SUCH MINOR(S).

10.5    Licensee/Invitee will indemnify, defend and hold harmless the Released Parties from and against any and all demands, suits, claims, costs (including reasonable attorneys' fees and expenses), expenses and liability arising out of, incidental to or related in any way to Licensee's/Invitee's: (i) use of the Tickets; (ii) attendance at, observation of, and/or

ix

participation in the Game, Jewel Event and/or Other Event; (iii) acts or omissions; or (iv) breach of any of the terms, conditions or representations made in the Agreement and these Terms and Conditions.

11. RESERVATION OF RIGHTS.

11.1    Licensor reserves the right, in its sole and absolute discretion, with or without refunding the established price of the Ticket and Taxes, to revoke the Ticket License, refuse admission and/or eject any person who: (a) is or appears to be impaired; (b) conceals alcohol, illegal substances or other prohibited items while attempting to enter the Stadium; (c) acts in a manner that is unruly, disruptive or illegal; (d) uses derogatory, foul and/or abusive language and/or gestures; (e) displays and/or wears and fails to cover obscene, indecent and/or inappropriate clothing; (f) exposes him/herself; (g) otherwise violates the Stadium's Code of Conduct; (h) fails to comply with the terms and conditions of this Agreement; (i) interferes with any ball in the field of play or any Sports Participant attempting to make a play on any batted, pitched or thrown baseball; (j) attempts to gain admission/access/entry to the Legends Suite with a Ticket which is already being used by another person and/or a fraudulent wristband; (k) refuses to provide proof of vaccination status and/or provides false and/or fraudulent proof of vaccination; or (l) violates any Law. Violation of any of the foregoing, as determined by Licensor, by Licensee or any person using a Ticket shall constitute a material breach of this Agreement.

11.2    During any sporting event, it shall be illegal for any person other than a Sports Participant to: (a) knowingly enter or remain unlawfully upon the playing area; (b) subject a Sports Participant to contact by means of any substance, object or dangerous instrument; (c) place, drop, toss or hurl any substance, object or dangerous instrument onto the playing area; (d) strike, slap, kick or otherwise subject to physical contact a Sports Participant; and (e) attempt to do (b), (c) or (d) with the intent to cause physical injury to a Sports Participant or with the intent to disrupt a sporting event. Any person who violates the foregoing may be guilty of a misdemeanor punishable by imprisonment and/or fine as well as civil penalties of up to $25,000. Violators will be prosecuted to the fullest extent of the law. Violation of any of the foregoing, as determined by Licensor, by Licensee, any Invitee or any person using a Ticket shall constitute a material breach of this Agreement.

11.3    Licensee acknowledges that Licensor is retaining all rights of access to and use of the Legends Suite with respect to all uses and functions for which Licensee has not duly exercised expressed rights granted hereby and made all payments of each Ticket Fee and Taxes. Any use reserved by Licensor or any grant of rights by Licensor to any third party in connection with the exercise of such reserved rights shall not entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

11.4    Licensor further reserves the right to install protective devices, such as netting, aisle termination glass or other transparent or non-transparent panels, with or without non-transparent trim, within the Stadium, including in the concourses, seating areas, aisles, etc., to the extent Licensor, in its sole and absolute discretion, deems necessary to protect fans and/or as may be required by Law. The installation and/or use of such protective devices in the Stadium shall not entitle Licensee to any compensation, credit, rebate, refund, offset, make-good or other remedy.

11.5    Licensor further reserves the right to enforce the following policies:

(a)    Subject to such exceptions as may be determined by Licensor, the Licensee must be age 18 or older.

(b)    A Licensee is only permitted to purchase, control, coordinate, manage or direct (collectively, "control") the following maximum number of Tickets-per-Game (the "Ticket Limit"): (i) eight (8) Tickets-per-Game for a Licensee existing as of August 1, 2018; or (ii) four (4) Tickets-per-Game for a Licensee existing after August 1, 2018. Examples of how the Ticket Limit can be exceeded include: (i) Ticket(s) controlled by any person related to Licensee; or (ii) Ticket Account(s) that is/are in any way tied, linked or related to a specific person or group that is in any way affiliated with each other or under common ownership, control or direction. Use of aliases, separate forms of payment or separate persons or third parties to circumvent the Ticket Limit constitutes a material breach of the Ticket License and the Agreement. The Ticket Limit will be strictly enforced. Licensor may refuse any sale and revoke any Ticket License that violate the Ticket Limit. Licensor reserves the right to make exceptions to the Ticket Limit.

(c)    Licensee must be a legal resident, domiciled and/or have a principal place of business located in the Territory (the "Territory Limit"). Licensor can determine whether a Licensee, which includes: (i) any person related to Licensee; or (ii) any Ticket Account(s) that is/are in any way tied, linked, or related to a specific person or group that is in any way a legal resident, domiciled and/or has a principal place of business located in the Territory. Falsely claiming a legal residence/domicile at a post office box/commercial mail receiving agency located in the Territory, redirecting mail from inside/outside the Territory or using addresses of persons or third parties located in the Territory constitutes a material breach of the Ticket License and the Agreement. Licensor will strictly enforce the Territory Limit policy, refuse to sell to any person that would cause this policy to be violated and revoke any Ticket License relating to any Ticket Account that violates this policy. Licensor reserves the right to make exceptions to the Territory Limit policy.

x

12. <u>MANDATORY ARBITRATION AGREEMENT & CLASS ACTION WAIVER ("ARBITRATION AGREEMENT")</u>.

12.1     (a)     Licensor cares deeply about maintaining good relationships with fans. If Licensee/Invitee has a problem, a telephone call to customer service may resolve the matter quickly and amicably. Any dispute not resolved informally must be resolved in accordance with this Arbitration Agreement.

(b)     Unless prohibited by federal Laws, Licensee and Licensor agree to arbitrate through BINDING INDIVIDUAL ARBITRATION any and all claims and disputes relating in any way to the Agreement, the purchase or use of any Ticket Plan and/or Ticket, the participation in, attendance at, and/or observation of the Game, Jewel Event and/or Other Event by Licensee, any Invitee (including any Accompanying Party) (collectively, for purposes of this Arbitration Agreement, the "<u>Covered Licensees</u>"), these Terms and Conditions, and any related dealings between them, including claims of personal injury (including illness and death) or property damage arising out of attendance at and/or participation in the Game, Jewel Event and/or Other Event by any Covered Licensees ("<u>Arbitration Claims</u>"), except for Arbitration Claims concerning the validity, scope or enforceability of the Arbitration Agreement. This Arbitration Agreement shall be governed by Article 75 of the CPLR.

(c)     In any Arbitration Claim to be resolved by arbitration, neither Covered Licensees nor Licensor will be able to have a court or jury trial or participate in a class action or class arbitration. Other rights that Covered Licensees and Licensor would have in court will not be available or will be more limited in arbitration, including the right to appeal. Covered Licensees and Licensor each understand and agree that by requiring each other to resolve all disputes through individual arbitration, THE COVERED LICENSEES AND LICENSOR ARE EACH WAIVING THE RIGHT TO A COURT OR JURY TRIAL. ALL DISPUTES SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS, AND NOT AS A CLASS ACTION, REPRESENTATIVE ACTION, CLASS ARBITRATION OR ANY SIMILAR PROCEEDING. The arbitrator(s) may not consolidate the claims of multiple parties.

(d)     Arbitrations shall be administered by JAMS in accordance with its then-existing commercial arbitration rules. Covered Licensees may obtain information about arbitration, arbitration procedures and fees from JAMS by calling 212-751-2700 or visiting www.jamsadr.com. If JAMS is unable or unwilling to arbitrate a dispute, then the dispute may be referred to any other arbitration organization or arbitrator the parties both agree upon in writing or that is appointed pursuant to Section 7504 of the CPLR. The arbitration shall take place in New York, New York. The arbitration shall be presided over by a single arbitrator, who shall be selected in accordance with the rules that, as specified above, shall govern the arbitration. The arbitrator shall be authorized to award any relief that would have been available in court, provided that the arbitrator's authority is limited to Covered Licensees and Licensor alone, except as otherwise specifically stated herein. No arbitration decision will have any preclusive effect as to non-parties. The arbitrator's decision shall be final and binding. The Covered Licensees and Licensor agree that the Arbitration Agreement extends to any other parties involved in any Arbitration Claims, including all Covered Licensees and the Released Parties. This Arbitration Agreement shall take precedence over the rules of the arbitration organization or arbitrator in the event of any conflict.

(e)     Payment of all filing, administration, hearing and other fees ("<u>Arbitration Fees</u>") will be governed by the JAMS's rules. Covered Licensees will be responsible for paying Covered Licensee's share of any Arbitration Fees, but only up to the amount of the filing fees Covered Licensees would have incurred in the state or federal court in New York, whichever is less. Licensor will not seek attorneys' fees and costs in arbitration unless the arbitrator determines the claims are frivolous. Notwithstanding any other provision herein, Covered Licensees and Licensor may seek relief in a small claims court for Arbitration Claims within its jurisdiction. In addition, Covered Licensees and Licensor each may exercise any lawful rights to seek provisional remedies or self-help, without waiving the right to arbitrate by doing so. Notwithstanding any other provision of the Agreement and these Terms and Conditions, if the foregoing class action waiver and prohibition against class arbitration is determined to be invalid or unenforceable, then the entire Arbitration Agreement shall be void. If any portion of the Arbitration Agreement other than the class action waiver and prohibition against class arbitration is deemed invalid or unenforceable, it shall not invalidate the remaining portions of the Arbitration Agreement. This Arbitration Agreement will survive the termination of the Agreement and these Terms and Conditions and/or the bankruptcy or insolvency of a party (to the extent permitted by applicable Law).

(f)     LICENSEE HAS THE RIGHT TO REJECT THIS ARBITRATION AGREEMENT, BUT LICENSEE MUST EXERCISE THIS RIGHT PROMPTLY. If Licensee does not wish to be bound by the Arbitration Agreement, Licensee must notify Licensor by mailing a written opt-out notice, postmarked within seven (7) days after Licensee acknowledges acceptance of and agrees to be bound by these Terms and Conditions. Licensee must send the request to: New York Yankees, Attn: Legal Department, Re: Arbitration, One East 161st Street, Bronx, New York 10451. The request must include your full name, address, account number, and the statement "I reject the Arbitration Agreement contained in the Legends Suite Ticket Agreement." If Licensee exercises the right to reject arbitration, the other terms of the Agreement and these Terms and Conditions shall remain in full force and effect as if Licensee had not rejected arbitration.

(g)  Prior to bringing a claim under the Arbitration Agreement, the Claimant shall give the other party or parties written notice of the Arbitration Claim (a "Claim Notice") and a reasonable opportunity, not less than 30 days, to resolve the Arbitration Claim.  Any Claim Notice to one or more of Licensor shall be sent by mail to: New York Yankees, Attn: Legal Department, Re: Legends Suite Ticket Agreement Claim Notice, One East 161st Street, Bronx New York 10451.  Any Claim Notice must (i) identify the Claimant by name, address, email address, and telephone number; (ii) explain the nature of the Arbitration Claim and the relief demanded; and (iii) be submitted only on behalf of the Claimant, and not on behalf of any other party.  The Claimant must reasonably cooperate in providing any information about the Arbitration Claim that the other party reasonably requests and must give the other party a reasonable opportunity to respond to the demand for relief.

LICENSEE IS DEEMED TO HAVE AGREED TO THIS ARBITRATION AGREEMENT ON BEHALF OF ANY INVITEE (INCLUDING ACCOMPANYING MINOR(S) AS THEIR PARENT OR GUARDIAN OR AS THE AUTHORIZED AGENT OF THEIR PARENT OR GUARDIAN).  IF LICENSEE DOES NOT WISH TO OR IS NOT AUTHORIZED TO MAKE SUCH AGREEMENT ON BEHALF OF ANY ACCOMPANYING MINOR(S), LICENSEE SHOULD IMMEDIATELY LEAVE THE STADIUM WITH SUCH ACCOMPANYING MINOR(S).

12.2    Confidentiality.  Except as necessary in connection with a judicial challenge to or enforcement of an arbitration award, or unless otherwise required by Law or judicial decision, the parties agree that the arbitration procedure will be confidential.  All conduct, statements, promises, offers, views and opinions, oral or written, expressed during the arbitration by any party or a party's agent, employee or attorney will remain confidential and, where appropriate, will be considered work product and privileged and the existence and the results of the arbitration will be maintained by the parties and their respective agents, employees, professionals and attorneys as confidential at all times.

12.3    Arbitration Exception.  Notwithstanding Sections 12.1(b) – (e), above, in the event the dispute involves: (a) Licensee's failure to pay: (i) the full amounts due under any of the Agreement, the License Agreement and/or the Food and Beverage Agreement; and/or (ii) any amounts due for any License Period under any of the Agreement, the License Agreement and/or the Food and Beverage Agreement; and/or (b) Licensee's failure to participate in the arbitration in good faith, or  attempts to frustrate the arbitration process and/or the arbitration process reaches an impasse, then as a result of any of the foregoing, Licensor, at its sole option, shall be relieved from mandatory arbitration and may immediately proceed with any legal action, suit or proceeding in the United States District Court for the Southern District of New York, or if such court does not have subject matter jurisdiction, the State Courts of New York located in Bronx County.  Licensee expressly and irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam and waives any claim that such forum is inconvenient, inappropriate or any similar claim.  Licensee further acknowledges and agrees that if Licensor is forced to proceed under this Section 12.3 with respect to any dispute, such dispute is likely to involve complicated and difficult issues.  Accordingly, Licensee hereby irrevocably and unconditionally waives any right it may have to a trial by jury in respect to any litigation contemplated hereunder.  Licensee further certifies and acknowledges that: (w) no representative, agent or attorney of Licensor has represented, expressly or otherwise, that Licensor would not, in the event of litigation, seek to enforce Licensee's waiver of a trial by jury; (x) it understands and has considered the implications of Licensee's waiver of a trial by jury; (y) it makes such waiver voluntarily; and (z) it has induced Licensor to enter into this Agreement by, among other things, its waiver of a trial by jury and the certifications contained in Sections 12.3(w) – (z).

13.  MISCELLANEOUS.

13.1    Assignment by Licensor.  Licensor may assign, pledge or otherwise transfer or encumber (each, a "transfer") this Agreement and any or all of its rights and obligations hereunder and any rights and benefits emanating hereunder to any other entity (each, an "Assignee") and this Agreement shall be subject to any such transfer.  Upon reasonable prior notice from Licensor, Licensee shall make any payments due hereunder to such Assignee and shall execute and deliver any documents that Licensor or any Assignee may reasonably request to acknowledge and confirm that upon any such transfer, this Agreement will remain in full force and effect, will continue to be a legal, valid and binding obligation of Licensee enforceable in accordance with its terms (subject to applicable Laws relating to bankruptcy or insolvency and general principles of equity) and that neither Licensee nor, to Licensee's knowledge, Licensor is in material breach or violation of this Agreement.

13.2    Assignment by Licensee.

(a)  Licensee may not sell, assign, sublicense, re-license, delegate, pledge, grant a lien or security interest in or otherwise transfer or encumber this Agreement or any of Licensee's rights and/or obligations hereunder without the prior written consent of Licensor, which consent may be withheld in Licensor's sole and absolute discretion.  Notwithstanding the foregoing, Licensor will not withhold its consent to assignment of this Agreement to any of the following (it being understood that clauses (i), (ii) and (iii) shall apply only to a Licensee that is an individual and clause (iv) shall apply only to

20-Game Legends Suite Ticket Agreement for Two (2) License Periods (Plan 2)

a Licensee that is an entity); provided, however, no consent by Licensor hereunder to any assignment of this Agreement shall relieve Licensee of any of its obligations under this Agreement and Licensee shall remain liable therefor:

    (i)  a member of Licensee's immediate family;

    (ii)  a trust established for the benefit of Licensee or one or more members of Licensee's immediate family;

    (iii)  upon Licensee's death, Licensee's estate; or

    (iv)  an affiliate of Licensee that controls, is controlled by or is under common control with Licensee.

(b) Any attempted sale, assignment, sublicense, delegation, re-license, pledge, lien, security interest or other transfer or encumbrance of this Agreement without Licensor's express prior written consent (including any assignment described in clauses (a)(i)-(iv), above) shall be void and, upon demand by Licensor, shall be formally rescinded or, at its sole option, Licensor may declare an immediate Event of Default hereunder and be entitled to all remedies provided for in Section 8.2, above. If Licensee is an entity, a sale, assignment or other transfer, directly or indirectly, of effective control of Licensee or of a fifty percent (50%) or greater ownership interest in Licensee, in one or a series of related transactions, shall be deemed an assignment for purposes of this Agreement; provided, however, that this sentence shall not apply to any Licensee that has a class of equity securities registered under Section 12 of the Securities Exchange Act of 1934, as amended, and the transfer of control or ownership interest arises as a result of a sale or other transfer of such equity securities.

13.3    Governing Law. This Agreement shall be governed and construed by New York law without giving effect to conflict of law principles thereof.

13.4    Notices. All notices, requests, claims, demands and other communications must be in writing and shall be deemed duly given on the date of delivery, if transmitted by a nationally recognized courier service or by facsimile to the applicable facsimile number set forth below, so as to be received during the hours of 8:00 AM to 5:00 PM, Monday through Friday, or upon receipt, if mailed to the person to whom notice is to be given by certified or registered mail, postage prepaid, and properly addressed to the respective address set forth below or such other address as may be set forth in a written notice of change of address transmitted in the manner set forth in this Section 13.4.

    (a)  If to Licensor:
    New York Yankees Partnership
    Yankee Stadium
    Bronx, New York 10451
    Attention:    Lonn A. Trost, Esq.
          Chief Operating Officer
    Phone:    (718) 579-4420
    Facsimile:    (718) 681-1051

    (b)  If to Licensee: To the person, address and contact information set forth below Licensee's signature.

13.5    Entire Agreement; Modification; No Waiver. This Agreement, the License Agreement, the Food and Beverage Agreement and the terms and conditions set forth on any Ticket (in digital or printed form) contain the entire agreement of the parties with respect to the matters provided for herein and shall supersede any representations or agreements previously made or entered into by the parties hereto (whether oral or written). No amendment, modification or waiver to this Agreement shall be valid or enforceable unless in writing and signed by both parties. The failure of Licensor to insist in any one or more instances upon the strict performance of the representations, warranties, covenants, agreements, terms, provisions or conditions of this Agreement or to exercise any election herein contained shall not be construed as a waiver or relinquishment for the future of such covenant, agreement, term, provision, condition or election, but the same shall continue and remain in full force and effect. The rights and remedies herein provided are cumulative and may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by law or equity.

13.6    Binding Effect. Without limiting the prohibitions on assignment by Licensee set forth herein, this Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns. This Agreement shall not be binding and enforceable until signed by a duly authorized representative of Licensor. An original counterpart of this Agreement, signed by Licensor, will be on file at Licensor's offices. Any incomplete or altered Agreement may be rejected by Licensor.

13.7    Severability. If any provision of this Agreement shall be held invalid or unenforceable, the remainder of this Agreement shall not be affected, but shall continue to be valid and enforceable to the fullest extent permitted by Law.

xiii

20-Game Legends Suite Ticket Agreement for Two (2) License Periods (Plan 2)

13.8    Time of Essence. Time is of the essence with respect to the payment by Licensee of the Ticket Fee, Taxes and any other monetary obligation and the performance by Licensee of any other obligation contained in this Agreement.

13.9    Counterparts. This Agreement may be executed in one or more counterparts, and by the different parties in separate counterparts, each of which when executed will be an original but all of which taken together will constitute one and the same agreement. Licensor may execute this Agreement with a rubber stamp signature or facsimile/digital signature. This Agreement may be executed and delivered via facsimile machine or other form of electronic delivery by the parties hereto, which shall be deemed for all purposes as an original.

13.10    Exhibits. All exhibits attached to the Agreement are incorporated herein and made a part hereof.

13.11    Force Majeure. Except as expressly provided in Section 9, Licensor shall not be liable for any failure to comply or delay in complying with its obligations hereunder if such failure or delay is due, directly or indirectly, to a Force Majeure Event. It is expressly agreed that Licensor will not be obligated to settle any strike, lockout or other labor dispute to avoid a Force Majeure Event from continuing.

13.12    Damages. IN NO EVENT WILL LICENSOR AND/OR ANY OTHER RELEASED PARTY BE LIABLE TO LICENSEE/INVITEE OR ANY TICKET PURCHASER FOR ANY DIRECT, INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES OR FOR LOST PROFITS, REVENUES OR BUSINESS OPPORTUNITIES EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

13.13    (a)    No Recourse Against Licensor's Partners. No general partner of Licensor shall have any personal liability with respect to any of Licensor's obligations under this Agreement by reason of his/her/its/their status as general partner. In addition, no limited partner, member, officer, director, stockholder or other holder of any ownership interest of or in Licensor shall have any personal liability with respect to Licensor's obligations under the Agreement by any reason of his/her/its/their status as limited partner, officer, director, stockholder, interest holder or otherwise.

(b)    Recourse Against Licensee's Partners or Members. Each general or limited partner, member, manager, beneficiary, trustee, or other controlling person (any natural person or legal entity (*i.e.*, corporation, limited liability company, general or limited partnership and/or trust) each, a "person") of Licensee (as the case may be) shall be jointly and severally liable for any obligation or liability of Licensee under this Agreement, and all obligations and liabilities of Licensee hereunder shall be enforceable against each such person and each such person's assets on a joint and several basis.

13.14    Subservience.

(a)    Notwithstanding any other provision of this Agreement, this Agreement and the rights, exclusivities and protections granted by Licensor to Licensee hereunder shall, at the request of MLB, be subject to its review and written approval, and shall in all respects be subordinate to, and shall not prevent the issuance, entering into, or amendment of, any of the following, each as may be issued, entered into or amended from time to time (collectively, the "MLB Documents"): (i) any present or future agreements or arrangements entered into by, or on behalf of, any of the Major League Baseball entities and/or any of their respective present or future affiliates, assigns or successors (collectively, the "MLB Entities"), or the MLB Clubs acting collectively, including the Major League Constitution, the Basic Agreement between the MLB Clubs and the MLB Players Association, the Professional Baseball Agreement, the Major League Rules, the Interactive Media Rights Agreement, and each agency agreement and operating guidelines among the MLB Clubs and any MLB Entity; and (ii) the present and future mandates, rules, regulations, policies, practices, bulletins, by-laws, directives or guidelines issued or adopted by, or on behalf of, the Commissioner or any other MLB Entity. The issuance, entering into, amendment, or implementation of any of the MLB Documents shall be at no cost or liability to Licensor or any MLB Entity or to any individual or entity related thereto. In the event such MLB Documents materially affect Licensor's performance of this Agreement, then Licensor shall have the right to terminate this Agreement and Licensee shall be entitled, as its sole remedy, to a refund of the portion of the Ticket Fee and Taxes paid for the relevant License Period equal to the product obtained by multiplying: (i) the number of Games covered by the Ticket Plan remaining in the Regular Season in the relevant License Period, excluding the potential for any "tie-breaker" games, immediately following the effective date of termination by Licensor; by (ii) the Ticket Fee and Taxes for the relevant License Period divided by the number of Games covered by the Ticket Plan in a Regular Season, excluding the potential for any "tie-breaker" games.

(b)    This Agreement and the rights and interests of Licensee hereunder shall be further subordinate and subject to: (i) the Lease Agreement dated as of August 1, 2006, by and between the New York City Industrial Development Agency and Yankee Stadium LLC, as it may be amended, restated, modified, supplemented, extended or assigned from time to time (the "Stadium Lease"); (ii) the Stadium Sublease, dated as of August 1, 2006, by and between Yankee Stadium LLC and Licensor, as it may be amended, restated, modified, supplemented, extended or assigned from time to time (the "Stadium

xiv

Sublease") and (iii) any applicable rules, procedures, policies, regulations, directives, agreements, governing documents, actions and subservience requirements, as in effect from time to time, of the Other Event participants and/or promoter.

13.15    No Presumption.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party which drafted or caused this Agreement to be drafted.

13.16    Certain Rules of Interpretation. For purposes of this Agreement, whenever the words "commercially reasonable efforts" are used, they shall be deemed to mean the good faith exploration and fair consideration by the party undertaking such efforts of all financially reasonable options that are available to satisfy the obligation(s) which is/are owed to the other party taking into consideration the totality of the circumstances including the financial interests of the party undertaking such efforts; provided, in no event shall the party undertaking such efforts be required to suffer serious financial difficulty and/or loss.  Furthermore, whenever the words "include", "includes", or "including" are used, they shall be deemed to be followed by the words "without limitation" and/or "but not limited to", and, whenever the circumstance or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa.  As used in this Agreement, the words "herein", "hereof", "hereby" and "hereunder" shall refer to the Agreement as a whole, and not to any particular section, provision or subdivision thereof.  All references to a "Paragraph", "sub-paragraph", Section" or "sub-Section" shall mean paragraph, sub-paragraph, section or sub-section, as the case may be, of the Agreement, unless the context otherwise requires.  The captions used in this Agreement are intended for convenience of reference only, shall not constitute any part of this Agreement and shall not modify or affect in any manner the meaning or interpretation of any of the provisions of this Agreement.

13.17    Survival.  The parties agree that all representations and warranties contained in this Agreement shall survive the termination and/or expiration of this Agreement.  In addition, the parties agree that the following Sections of Exhibit A (Terms and Conditions) shall survive the termination and/or expiration of this Agreement: Sections 4, 7, 8, 10, 11, 12, 13.1, 13.3, 13.4, 13.5, 13.6, 13.7, 13.11, 13.13, 13.14, 13.15, 13.16, 13.17 and 14 and Exhibit B (Health Notice).

14. CERTAIN DEFINITIONS.  For purposes of this Agreement, unless otherwise defined herein or the context requires a different definition, the following terms shall have the following meanings:

"Accompanying Party" means any person accompanying Licensee/Invitee including any minor or person admitted into the Stadium by the Ticket (each of whom Licensee/Invitee represents have authorized Licensee/Invitee to act on their behalf in accepting the Terms and Conditions).

"Adverse Weather Condition(s)" mean(s) rain, freezing rain, snow, sleet, hail, fog, tornado, flood, hurricane, tsunami (caused by hurricane), lightning or any other adverse atmospheric condition with respect to temperature, pressure, humidity, wind and/or any combination thereof.

"City Parties" mean the City of New York, the New York City Industrial Development Agency, the New York City Economic Development Corporation and the City of New York Police Department and their respective trustees, officials, members, officers, directors, employees, agents and servants.

"Club" means that MLB Club (and all successors thereto and assigns thereof) that is currently a member of the American League and at the time of execution hereof is playing baseball under the name "New York Yankees," all as may be subsequently changed from time to time by or pursuant to any MLB Documents or action by any MLB Entity.

"Commissioner" means the Office of the Commissioner of Baseball.

"Communicable Disease" means airborne, aerosolized or surface transmissible communicable and/or infectious diseases, viruses, bacteria or illnesses or the causes thereof.

"Concessionaire" means the entity(ies) designated by Licensor from time to time with whom Licensor or any of its affiliates enters into an agreement(s) to provide food and beverages at the Stadium.

"COVID-19" means COVID-19 and any strains, variants, or mutations thereof, the coronavirus that causes COVID-19.

"CPLR" means the Civil Practice Law and Rules of New York.

"Food and Beverage Agreement" means the agreement(s) between Licensee and the Concessionaire that sets forth the terms and conditions pursuant to which Licensee and Invitees shall be provided with food and non-alcoholic beverages and dining privileges in the Legends Suite.

"Food and Beverage Fee" means the amounts set forth in the Food and Beverage Agreement and payable by Licensee to the Concessionaire for food and non-alcoholic beverages during each License Period during the Term for: (i) the Games; (ii) Jewel Events (as applicable); and (iii) Other Events (as applicable).

xv

"Force Majeure Event" means any of the following: (i) act of God; (ii) Health Emergency; (iii) hostility (whether war is declared or not), civil war, rebellion, revolution, insurrection, act of terrorism or enemy action; (iv) military or usurped power or confiscation, nationalization or national, state and/or local government sanction, regulation, restriction or emergency (declared or undeclared); (v) riot, crime or civil commotion; (vi) unavoidable casualty, fire or earthquake; (vii) interruption or failure of electricity or utilities, electrical, utilities or mechanical difficulty, inability to obtain labor, lack of materials, strike (regardless of the cause), lockout, work stoppage or other labor disturbance; (viii) order, directive, rule or regulation by MLB; (ix) MLB Labor Dispute; (x) Adverse Weather Condition; or (xi) any other cause or condition, whether similar or dissimilar to any of the foregoing, beyond the reasonable control of Licensor.

"Game(s)" mean(s) the MLB games in the Stadium (including, if applicable, one or more "tie-breaker" games played for the purpose of determining whether the Club will participate in any Postseason Games) participated in by the Club (designated as the home team) during the Regular Season for determining the participants in the Postseason Games, but excluding all exhibition games, Jewel Events and Other Events.

"Health Emergency" means disease (including COVID-19 and any Communicable Disease), plague, famine, epidemic, pandemic, public health emergency, contagions and/or communicable diseases irrespective of cause that results in a national, state and/or local crisis, quarantine, public health emergency and/or extraordinary public security or health measures (such as shelter-in-place, stay-at-home or social/physical distancing directives) declared by any national, state and/or local government or regulatory body and/or MLB.

"Invitee(s)" mean(s) all persons, including any Accompanying Party gaining entry into the Stadium and/or Legends Suite with any Ticket(s).

"JAMS" means the alternative dispute resolution service formerly known as Judicial Arbitration and Mediation Services.

"Jewel Event(s)" mean(s) any Postseason Game(s) or other event(s) designated by MLB as a "Jewel Event" (*e.g.*, MLB All-Star Game, MLB All-Star Game-related activities, Fan Festival, Celebrity Softball Game, Workout Day, Home Run Derby, Futures Game, etc.).

"Law(s)" mean all applicable federal, state and local laws, codes, statutes, orders, directives, rules and regulations.

"Legends Club" means the bi-level restaurant/club located contiguous to the Seating Area.

"Legends Suite" means, collectively, the Seating Area, the Legends Club and the Suite Lounges in the Stadium.

"License Agreement" means the agreement that sets forth the terms and conditions pursuant to which Licensee agrees to license the right to use and access the Legends Suite during the Term and which is coterminous with the Agreement.

"License Fee" means the License Fee set forth in the License Agreement and payable by Licensee to Licensor for the license to use and access the Legends Suite during each License Period during the Term.

"License Period" means the time period during which the Ticket License is effective and could include (if specified) a twelve calendar month period beginning January 1 and ending December 31 of the same year.

"MLB" means Major League Baseball.

"MLB Labor Dispute" means a MLB players' strike, a lockout by the MLB Clubs or any other labor dispute or work stoppage involving MLB players or other MLB personnel and/or MLB and the MLB Clubs.

"New Agreements" mean the New Ticket Agreement, the New License Agreement and the New Food and Beverage Agreement.

"New Food and Beverage Agreement" means the agreement(s) between Licensee and the Concessionaire that set(s) forth the terms and conditions pursuant to which Licensee and Invitees shall be provided with food and non-alcoholic beverages and dining privileges in the Legends Suite during the New Term and that is coterminous with the New Ticket Agreement and the New License Agreement.

"New Food and Beverage Fee" means the amount payable by Licensee to the Concessionaire for food and non-alcoholic beverages during the New Term as provided in the New Food and Beverage Agreement.

"New License Agreement" means the agreement that sets forth the terms and conditions pursuant to which Licensee agrees to license the right to use and access the Legends Suite during the New Term and that is coterminous with the New Ticket Agreement and the New Food and Beverage Agreement.

20-Game Legends Suite Ticket Agreement for Two (2) License Periods (Plan 2)

"New License Fee" means the amount payable by Licensee to Licensor to license the right to use and access the Legends Suite for each License Period during the New Term as provided in the New License Agreement.

"New Term" means the term of the New Ticket Agreement specified therein.

"New Ticket Agreement" means the agreement that sets forth the terms and conditions pursuant to which Licensor grants Licensee the New Ticket License during the New Term and that is coterminous with the New License Agreement and the New Food and Beverage Agreement.

"New Ticket Fee" means the amount payable by Licensee to Licensor for the Tickets to the Games covered by the Ticket Plan as provided in the New Ticket Agreement.

"New Ticket License" means the revocable, non-exclusive license granted by Licensor to Licensee for the specific seating locations in the Legends Suite pursuant and subject to the then-existing terms and conditions set forth in the New Ticket Agreement and the New License Agreement.  Each Ticket represents a separate New Ticket License.

"Other Event(s)" mean(s) any and all charitable, religious, civic, political, sports, musical, theatrical or other events (other than Games and Jewel Events) that are held in the Stadium from time to time including any event where, as a result of any contractual arrangement with an event promoter, Licensor does not control the right to license Tickets or other tickets in the Stadium.

"Parking Pass(es)" mean(s) such sticker(s), pass(es), code(s) or equivalent(s), as and if provided by Licensor in its sole and absolute discretion, that will permit Licensee and Invitees to park in select parking lot(s) associated with the Stadium or the Club but are not owned or controlled by Licensor.

"Postseason Game(s)" mean(s) MLB games in the Stadium participated in by the Club (designated as the home team) during any MLB postseason series (*e.g.*, American League Wild Card, American League Division Series, American League Championship Series, World Series or their equivalent in the event the designation of the various series or form of postseason play is changed or altered by MLB) as originally scheduled and published by MLB.

"Reduced Ticket Fee Escalator" means any lower percentage increase in the Ticket Fee which may be less than the Ticket Fee Escalator on a License Period-by-License Period basis as determined by Licensor in its sole and absolute discretion.  Such Reduced Ticket Fee Escalator may also be zero if the Licensor determines not to increase the Ticket Fee for any subsequent License Period.

"Regular Season" means the MLB regular season during which the Club participates in such number of Games as determined by MLB and that commences and ends on such dates as determined by MLB as originally scheduled and published by MLB.

"Seating Area" shall have the meaning assigned thereto in the License Agreement.

"Sports Participant" means any umpire, referee, player, coach, manager, security personnel, groundskeeper, Stadium operations employee or any other sanctioned participant, such as musicians, band members, color guards, etc.

"Stadium" means Yankee Stadium located at One East 161st Street in the Bronx, New York and the areas surrounding the Stadium, including parking lots.

"Suite Lounges" means the two (2) lounge areas located in proximity with the Seating Area down the foul lines toward right and left field past each dugout.

"Taxes" mean any and all use, sales, privilege, rental, admission, amusement, entertainment, occupancy and other taxes, charges, impositions, levies, fees and assessments that are or may be assessed, levied or imposed with respect to the Legends Suite, the Agreement, the License Fee, the License Agreement, the Ticket Fee, the Food and Beverage Agreement, the Food and Beverage Fee and any other services, benefits and/or transactions contemplated by this Agreement, such as Parking Passes, food, beverages, use of the Legends Suite, etc. (but specifically excludes Licensor's income taxes), regardless of whom the tax, charge, imposition or levy is assessed, levied or imposed upon (*i.e.*, Licensor or Licensee).

"Territory" means: (i) the State of New York; (ii) the State of Connecticut; (iii) the State of New Jersey; and (iv) the State of Pennsylvania.

"Ticket(s)" mean(s) ticket(s), pass(es), code(s) or equivalent(s) permitting admission to the Legends Suite corresponding to the Seating Location(s) designated thereon that Licensee: (a) is required to license for the Games pursuant to the terms and conditions set forth in the Agreement; and (b) subject to Sections 5.2 through 5.5 of Exhibit A (Terms and Conditions), may license for Jewel Events and Other Events.

xvii

"Ticket Account" means the record maintained by Licensor that contains information concerning Licensee and the Tickets licensed by Licensee pursuant to this Agreement.

"Ticket Fee" means the amount payable by Licensee to Licensor for the Tickets to the Games covered by the Ticket Plan for each License Period during the Term.  The Ticket Fee for each subsequent License Period during the Term, after the first License Period shall be equal to the sum of: (a) the Ticket Fee for the immediately preceding License Period; plus (b) the product obtained by multiplying: (i) the Ticket Fee for the immediately preceding License Period by (ii) the Ticket Fee Escalator.

"Ticket License" means the revocable, non-exclusive license granted by Licensor to Licensee for the Seating Locations in the Legends Suite pursuant and subject to the terms and conditions set forth in the Agreement and the License Agreement. Each Ticket represents a separate Ticket License.

"Ticket Plan" means the plan pursuant to which Licensee licenses Tickets for the Seating Locations, with the specific number of Games and specific Games included in such plan determined by the Licensor.  For example, a Full Season Ticket Plan shall be for all Games.  As a further example, a Partial Season Ticket Plan shall be for a certain number of Games, with the specific Games included in such Partial Season Ticket Plan determined by Licensor.

"Total Fee" means the sum total of the Ticket Fee, License Fee and Food and Beverage Fee in each applicable License Period during the Term.

xviii

20-Game Legends Suite Ticket Agreement for Two (2) License Periods (Plan 2)

# EXHIBIT B

# Health Notice

Unless otherwise defined or the context requires a different definition, all capitalized terms shall have the meanings assigned to such terms in Section 14 of Exhibit A (Terms and Conditions).

1.      COVID-19 AND OTHER INFECTIOUS AND/OR COMMUNICABLE DISEASES, VIRUSES, BACTERIA OR ILLNESSES.

(a)      COVID-19 IS AN EXTREMELY CONTAGIOUS DISEASE THAT CAN LEAD TO SEVERE ILLNESS AND DEATH. AN INHERENT RISK OF EXPOSURE TO COVID-19 EXISTS IN ANY PUBLIC PLACE INCLUDING THE STADIUM REGARDLESS OF PRECAUTIONS THAT MAY BE TAKEN. LICENSEE/INVITEE AGREES TO: (i) ASSUME ALL RISKS ASSOCIATED WITH COVID-19 AND OTHER COMMUNICABLE DISEASES; AND (ii) COMPLY WITH ALL RELATED HEALTH & SAFETY POLICIES OF THE LICENSOR AND THE STADIUM.

(b)      Licensee/Invitee acknowledges and agrees to comply with: (i) all relevant policies and protocols issued by the Licensor and/or the Stadium, including any policies and protocols regarding security, bags, fan conduct and health and safety, currently available at https://www.mlb.com/yankees/ballpark/information, all of which, due to the evolving nature of the COVID-19 pandemic, may continue to be updated from time to time between purchase of the Ticket and the ticketed Game, Jewel Event or Other Event date; and (ii) all current guidance of the Centers for Disease Control and Prevention ("CDC") and all applicable Laws and policies of federal, state, city and local authorities.

2.      FAN HEALTH PROMISE.

(a)      Licensee/Invitee acknowledges and understands that, if infected with COVID-19 or other Communicable Disease, Licensee/Invitee may infect others that they may subsequently come in contact with, even if they are not experiencing or displaying any symptoms of illness, and that the risk of exposure to others remains at all times. Accordingly, Licensee/Invitee agrees that Licensee/Invitee will not attend the Game, Jewel Event or Other Event, if within ten (10) days preceding the Game, Jewel Event or Other Event, they have:

(i)      tested positive or presumptively positive for COVID-19 or other Communicable Disease or been identified as a potential carrier of COVID-19 or other Communicable Disease; OR

(ii)      experienced any symptoms commonly associated with COVID-19 or other Communicable Disease; OR

(iii)      been in direct contact with or the immediate vicinity of any person who is confirmed or suspected of being infected with COVID-19 or other Communicable Disease.

3.      RESALE TERMS AND POD INTEGRITY (AS APPLICABLE).

(a)      Licensee/Invitee agrees to comply with all terms and conditions presented at the time of purchase not specifically enumerated herein, including (i) terms that mandate or prescribe the quantity of Tickets available to be purchased, (ii) additional requirements regarding Accompanying Party(ies) and (iii) terms regarding the resale or transfer of Tickets.

4.      ASSUMPTION OF RISK RELATED TO COVID-19 AND OTHER COMMUNICABLE DISEASES.

(a)      Licensee/Invitee acknowledges and expressly assumes all risks that are in any way related to or arising from being exposed to or contracting COVID-19 or other Communicable Disease in the Stadium. By using the Ticket, Licensee/Invitee is acknowledging and confirming, both now and in the future, that Licensee/Invitee understands and expressly assumes the risk that Licensee/Invitee may be exposed to COVID-19 or other Communicable Disease. Licensee/Invitee expressly understands that these risks include contracting COVID-19 or other Communicable Disease and the associated dangers, medical complications and physical and mental injuries, both foreseen and unforeseen, that may result from contracting COVID-19 or other Communicable Disease. Licensee/Invitee further acknowledges and understands that any interaction with the general public poses an elevated, inherent risk of being exposed to and contracting Communicable Disease, including COVID-19, that it cannot be guaranteed that Licensee/Invitee will not be exposed, and that as such, potential exposure to or contraction of COVID-19 or other Communicable Disease are risks inherent in Licensee's/Invitee's decision to use the Ticket that cannot be eliminated.

i

20-Game Legends Suite Ticket Agreement for Two (2) License Periods (Plan 2)

5.      RELEASE OF LIABILITY AND COVENANT NOT TO SUE.

        (a)      LICENSEE/INVITEE, ON BEHALF OF LICENSEE/INVITEE AND THEIR PERSONAL REPRESENTATIVES, HEIRS, SPOUSE, GUARDIANS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, NEXT OF KIN AND ANY OTHER PERSON OR ENTITY THAT MAY BE ENTITLED TO MAKE A CLAIM ON THEIR BEHALF, WAIVES, RELEASES, DISCHARGES, HOLDS HARMLESS AND COVENANTS NOT TO SUE THE RELEASED PARTIES WITH RESPECT TO ANY CLAIM, LIABILITY OR DEMAND OF WHATEVER KIND OR NATURE, EITHER IN LAW OR IN EQUITY (INCLUDING FOR PERSONAL INJURIES OR WRONGFUL DEATH) THAT MAY ARISE IN CONNECTION WITH, OR RELATE IN ANY WAY TO, (i) USE OF THE TICKET, (ii) PRESENCE AT THE STADIUM OR (iii) PARTICIPATION IN THE GAME, JEWEL EVENT OR OTHER EVENT OR ANY RELATED ACTIVITIES ARRANGED, PROMOTED AND/OR SPONSORED BY THE LICENSOR OR OTHER RELEASED PARTIES, INCLUDING THOSE CLAIMS THAT ARISE AS A RESULT OF: (A) IN WHOLE OR IN PART, THE SOLE, JOINT, OR COMPARATIVE NEGLIGENCE, OR STRICT LIABILITY, OF THE RELEASED PARTIES AND/OR (B) THE INHERENT RISKS ASSOCIATED WITH VISITING THE STADIUM, INCLUDING (I) ALL CLAIMS FOR PERSONAL INJURIES, WRONGFUL DEATH OR EXPOSURE TO OR CONTRACTION OF COVID-19 OR OTHER COMMUNICABLE DISEASE BY LICENSEE/INVITEE, OR OTHER INDIVIDUALS EXPOSED TO COVID-19 OR OTHER COMMUNICABLE DISEASE BY LICENSEE/INVITEE; AND (II) ALL CLAIMS IN CONNECTION WITH THE APPLICATION OF ANY HEALTH AND SAFETY PROTOCOLS TO LICENSEE/INVITEE.

        (b)      The acknowledgements and express assumptions of risk, waivers of claims, and releases of liability contained herein are binding and full waivers of claims and releases of liability, and interpreted to be as broad and inclusive as is permitted by Law, including with respect to any controversy, claim or dispute that may arise related to exposure or contraction of COVID-19 or other Communicable Disease. If any part hereof is held to be invalid or legally unenforceable for any reason, the remainder of these terms shall not be affected thereby and shall remain valid and fully enforceable.

6.      FULLY VACCINATED SEATING SECTIONS (AS APPLICABLE).

        (a)      Licensor may offer seating sections at full capacity without physical distancing for persons who have been fully vaccinated against COVID-19 ("Fully Vaccinated Seating Sections").

        (b)      In order to be permitted entry into the Stadium and to sit in a Fully Vaccinated Seating Section, a ticket holder (5 years or older) must show proof of full COVID-19 vaccination.

        (c)      According to the CDC, a person is considered fully vaccinated against COVID-19: (A) two (2) weeks or more after receiving the second dose in a 2-dose series (*e.g.*, Pfizer-BioNTech or Moderna); or (B) two (2) weeks or more after they have received a single-dose vaccine (*e.g.*, Johnson and Johnson [J&J]/Janssen).

        (d)      Acceptable forms of proof of full COVID-19 vaccination include: (i) a CDC-approved COVID-19 Vaccination Record Card; (ii) Excelsior Pass; (iii) a government-issued photograph identification and proof of vaccination form; or (iv) electronically stored versions of any of the foregoing.

        (e)      Guests 4 years old and younger who accompany a fully vaccinated person in a Fully Vaccinated Seating Section are exempt from providing proof of being fully vaccinated against COVID-19.

ii

20-Game Legends Suite Ticket Agreement for Two (2) License Periods (Plan 2)

**LEGENDS SUITE FOOD AND BEVERAGE AGREEMENT**
**(20 Games – Plan 2)**

Dear Licensee:

Reference is hereby made to that certain Legends Suite License Agreement (the "<u>License Agreement</u>") entered into or being entered into between Jennifer Kutler and the New York Yankees Partnership, with respect to the Seating Locations. Unless otherwise defined herein or the context requires a different definition, capitalized terms herein shall have the meanings provided for in Section 15 of Exhibit A (Terms and Conditions) to the License Agreement. In accordance with the License Agreement, and as required thereby, you, as Licensee, are entering into this Food and Beverage Agreement (the or this "<u>Agreement</u>") with Legends Hospitality, LLC (the "<u>Concessionaire</u>").

1.      <u>TERM</u>.  The term of the Food and Beverage Agreement will be coterminous with the License Agreement.

2.      <u>FOOD AND BEVERAGE FEES</u>.

        (a)      (i)      In consideration for the services and benefits provided for in <u>Section 3</u>, below, for the first License Period, Licensee shall pay to the Concessionaire a Food and Beverage Fee of Eight Thousand Dollars and Zero Cents ($8,000.00).

                (ii)      Thereafter, during the remainder of the Term, the Food and Beverage Fee shall increase annually by a maximum of four and one-half percent (4.5%) (the "<u>Food and Beverage Fee Escalator</u>") compounded on a License Period-by-License Period basis following the first License Period. For example, the Food and Beverage Fee for the second License Period shall be Eight Thousand Three Hundred Sixty Dollars and Zero Cents ($8,360.00) (*i.e.,* $8,000.00 x 1.045% = $8,360.00).

        (b)      Each License Period's Food and Beverage Fee shall be due and payable as follows:

                (i)      For the 2023 License Period, payment shall be due in full upon execution of the Agreement by Licensee, unless otherwise agreed to between the parties; and

                (ii)      For all remaining License Periods during the Term, payment shall be due on December 31 of the year prior to the applicable License Period (*i.e.*, December 31, 2023, for the 2024 License Period; December 31, 2024, for the 2025 License Period; etc.).

        (c)      Notwithstanding anything to the contrary in the Agreement, Licensee acknowledges that each License Period's Food and Beverage Fee Escalator shall be determined by the Concessionaire in its sole and absolute discretion.  Accordingly, and for each successive License Period during the Term after the first License Period, nothing contained herein prohibits the Concessionaire from either: (i) not increasing the License Period's Food and Beverage Fee; or (ii) increasing the License Period's Food and Beverage Fee by a percentage lower than the Food and Beverage Fee Escalator.  Licensee further acknowledges that any application of a Reduced Food and Beverage Fee Escalator by the Concessionaire: (iii) does not create an expectation that a Reduced Food and Beverage Fee Escalator(s) must be applied to the Food and Beverage Fee in any future License Period; and (iv) does not create an entitlement to any future Reduced Food and Beverage Fee Escalator(s).  Furthermore, and notwithstanding anything to the contrary contained in this Agreement, if the Concessionaire applies a Reduced Food and Beverage Fee Escalator for any given License Period, the Concessionaire shall be permitted to equalize any subsequent License Period's Food and Beverage Fee so that the amount payable by Licensee to the Concessionaire for such License Period is equal to the amount Licensee would have paid had the Food and Beverage Fees for each License Period (after the first License Period)

1

been increased for each License Period by the Food and Beverage Escalator on a compounded basis commencing with the second License Period.

(d)     Furthermore, and notwithstanding anything to the contrary in this Agreement, the License Agreement and/or the Ticket Agreement, the Concessionaire may adjust each Food and Beverage Fee by a percentage greater than or less than the Food and Beverage Fee Escalator (as determined by the Concessionaire in its sole and absolute discretion) on a License Period-by-License Period basis; provided, in no event shall Licensee be required and/or obligated to pay more than the Total Fee for the applicable License Period.

(e)     THE FOOD AND BEVERAGE FEE DOES NOT CONTAIN OR INCLUDE THE COST OR THE PRICE OF ANY FOOD AND BEVERAGES FOR ANY JEWEL EVENTS OR OTHER EVENTS.  FOODSERVICE AND RELATED BENEFITS REFERRED TO IN SECTION 3 HEREIN FOR JEWEL EVENTS OR OTHER EVENTS MAY BE PROVIDED IN THE DISCRETION OF LICENSOR AND THE CONCESSIONAIRE.  THE PROVISION OF SUCH FOODSERVICE AND RELATED BENEFITS SHALL BE AS DETERMINED BY LICENSOR AND THE CONCESSIONAIRE AND WILL BE SUBJECT TO SEPARATE FOOD AND BEVERAGE FEES AND CHARGES WHICH SHALL EITHER BE PAYABLE IN ADVANCE, WHEN TICKETS ARE PURCHASED FOR SUCH JEWEL EVENTS OR OTHER EVENTS, OR PAYABLE AT THE TIME OF THE JEWEL EVENT OR OTHER EVENT, AS DETERMINED BY LICENSOR AND THE CONCESSIONAIRE.

(f)     If, during the Term, any Jewel Events or Other Events are held at the Stadium and Licensor and/or Concessionaire requires that foodservice benefits be purchased in advance in connection with the purchase of Tickets for any such Jewel Event or Other Event (both of the foregoing to the extent Licensee is eligible to purchase Tickets as determined by Licensor), Licensee's election to license Tickets to any such Jewel Event or Other Event shall be deemed Licensee's agreement to pay the separately provided for Food and Beverage Fee, applicable to each Ticket pertaining to the Seating Locations for each such Jewel Event or Other Event.  If the maximum number of Jewel Events to which Licensee has licensed Tickets are not played, any Food and Beverage Fees paid with respect to such Jewel Event Tickets for such unplayed Jewel Events will be refunded to Licensee unless, with the exception of the final License Period of the Term, Licensee agrees to apply such refund to the Food and Beverage Fee, with respect to Games, for the License Period immediately following the License Period during which the relevant Jewel Event(s) took place.

(g)     With respect to applicable Jewel Events and Other Events for which foodservice benefits are available hereunder and required to be paid for in advance, the Food and Beverage Fee applicable to each of the Tickets for the first License Period during the Term is One Hundred Dollars and Zero Cents ($100.00) for each Ticket to any Jewel Event or Other Event.  For each License Period during the Term thereafter, the Food and Beverage Fee applicable to each of the Tickets for each applicable Jewel Event or Other Event shall be as determined by the Concessionaire from time to time.  Payment in full to the Concessionaire for all Food and Beverage Fees with respect to all applicable Jewel Events and Other Events that are required to be paid in advance shall be paid in full with payment for Tickets for such applicable Jewel Events and Other Events.

(h)     LICENSEE ACKNOWLEDGES THAT THE TOTAL NUMBER OF GAMES THAT COMPRISES A REGULAR SEASON SHALL BE DETERMINED BY MLB.  LICENSEE SHALL NOT BE ENTITLED TO ANY REFUND OF THE FOOD AND BEVERAGE FEE IF THE TOTAL NUMBER OF GAMES INCLUDED IN THE TICKET PLAN IS REDUCED AS A RESULT OF MLB'S DETERMINATION THAT A REGULAR SEASON IS COMPRISED OF LESS THAN 81 GAMES.  INSTEAD, THE FOOD AND BEVERAGE FEE WILL BE APPORTIONED OVER THE

2

ACTUAL TOTAL NUMBER OF GAMES IN THE TICKET PLAN AS DETERMINED BY LICENSOR.

(i)     For purposes of this Agreement:

(i)     "Food and Beverage Fee" means: (A) the amount payable by Licensee to the Concessionaire for the foodservice at the Games for each License Period; and (B) the amount payable by Licensee to the Concessionaire for foodservice at each Jewel Event and/or Other Event.  The Food and Beverage Fee for each subsequent License Period during the Term, after the first License Period shall be equal to the sum of: (X) the Food and Beverage Fee for the immediately preceding License Period; plus (Y) the product obtained by multiplying: (I) the Food and Beverage Fee for the immediately preceding License Period by (II) the Food and Beverage Fee Escalator;

(ii)     "Reduced Food and Beverage Fee Escalator" means any lower percentage increase in the Food and Beverage Fee which may be less than the Food and Beverage Fee Escalator on a License Period-by-License Period basis as determined by the Concessionaire in its sole and absolute discretion. Such Reduced Food and Beverage Fee Escalator may also be zero if the Concessionaire determines not to increase the Food and Beverage Fee for any subsequent License Period; and

(iii)     "Food and Beverage Fee Escalator" means the percentage increase of in the Food and Beverage Fee set forth in the Agreement and compounded on a License Period-by-License Period basis following the first License Period.

3.     SERVICES AND OTHER BENEFITS.  During the Term, the Concessionaire shall provide the holder of a Ticket for Games the following:

(a)     All-inclusive food and non-alcoholic beverages at the Legends Club, Suite Lounges and in the applicable Seating Locations, including fine dining and performance-cooking stations. Special dietary requirements or considerations will be accommodated, subject to reasonable requirements of the Concessionaire and prior notice requirements, which will be announced.  Food selections and menus will be varied and subject to changes, in the discretion of the Concessionaire, but consistent with Licensor's and the Concessionaire's commitment to high quality food and foodservice, consistent with the premium branding associated with the Legends Suite.  Not all food items will be available during all hours of operation as food offerings will be adjusted during the progression of the Games; specifically, from the opening of the Stadium gates through the end of the Games.  The foregoing will be provided in consideration of the applicable payments provided for in Section 2, above, without additional costs, service charges or other charges, although gratuities may be paid to the wait staff in the discretion of Licensee and its Invitees; and

(b)     Alcoholic beverages shall be available, subject to additional charges, determined in the sole and absolute discretion of the Concessionaire.  The availability of and purchase of alcoholic beverages shall be subject to all applicable Laws of the relevant regulatory authorities, as well as any alcohol control procedures of MLB or other appropriate procedures of the Concessionaire or Licensor.

(c)     The temporary unavailability of one or more of the foregoing services shall not constitute a breach by Licensor under the Agreement or by the Concessionaire hereunder or entitle Licensee to any compensation, credits, rebates, refunds, offsets, make goods or any other remedies.  The foodservice benefits provided for herein may be used on Game days only by persons holding valid Tickets for the then current Game day for Licensee's Seating Locations and are not otherwise transferable. The right to use and obtain the foodservice benefits applicable to each Game has no cash value and the failure to make use of such foodservice benefits with respect to any Game shall not result in any credits, refunds, offsets, make-goods, remedies or other forms of price adjustment.

3

(d)    During the Term, the provision of foodservice benefits comparable to the foregoing for Jewel Events and/or Other Events is subject to the determination of Licensor, in its discretion, that the purchase of Tickets for Jewel Events and/or Other Events shall require the purchase by Licensee of such foodservice benefits, in accordance with this Agreement.

4.    DEFAULT AND TERMINATION.

(a)    Default.  Licensee shall be in default under this Agreement upon the occurrence of any one or more of the following events (any such event, an "Event of Default"):

(i)    Licensee fails to pay, as and when due, any portion of any: (A) Food and Beverage Fee; (B) other food and beverage fees; or (C) other fees, charges, or amounts due to be paid to the Concessionaire in accordance with this Agreement.

(ii)    Licensee fails to enter into the License Agreement and/or Ticket Agreement and license the requisite number of Tickets to the Games pursuant to the terms and conditions of the License Agreement and/or Ticket Agreement.

(iii)    Licensee fails to perform or observe any terms, conditions, covenants or obligations under this Agreement, the License Agreement and/or Ticket Agreement within ten (10) days after Licensor gives Licensee notice of such failure including any failure to pay the License Fee, Ticket Fee and/or Taxes and the costs associated with any Tickets and Taxes to Jewel Events and/or Other Events licensed by Licensee.

(iv)    The License Agreement and/or Ticket Agreement is terminated for any reason other than breach thereof by Licensor or any express provision contained in the License Agreement or Ticket Agreement herein contained permitting Licensee to terminate any of such agreements.

(v)    Licensee and/or any Invitees engage(s) in any illegal activity or commit(s) any material or repeat violation of any provision of this Agreement or any of Licensor's rules and regulations pertaining to the use of the Legends Suite or the Stadium.

(b)    Remedies.  Upon the occurrence of any Event of Default, the Concessionaire may, in addition to all other rights and remedies that it may have, at its option and with or without notice to Licensee, do any one or more of the following:

(i)    cause Licensee to be denied the right to access any of the Legends Club and Suite Lounges and suspend all rights to any foodservice benefits provided under this Agreement;

(ii)    terminate all rights and privileges of Licensee under this Agreement and, as liquidated damages and not as a penalty, declare the entire total unpaid balance of the Food and Beverage Fee for the remainder of the Term, immediately due and payable, whereupon neither the Concessionaire nor Licensor shall have any further obligation of any kind to Licensee hereunder. Neither the Concessionaire nor Licensor shall have any duty to mitigate any damages incurred by it as a result of a default by Licensee hereunder; and/or

(iii)    terminate all rights and privileges of Licensee under this Agreement, whereupon: (A) this Agreement shall automatically terminate; (B) Licensor and the Concessionaire shall have no further obligation of any kind to Licensee hereunder; and (C) the Concessionaire may recover from Licensee, and Licensee shall pay to the Concessionaire, all damages the Concessionaire and Licensor may incur by reason of the Event of Default, including the costs of recovering all unpaid amounts due with respect to periods prior to termination.

(c)    Attorneys' And Professionals' Fees And Costs.  Upon any Event of Default, the prevailing party shall be entitled to recover all reasonable attorneys' and professionals' fees and

4

expenses and costs (including arbitration fees and costs) incurred in connection with such Event of Default.

5.      ENTIRE AGREEMENT; MODIFICATION; NO WAIVER.  This Agreement contains the entire agreement of the parties with respect to the matters provided for herein and shall supersede any representations or agreements previously made or entered into by the parties hereto (whether oral or written).  No amendment modification or waiver to this Agreement shall be valid or enforceable unless in writing, signed by both parties.  The failure of the Concessionaire to insist on any one or more instances upon the strict performance of the representations, warranties, covenants, agreements, terms, provisions or conditions of this Agreement or to exercise any election herein contained, shall not be construed as a waiver or relinquishment for the future of such covenant, agreement, term, provision, condition or election, but the same shall continue and remain in full force and effect.  The rights and remedies herein provided are cumulative and may be exercised singly or concurrently and are not exclusive of any rights or remedies provided by Law.

6.      MISCELLANEOUS.

(a)      The following provisions set forth in Exhibit A (Terms and Conditions) to the License Agreement are incorporated herein by reference thereto, as though each of such provisions was set forth fully in this Agreement, except the references therein to "Agreement" shall mean this Food and Beverage Agreement and references therein to Licensor shall mean the Concessionaire, unless the context otherwise requires: Section 13 (Mandatory Arbitration Agreement & Class Action Waiver); Section 14.3 (Governing Law); Section 14.4 (Notices); Section 14.6 (Binding Effect); Section 14.7 (Severability); Section 14.8 (Time of Essence); Section 14.9 (Counterparts); Section 14.14 (Subservience)(except for last sentence of Section 14.14(a), which has no applicability to the subject matter of this Agreement); Section 14.15 (No Presumptions); and Section 14.16 (Certain Rules of Interpretation).


AGREED & ACCEPTED:

LICENSEE:                                    CONCESSIONAIRE:
JENNIFER KUTLER                              LEGENDS HOSPITALITY, LLC

By: _____               By: _____
Name: JENNIFER KUTLER                        Name: Marty Greenspun
Title: Payroll Specialist                    Title:   Chief Customer Officer
Date: August 15, 2022
Address:  400 Thomas Ave.
          Floor 2
          Lyndhurst, NJ 07071-3100